**No. 25-10676**

# United States Court of Appeals

*for the*

# Eleventh Circuit

———— • ————

WALTER PETTAWAY, as Administrator of the
Estate of Joseph Lee Pettaway, deceased,

*Plaintiff-Appellant,*

– v. –

ERNEST N. FINLEY, JR., *et al.*,

*Defendants,*

NICHOLAS D. BARBER, ERNEST N. FINLEY,
THE CITY OF MONTGOMERY, ALABAMA,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA IN CASE NO. 2:19-cv-00008-ECM-JTA,
(HONORABLE EMILY COODY MARKS, CHIEF U.S. DISTRICT JUDGE)

## OPENING BRIEF OF APPELLANT

HORACE E. NIX, JR.
LAW OFFICES OF H.E. NIX
P.O. Box 241892
Montgomery, Alabama 36124
(334) 279-7770

GRIFFIN SIKES, JR.
LAW OFFICES OF GRIFFIN SIKES, JR.
3058 Bankhead Avenue
Montgomery, Alabama 26106
(334) 233-4070

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (812323)

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

Docket No. 25-10676

CERTIFICATE OF INTERESTED PERSONS

AND CORPORATE DISCLOSURE STATEMENT

OF APPELLANT WALTER PETTAWAY

WALTER PETTAWAY, Appellant

v.

THE CITY OF MONTGOMERY, ALABAMA,
and ERNEST FINLEY, et al.,

Appellant On Appeal from Memorandum Opinion and Order Granting Summary Judgment to the City of Montgomery and Ernest Finley (Doc.433) and Order (Doc.434) of the United States District Court for the Middle District of Alabama,

Case No. 2:19-cv-00008-ECM-JTA

A.

Adams, Hon. Jerusha T., U. S. Magistrate Judge, M.D. Ala.

Barber, Nicholas, Defendant/Appellant

Bellinger, Stacy, Counsel for Defendant/Appellee, City of Montgomery

Brasfield, Sydney, Counsel for Defendant/Appellant, Nicholas Barber, and

Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley

Chambliss, Rebecca L., Counsel for Defendant/Appellant, Nicholas Barber

City of Montgomery, Alabama, Defendant/Appellee

Finley, Ernest, Defendant/Appellee

C-1

Flournoy, Neal, former Defendant

Gray Jr., William Patton, Counsel for former Defendant, Ryan Powell

Green, Michael, former Defendant

Ingram, Allison A., Counsel for Defendant/Appellant, Nicholas Barber, and
    Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley

Marks, Hon. Emily C., Chief U. S. District Judge, M.D. Ala.

Neeley, Graham R., Counsel for Defendant/Appellant, Nicholas Barber, and
    Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley

Nix Jr., Horace Earl, Counsel for Plaintiff/Appellee, Walter Pettaway

Norris, John David, Counsel for former Defendant, Neal Flournoy

Powell, Ryan, former Defendant

Ruiz, Bianka, former Defendant

Sheehan Jr., C. Winston, Counsel for Defendant/Appellant, Nicholas Barber, and
    Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley

Sikes Jr., Griffin, Counsel for Plaintiff/Appellee, Walter Pettaway

Smith, Joshua Taylor, former Defendant

Thrasher, Justin, former Defendant

Watts, Keiundra, former Defendant

B.

Appellant Walter Pettaway is an individual. Appellee Ernest Finley is an individual.
Appellee City of Montgomery, Alabama is a municipality.

Respectfully submitted,

/s/ Griffin Sikes, Jr.
Griffin Sikes, Jr.
Attorney for Plaintiff/Appellant Walter Pettaway

C-2

Certificate of Service

I hereby certify that on March 28, 2025, the foregoing has been served upon the following counsel of record by electronic filing and notification through CM/ECF with the Eleventh Circuit Court of Appeals:

Stacy L. Bellinger, Esq.
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

Allison A. Ingram, Esq., Counsel for Defendant/Appellee, Nicholas Barber, and
        Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley
BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680
ALA@ball-ball.com

Sheehan, Jr., C. Winston, for Defendant/Appellant, Nicholas Barber, and
        Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley
BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680
wsheehan@ball-ball.com

Neeley, Graham R., Counsel for Defendant/Appellant, Nicholas Barber, and
        Defendants/Appellees, City of Montgomery, Alabama and Ernest Finley
BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045

C-3

Post Office Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680
gneeley@ball-ball.com

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Walter Pettaway does not request oral argument.

**TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT OF SUBJECT-MATTER
    AND APPELLATE JURISDICTION ....................................................... viii

STATEMENT REGARDING ADOPTION
    OF BRIEFS OF OTHER PARTIES ..............................................................1

STATEMENT OF THE ISSUE.........................................................................1

STATEMENT OF THE CASE...........................................................................1

    I.     COURSE OF THE PROCEEDINGS.....................................................1

    II.    STATEMENT OF THE FACTS ............................................................4

        A.    Introduction....................................................................................4

        B.    Events before the police dog attack began.................................6

        C.    Events during and after the police dog attack...........................8

        D.    City Policy – Written Directive 3.3.5 .......................................11

        E.    City's knowledge .........................................................................14

            1.    MPD police have and will inflict life-threatening
                 injuries on arrestees .........................................................14

            2.    Many life-threatening injuries require immediate
                 medical care ......................................................................14

            3.    MPD does not train, require training, or employ
                 police trained in first aid................................................15

            4.    EMTs will not arrive in time to provide "prompt
                 medical care" ...................................................................16

        F.    Failure to provide prompt medical care to Mr. Pettaway
            caused his death .........................................................................18

    III.   STANDARD OF REVIEW .................................................................21

SUMMARY OF THE ARGUMENT ...................................................................21

A.   All Elements of a Monell claim were proven .....................................21

(1)   City's failure to provide prompt medical care was a
constitutional violation.................................................................22

(2)   City policy constituted deliberate indifference to that
constitutional right ......................................................................22

(3)   City policy caused the violation of its duty to provide
prompt medical care....................................................................24

B.   Rule 56 was circumvented and violated.............................................24

C.   Causation was proven.........................................................................27

ARGUMENT ......................................................................................................28

A.   Introduction to plaintiff's Monell claim and its basis .........................28

B.   All requisite elements of a Monell claim were established ................32

(1)   A constitutional rights violation was established by the
evidence .......................................................................................33

(2)   Directive 3.3.5 is deliberately indifferent to due process
medical care rights ......................................................................38

(3)   Directive 3.3.5 was a proximate cause of failure to
provide prompt medical care ......................................................42

C.   Rule 56 was ignored, circumvented and violated by the
district court.........................................................................................44

(1)   A constitutional violation by an individual policeman is
not required by Monell.................................................................47

(2)   Cities, not policemen, have a duty to provide medical
aid to injured arrestees ...............................................................50

(3)   Calling EMTs does not satisfy the City's duty when
immediate care is needed ...........................................................52

CONCLUSION ...................................................................................................55

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*American Surety Co. v. Pauly*,
170 U.S. 160 (1898)................................................................ 27, 53, 54

*Anderson v. City of Atlanta*,
778 F.2d 678 (11th Cir. 1985) ...................................................... 48, 50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................46

*Barnett v. Macarthur*,
956 F.3d 1291 (11th Cir. 2020) .......................................... 25, 46, 47, 48, 49, 50

*Barrett v. Orange Cty. Human Rights Comm'n*,
194 F.3d 341 (2nd Cir. 1999) ...........................................................48

*Battat v. QBE Specialty Ins. Co.*,
2022 U.S. Dist. LEXIS 16984 (N.D.Ga. 2022) .....................................54

*Bodo v. Geovera Specialty Ins. Co.*,
2019 U.S. Dist. LEXIS 232690 (M.D. Fla. 2019)..................................54

*Bozeman v. Orum*,
422 F.3d 1265 (11th Cir. 2005) ............................................ 26, 27, 35

*City of Canton v. Harris*,
489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) .................................50

*City of Revere v. Mass. General Hosp.*,
463 U.S. 239 (1983)............................ 8, 22, 25, 26, 35, 36, 37, 38, 46, 51, 52, 56

*Clark v. Rockhill Ins. Co.*,
2019 U.S. Dist. LEXIS 185818 (M.D. Fla. 2019)..................................54

*Deshaney v. Winnebago County Dep't of Social Services*,
489 U.S. 189 (1989).......................................................... 25, 52

*El Faro Assembly of God, Inc. v. Am. States Ins. Co.*,
2017 U.S. Dist. LEXIS 25350 (M.D. Fla. 2017)....................................55

*Fagan v. City of Vineland*,
22 F.3d 1283 (3rd Cir. 1994) ...........................................................48

*Fairley v. Luman*,
281 F.3d 913 (9th Cir. 2002) ...........................................................49

iv

*Garcia v. Salt Lake City*,
  768 F.2d 303 (10th Cir. 1985) ...................................................................49

*House, Inc. v. City of Dothan*,
  2024 U.S. App. LEXIS 2142 (11th Cir. 2024) ..................................................44

*King v. Reap*,
  269 F. App'x 857 (11th Cir. 2008)........................................... 2, 8, 22, 33, 46, 53

*Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*,
  920 F.3d 704 (11th Cir. 2019) ...................................................................21

*Melton v. Abston*,
  841 F.3d 1207 (11th Cir. 2016) ....................................................... 24, 39, 41, 46

*Merchs. Bonding Co. v. Hous. Auth. of the Birmingham District*,
  2013 U.S. Dist. LEXIS 205743 (N.D. Ala. 2013).................................................54

*Meredian Holdings Grp., Inc. v. Pereira*,
  2020 U.S. Dist. LEXIS 265157 (M.D. Ga. 2020) .................................................54

*Metro. Life Ins. Co. v. Liebowitz*,
  2023 U.S. App. LEXIS 17326 (11th Cir 2023) ....................................................54

*Milledge v. Fla. Dep't of Corr. Secy*,
  760 Fed. Appx. (11th Cir. 2019)...................................................................... 23, 41

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)................................................................................3

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978).................................................................. 25, 32, 46, 49, 50

*Oriole Gardens Condos., III v. Independence Cas. & Sur. Co.*,
  2012 U.S. Dist. LEXIS 29100 (S.D. Fla. 2012) ............................................. 54-55

*Oxford N. Shore Med. Ctr., Inc. v. CIGNA Health*,
  68 F.4th 1241 (11th Cir. 2023) ................................................................ 44, 45

*Phillips v. Assocs. Asset Recovery, LLC*,
  2025 U.S. Dist. LEXIS 12937 (N.D. Ga., 2025) .................................................54

*Reid v. Streit*,
  697 Fed. Appx. 968 (11th Cir. 2017)........................................................... 26, 52

*Rogers v. Sheriff of Santa Rosa Cnty.*,
  2023 U.S. App. LEXIS 6482 (11th Cir. 2023) ...................................... 25, 46, 49

*Speer v. City of Wynne*,
  276 F.3d 980 (8th Cir. 2002) .....................................................................49

*Swint v. Chambers County Comm'n*,
  514 U.S. 35 (1995)..................................................................................3

*Teel v. Lozada*,
  99 F.4th 1273 (11th Cir. 2024) ..................................................... 21, 32, 45

*Thomas v. Cook Cty. Sheriff's Dep't*,
  604 F.3d 293 (7th Cir. 2010) .................................................................49

*Thomas v. Davie*,
  847 F.2d 771 (11th Cir. 1988) ...............................................................40

*Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*,
  674 F. Supp. 2d 1333 (S.D. Fla. 2009) ...................................................54

*Wideman v. Shallowford Cmty. Hosp., Inc.*,
  826 F.2d 1030 (11th Cir. 1987) ...................................................... 27, 36

*Yacht Club on the Intracoastal Condo. Ass'n v. Lexington Ins. Co.*,
  599 Fed. Appx. 875 (11th Cir 2015)........................................................54

## Constitutional Provisions

U.S. Const. amend. I  ...............................................................................1

U.S. Const. amend. IV  ................................................... 49, 50, 51, 52

U.S. Const. amend. XIV  .................................................... 1, 2, 42, 52

## Statutes & Other Authorities:

28 U.S.C. § 1291 ......................................................................................3

42 U.S.C. § 1983 ...................................... 1, 2, 3, 24, 32, 47, 48, 49, 50

City Rule 30(b)(6)........................................ 12, 15, 28, 30, 31, 33, 38

City Written Directive 3.3.5.................... 2, 5, 6, 8, 11, 12, 13, 16, 17, 22, 23, 24, 27
  30, 31, 32, 38, 40, 41, 42, 43, 44

Fed. R. Civ. P. 56 ....................................... 1, 24, 28, 37, 44, 45, 46, 55

Fed. R. Civ. P. 56(a)...............................................................................21

American College of Surgeons – Stop The Bleed;
  www.mayoclinichealthsystem.org/-/media/local-files/eau-
  claire/documents/medical-services/ed-trauma/stop-the-bleed-
  booklet.pdf?la=en&hash=83DF7E5ECEAFEF39C89ED037FE39CC77 .... 18, 29

International Association of Chiefs of Police's – Emergency Trauma Care;
https://www.theiacp.org/sites/default/files/2018/08/
Emergency%20Care.pdf ....................................................................................40

U.S. Department of Homeland Security - https://www.dhs.gov/science-and-
technology/news/2022/05/19/st-helps-stop-bleed-fast#:~:text ...........................17

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

Plaintiff-Appellant Walter Pettaway, acting as Administrator of the Estate of Joseph Lee Pettaway, brought this civil action pursuant to 42 U.S.C. §§1983, 1988 and the Fourth and Fourteenth Amendments to the U.S. Constitution.

Subject matter jurisdiction of the district court and this Court are founded upon 28 U.S.C. §§1331 and 1343.

This Court has jurisdiction of this appeal under 28 U.S.C. §1291 as an appeal from the district court's final order in this civil action entered on February 28, 2025 (Doc. 471) which order made final the prior interlocutory order entered on January 31, 2023 (Doc. 433) granting summary judgment to the City of Montgomery on plaintiff's §1983 *Monell* claim against it.

On March 3, 2025, plaintiff filed a timely Notice of Appeal (Doc. 476) of the district court's February 28, 2025 order (Doc. 471) of final judgment against plaintiff and in favor of defendant City on plaintiff's *Monell* claim, as well as all other claims in the action.

viii

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Appellant Walter Pettaway does not request adoption of briefs of any other parties.

## STATEMENT OF THE ISSUE

Did the district court violate Rule 56, F.R.C.P., by granting the City's motion for summary judgment as a matter of law when the evidence submitted presented genuine issues of material fact that precluded summary judgment?

## STATEMENT OF THE CASE

## I.  COURSE OF THE PROCEEDINGS

On January 4, 2019, Walter Pettaway, the brother and Administrator of the Estate of Joseph Lee Pettaway, filed a Complaint (Doc.1) initiating this civil action alleging §1983 wrongful death claims arising from his late brother's death.

The two principal claims in this action, as last amended (Doc. 205), are:

> (1) a §1983 excessive use of force wrongful death claim[1] against Nicholas Barber, a City of Montgomery policeman, alleging his violation of the Fourth Amendment based the death of Joseph Lee Pettaway that his use of force proximately caused; and

---

[1] As noted hereafter, this claim against Barber has now been settled.

1

(2) a §1983 *Monell* wrongful death claim made against the City of Montgomery alleging its violation of the Fourteenth Amendent arising from the City's Written Directive 3.3.5. That policy prohibited its police from providing the "prompt and proper medical care"[2] that cities and counties are required to provide to persons injured by their law enforcement officers and which prohibition caused the failure of the City to provide that required care to Joseph Lee Pettaway and was the "moving force" behind or a proximate cause of his death.

On October 5, 2022, plaintiff filed motions for summary judgment (Doc. 376) against Barber on the §1983 excessive force claim against him; and on the §1983 *Monell* claim alleging the City's denial of his right to medical care to Mr. Pettaway.

Also on October 5, 2022, defendants Barber and the City filed motions for summary judgment (Doc. 378) on the respective claims against them.

On January 31, 2023, the district court entered an Order (Doc. 433) which:

(1) denied defendant Barber's qualified immunity-based motion for summary judgment on the excessive force claim, Doc. 433, p. 24, and

(2) granted defendant City's motion for summary judgment on the failure to provide medical care *Monell* claim, Doc. 433, p. 28

On January 31, 2023, in a separate order (Doc. 434), the district court:

---

[2] *King v. Reap*, 269 F. App'x 857, 860 (11th Cir. 2008):

This Court has held that the denial of ***prompt and proper*** medical care to a pretrial detainee violates the detainee's due process rights. (citations omitted) (emphasis supplied)

2

ORDERED that plaintiff's motion for summary judgment is carried with this case.

On February 7, 2023, Barber appealed the denial of his qualified immunity-based motion for summary judgment on the excessive force claim against him,[3] which was docketed in this Court as Appeal 23-10406.

After briefs were filed in Appeal 23-10406, the Court ordered oral argument (Doc. 42) during the week of July 22, 2024.

However, before oral argument was held, Barber and the plaintiff settled the excessive force claim, the only claim involved in that appeal. The §1983 failure to provide medical care *Monell* claim against the City was not settled.

---

[3] The district court's denial of Barber's qualified immunity-based summary judgment motion on the excessive force claim was within the exception created by *Mitchell v. Forsyth*, 472 U.S. 511 (1985) to the general rule that appellate jurisdiction exists only for final judgments, 472 U.S. at 530:

> a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U. S. C. § 1291 notwithstanding the absence of a final judgment.

Under *Swint v. Chambers County Comm'n*, 514 U.S. 35 (1995), no jurisdiction existed for a cross-appeal of the grant of summary judgment to the City on the *Monell* claim, so no cross-appeal on that claim could be or was then taken.

3

On October 8, 2024, after Barber paid the settlement sum, Barber and the plaintiff filed a Joint Motion to Dismiss Appeal 23-10406 (Doc.49).

On January 15, 2025, this Court granted the joint motion to dismiss Barber's Appeal 23-10406, ordering "The enclosed copy of this Court's Order of Dismissal is issued as the mandate of this Court." (Doc.50-1)

On February 26, 2025, plaintiff filed in the district court a Motion to Dismiss the excessive force claim against defendant Barber and for entry of final judgment in the case. (Doc. 469).

On February 28, 2025, the district court entered an Order (Doc. 470) granting the motion to dismiss the excessive force claim against Barber and a second Order (Doc. 471) entering final judgment against the plaintiff on the *Monell* claim, and made final its prior orders on all claims by dismissing this civil action.

On March 3, 2025, plaintiff filed a Notice of Appeal (Doc. 476) of the district court's grant of final judgment against the plaintiff and in favor of the City of Montgomery on the plaintiff's *Monell* claim.

## II. STATEMENT OF THE FACTS

### A.  Introduction

In plaintiff's Complaint as last amended (Doc. 205), the principal claims were two different claims made against two different defendants arising from two

different sets of actions taken at different times and at different places, and alleging violations of two different constitutional Amendments.

One of these claims – the excessive force claim against Barber – was the subject of a prior interlocutory appeal, Appeal 23-10406, by Barber from the denial of his qualified immunity-based motion for summary judgment on that claim.

While Barber's appeal was pending, the excessive force claim it involved was settled, and Barber's appeal was dismissed before being decided by this Court.

The other claim, the *Monell* claim against the City, was not settled. It is the grant of summary judgment to the City on that claim that is the subject of this appeal.

Although the district court granted the City summary judgment on the *Monell* claim (Doc. 433), that summary judgment did not become final until the district court's entry of final judgment in this case (Doc.471) on February 28, 2025, after which this appeal was timely taken by plaintiff.

The excessive force claim against Barber, which has been settled, arose from former MPD policeman Nicholas Barber's release of a police dog into a house in west Montgomery on July 8, 2018, and the dog's attack on plaintiff's decedent, Joseph Lee Pettaway, in which the dog tore open Mr. Pettaway's left femoral artery.

The *Monell* claim against the City of Montgomery is based on a written policy of the City, Written Directive 3.3.5 (Doc.372-5), which prohibited its police from

5

providing any first aid or medical care to persons, such as Mr. Pettaway, who were injured by the police in the course of being arrested by the City.

As a result of the Directive 3.3.5, prohibiting MPD police from providing Mr. Pettaway with the "prompt and proper medical care" the City was constitutionally required to provide Mr. Pettaway for his torn femoral artery, he bled to death.

The facts concerning and preceding Barber's release of the police dog and its attack have limited value in this appeal, other than for narrative purposes. Those facts set the stage for or inform the Court of how the occasion arose for the City's Written Directive 3.3.5 to have been a proximate cause or "moving force" [4] behind the death of Mr. Pettaway.

Accordingly, we abbreviate recitation of the facts leading up to the dog attack and the rupture of Mr. Pettaway's femoral artery, and instead, focus on the events following the infliction of that injury, since it is those post-attack actions (or inactions) that are the basis for the *Monell* claim against the City in this appeal.

## B.  Events before the police dog attack began

On July 7, 2018, Mr. Pettaway (see photo, Doc.371-1) was 51 years old. He worked that day, as he had for the previous several months, with his childhood

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 at 694 (1978)

friend, James Jones, and a co-worker, Gary Dixon, to repair a small, dilapidated house at 3809 Cresta Circle in Montgomery that had been vacant for some time. Doc.371-2 is a photo of the house in July, 2018; and Doc.371-3 is its floor plan.

In the weeks prior to July 7, 2018, while the house was undergoing extensive repair, including installation of new sheetrock and flooring throughout, its water and power supply were turned off and there was nothing of substantial value in it other than a TV and some work tools.

On Saturday, July 7, 2018, after their work at the house that day was completed, Pettaway, Jones, Dixon and a group of their friends had a barbeque supper in the backyard of the house. Afterward, Dixon stayed at the house to spend the night. Later that night, Mr. Pettaway came back to the house and knocked on the door. Dixon did not answer the knock and not knowing that it was his co-worker Mr. Pettaway who was knocking, Dixon left the house and called the police after he heard someone enter the house (Mr. Pettaway) and reported what he thought to be an intruder in the house.

In addition to MPD officer Barber, four other MPD officers, Keiundra Watts, Bianka Ruiz, Joshua Smith and Ryan Powell, also responded to their dispatcher's call, went to the house and surrounded it, but made no attempt to communicate with the then-unknown house occupant, Mr. Pettaway.

As shown on the Barber video, Doc.370, after Mr. Jones arrived, Barber approached the front door of the house and twice between 3:11:34 AM and 3:11:44 AM uttered a strange, sing-song, unintelligible chant that he contended was a warning to the occupant of the house. He then immediately thereafter released his dog off-leash into the house with the knowledge and intent that the dog would attack any person the dog found inside the house. Prior thereto, MPD police had not made any attempt to communicate with the occupant of the house, Mr. Pettaway; and there is no evidence that Mr. Pettaway was aware of their presence outside the house.

## C. Events during and after the police dog attack

The following events, which occurred after the dog's attack on Mr. Pettaway began, when coupled with the City's Written Directive 3.3.5 (Doc.372-5) are the bases for the *Monell* claim against the City, alleging that City Directive 3.3.5 prohibited MPD police from providing the "prompt and proper medical care" to Pettaway that the City was required to provide to Mr. Pettaway, *King v. Reap*, 269 F. App'x 857 (11th Cir. 2008) and *Revere v. Mass. General Hosp.*, 463 U.S. 239 (1983).

All of the relevant events, actions and inactions at the Cresta Circle house that night were recorded on Barber's body camera. That recording (Doc. 370) (here-

8

inafter "Barber video") is the source for many of the facts and all of the times[5] of the

occurrence of events cited in this brief.  A copy Barber's video (Doc. 370) is included

in the Appendix, but in addition, selected photos downloaded and printed from the

Barber video are also included in the Appendix that are labelled "Barber video photo

exhibits" and are referenced by the time on the time stamp that each photo bears.

The dog found Mr. Pettaway under a bed at 3:15:38 AM (Barber video exhibit

3:15:38) and attacked him with its teeth.  The dog locked its teeth into Mr.

Pettaway's left thigh or crotch where his leg meets his torso.  As the dog tenaciously

held its bite for almost two minutes, the dog shook its head, driving its teeth deeper

into Mr. Pettaway and rupturing his femoral artery.

When first bitten, Mr. Pettaway cried out loudly, as heard at 3:15:38 AM on

the Barber video.  The dog's attack and Mr. Pettaway's cries continued until Barber

forced the dog to release its bite at around 3:17:30 AM.  Mr. Pettaway soon thereafter

lost consciousness which he never regained, as confirmed by the Barber video.

Barber left Mr. Pettaway lying inside, unconscious and bleeding, called his

dispatcher to request that EMTs be summoned to provide medical care to Mr.

Pettaway.  He then left the house, took his dog to his police vehicle and secured it.

---

[5] A running time-stamp showing the hour, minute and second of the images
that appear on the Barber video was automatically imprinted on the video recording.

Dr. Stephen Boudreau, the Medical Examiner who performed the autopsy, testified that loss of blood from his torn artery was the cause of Mr. Pettaway's death, Doc.371-11,p.18-19. See autopsy photos, Doc.371-13 and 371-14, Doc.371-11,pp.14-15, which Dr. Boudreau described in his deposition, Doc.371-11,pp.12-22.

For the first eight minutes after the dog's bite at 3:15:38 AM until 3:23:38 AM (see Barber video photo exhibits 3:15:38 to 3:23:38) when MPD police emerged from the front door of the house dragging Mr. Pettaway's unconscious body from the house, Mr. Pettaway lay on the floor of the room in which the dog had attacked him, bleeding and unconscious.

In this first eight minutes after Mr. Pettaway's artery was torn open, the City did not provide him with any medical care, despite his obvious loss of blood.

Then, in the next six minutes, starting at 3:23:38 AM, when MPD police emerged from the house dragging Mr. Pettaway's unconscious body from the house and laid it on the sidewalk in front of the house, until 3:29:38 AM, when the first EMT to arrive reached down and pulled back Mr. Pettaway's blood-soaked shirt to find the hemorrhaging wound, Mr. Pettaway lay on the sidewalk illuminated by half a dozen MPD policemen's flashlights, profusely bleeding. (see Barber video photo exhibits 3:23:38 to 3:29:38)

10

As with the first eight minutes after Mr. Pettaway's artery was torn open, during this following additional six minutes, the City did not provide him with any first aid or medical care.

All told, 14 minutes elapsed between 3:15:38 AM, when the dog's attack began and tore open Mr. Pettaway's femoral artery, and 3:29:38 AM, when the first EMT finally arrived and began to attend Mr. Pettaway's injury.  During this 14 minutes the City provided no medical care or first aid or made any efforts to stop or reduce the loss of blood from Mr. Pettaway's torn femoral artery.

At 3:35:10 AM, the EMT can be heard on the Barber video stating, "He's about to die."  At 3:36:11 AM, Mr. Pettaway's body was lifted onto a gurney, rolled to an ambulance, and taken to the hospital where he was pronounced dead.

### D.  City Policy – Written Directive 3.3.5

In July, 2018, Written Directive 3.3.5, Doc.372-5, was official MPD policy that was ordered into effect by MPD Chief Ernest Finley.[6]  It states its purpose in its first sentence: "to establish procedures for rendering aid after the use of force."

---

[6] Chief Finley testified, Doc.371-6,p.39:

> Q.  You were the policymaker who made or created or put 3.3.5 into effect as MPD policy, correct?
>
> A.  Correct.

11

Written Directive 3.3.5 provides at page 1, in paragraph C.:

> C. Medical Aid is to be rendered only by those trained and/or certified to render such aid.

However, as the City knew, it did not train, or require training, or employ any police officers who were trained in medical or first aid,[7] including any training in first aid that would have stopped or greatly diminished Mr. Pettaway's loss of blood.

---

[7] The City's Rule 30(b)(6) designee, MPD Lt. Andre Carlisle testified, Doc.371-20, p. 11-12:

> Q. Okay. So the Montgomery Police Department doesn't require or provide any medical or first aid training to policemen, correct?
>
> A. No.
>
> Q. I'm sorry?
>
> A. No.
>
> Q. What I said is correct.
>
> A. Yes.

and testified, Doc.371-20, p.25:

> A. [D]id the City of Montgomery require its police officers after they became police officers to receive any kind of training in first aid or medical care?
>
> A. No.

and further testified, Doc.371-20, p.33:

> Q. Were there any Montgomery Police Department officers -- prior to this directive [3.3.5] being entered in April of 2018,

Therefore, as Written Directive 3.3.5 dictated and as MPD police present that night at the Cresta Circle house, Officers Watts, Smith, Ruiz and Powell all testified, because they had no training in first aid or medical care, they were "*prohibited*" from providing any first aid or medical care to Mr. Pettaway, e.g., MPD Officer Keiundra Watts testified, Doc. 371-15, p. 57-58:

> Q. Okay. Do you understand from the sentence at the bottom of the page -- or the first page of Plaintiff's Exhibit 3 (Written Directive 3.3.5) where medical aid is to be rendered only by those trained or certified to render such aid; do you understand that *you are prohibited* from providing medical care unless you are trained?
>
> A. Yes, sir.
>
> Q. So not only the police department didn't – didn't require you to provide first aid, *they prohibited you* from doing that; correct?
>
> A. Yes.

And MPD Officer Joshua Smith testified, Doc. 371-18, p.48:

> Q. Do you see the last sentence there, paragraph C [of Written Directive 3.3.5]? Would you read that out loud.
>
> A. Yes, sir. "Medical aid is to be rendered by only those trained and/or certified to render such aid."

---

> were there any who were trained or certified with regard to providing medical aid?
>
> A. I'm not sure.
>
> Q. Okay. Do you know of any?
>
> A. I don't.

13

Q. Okay. So not only you were not required to. If you weren't trained or certified in the medical care or first aid, then *you were prohibited* from providing any first aid; correct?

A. Yes, sir.

And MPD Officer Bianka Raquel Ruiz, testified, Doc. 371-16, p. 39-40

Q. All right. Is the reason that you didn't have a – or take any action to reduce Mr. Pettaway's loss of blood was that you hadn't been trained in that and that *Montgomery Police Department policies prohibited you from – prohibited you* from doing that? Are those the reasons why you didn't do that?

A. That's correct. Yes sir.

**E.  City's knowledge**

*1. MPD police have and will inflict life-threatening injuries on arrestees*

Chief Finley admitted, Doc.279-8,p.55, that he knew that "in arresting and apprehending suspects or persons, police can and do cause a broad range of different types of injury" and, Doc.279-8, p.56, that those injuries encompass "the whole gamut of different types of personal injuries," some of which are "relatively minor and some are more serious" and some of which are "are life-threatening."

*2. Many life-threatening injuries require immediate medical care*

Chief Finley also admitted, Doc.371-6, p.56, there are certain types of injuries for which first aid or medical care must be given "immediately" in order to prevent death or very serious injury and they include arterial bleeding, Doc.371-6,p.60:

Q. Okay. Do you know that if a major blood vessel in a person's body is cut or severed or torn and they are bleeding heavily, that person's blood is escaping from their body, that that must be treated immediately?

MR. EAST: Object to form.

A. Yes.

Lt. Carlisle, the City's Rule 30(b)(6) designee[8] testified, Doc.371-20, p.38:

Q. Okay. Do you know how quickly a person can bleed to death from a cut or torn artery?

A. *A matter of seconds*.

Chief Finley testified, Doc.279-8,p.60-61, he would not disagree that a wound

to a major blood vessel can cause death "*in as little as three to five minutes*."

### *3. MPD does not train, require training, or employ police trained in first aid*

Lt. Carlisle, as a Rule 30(b)(6) designee, testified, Doc. 371-20, p.11-12:

Q. Okay. So the Montgomery Police Department doesn't require or provide any medical or first aid training to policemen, correct?

MR. EAST: Object to form.

A. No.

Q. I'm sorry?

---

[8] The City designated MPD Lt. Andre Carlisle to give the City's testimony in response to a Rule 30(b)(6) deposition notice about the following matters:

the training and instruction of City policemen since February 1, 2015, regarding their provision of first aid or emergency medical care to persons injured in their interactions with City policemen.

15

> A. No.
>
> Q. What I said is correct.
>
> A. Yes.

and, Doc.371-20, p.25:

> A. [D]id the City of Montgomery require its police officers after they became police officers to receive any kind of training in first aid or medical care?
>
> A. No.

and further, Doc.371-20, p. 33:

> Q. Were there any Montgomery Police Department officers – prior to this Directive [3.3.5] being entered in April of 2018, were there any who were trained or certified with regard to providing medical aid?
>
> A. I'm not sure.
>
> Q. Okay. Do you know of any?
>
> A. I don't.

### *4. EMTs will not arrive in time to provide "prompt medical care"*

Because Directive 3.3.5 prohibits MPD police from providing persons they injure with any kind of first aid or medical care, the City relied on EMTs summoned by the MPD to travel to those injured by their police and render them the "prompt and proper medical care" the City was constitutionally required to provide them.

However, as Chief Finley admitted, Doc.371-6,p.79, the City's reliance on EMTs to travel to injured persons to provide them with medical care resulted in "inevitable" and "unavoidable" delays in providing that medical care.

16

The Barber video establishes that 14 minutes elapsed between 3:15:38 AM, when Mr. Pettaway's agonized cry of pain from the dog first biting him can be heard on the Barber video, and 3:29:38 AM, when the first EMT to arrive at Cresta Circle first reached down to lift Mr. Pettaway's blood-soaked shirt and locate his torn artery.

The U.S. Department of Homeland Security states that delays in providing medical care occurring between infliction of an injury that causes heavy bleeding and the arrival of EMTs as "being the most common cause of death in trauma." https://www.dhs.gov/science-and-technology/news/2022/05/19/st-helps-stop-bleed-fast#:~:text:

> The average time for first responders to arrive is 7-10 minutes. These highly-trained individuals are experts at assessing a scene and administering aid instantly. However, *the average time for someone to bleed out after experiencing serious physical trauma* from an injury, say a gunshot wound, is *only 3-5 minutes*. This discrepancy, though unavoidable, has led to uncontrolled bleeding, or hemorrhage, being the most common cause of preventable death in trauma. (emphasis supplied)

By prohibiting the City police officers from providing medical care for his torn artery, the City's Written Directive 3.3.5 caused the 14 minute delay in providing Mr. Pettaway with any medical care.

For persons who sustain a serious physical trauma, like a torn artery, that causes substantial loss of blood, "the average time for them to bleed out" is "only 3

17

– 5 minutes." The American College of Surgeons states in their booklet *STOP THE BLEED* https://www.dhs.gov/science-and-technology/news/2022/05/19/st-helps-stop-bleed-fast#:~:text:

> [T]he average time for someone to bleed out after experiencing serious physical trauma from an injury . . . is only 3-5 minutes.

For such persons, the provision of medical care 14 minutes after the injury's infliction is patently not "prompt and proper medical care."

## F.  Failure to provide prompt medical care to Mr. Pettaway caused his death

Plaintiff's expert, Dr. Bennett Omalu, confirmed that which Chief Finley[9] and Lt. Andre Carlisle[10] testified: Mr. Pettaway's loss of blood during the 14 minutes he was not provided with any first aid or medical care caused Mr. Pettaway's death.

---

[9] Chief Finley testified that he would not disagree that a person can die in three to five minutes from unchecked bleeding from a major artery, Doc.279-8,p.60-61.

Chief Finley's appraisal for death the time for death from exsanguination from serious physical injury is echoed by The American College of Surgeons' Committee on Trauma in their booklet www.mayoclinichealthsystem.org/-/media/local-files/eau-claire/documents/medical-services/ed-trauma/stop-the-bleed-booklet.pdf?la=en&hash=83DF7E5ECEAFEF39C89ED037FE39CC77:

> the average time for someone to bleed out after experiencing serious physical trauma from an injury . . . is only 3-5 minutes.

[10] MPD Lt. Carlisle testified loss of blood from a major artery can cause death in a "matter of seconds" if no efforts are made to stop or retard the bleeding, Doc.371 -20, p.38.

18

Dr. Omalu's opinion on the survivability of the dog bite wound to Mr. Pettaway's femoral artery is stated in his affidavit, Doc.371-10, p.1:

> The facts established in this case demonstrate that Mr. Pettaway received a highly survivable wound by dog bite in the left inguinal region; and that, because no one attempted to stop or slow the bleeding through the simple application of pressure, he bled to death.  If direct pressure had been applied, it is very likely that Mr. Pettaway would have survived.

Dr. Omalu elaborated more fully at page 8 of his affidavit, Doc.371-10:

> 4.  The focal vascular injury to Mr. Pettaway's left femoral artery and vein, was highly survivable. The confidence interval for this opinion is 90 – 99%. Direct pressure, if applied to the injury, would have stopped or sufficiently slowed the bleeding, giving emergency physicians time to repair the damage and save Mr. Pettaway's life.
>
> 5.  To a 90 – 99% confidence interval and well beyond a reasonable degree of medical certainty Mr. Pettaway would have survived this wound if the basic, simple first aid measure of applying steady pressure to the wound and/or packing the wound with any available absorbent material, such as a T-shirt or any other available item of clothing had been made until the emergency medical personnel arrived.

Dr. Stephen Boudreau, the State Medical Examiner who performed the autopsy on Mr. Pettaway, agreed with Dr. Omalu that "almost all bleeding can be stopped with direct pressure" to the wound, Doc.371-11,pp.23-24:

> Q.  Okay.  I'm going to show you an exhibit to the complaint.  And I will tell you this is a – this is a Boy Scout Wilderness Guide for First Aid [Doc.233-20,p.20] – for, among other

things, stopping or retarding blood flow.  Look at the next to last paragraph.

A.  By direct pressure.

Q.  Yes, sir.  But the next to last paragraph talks about almost all bleeding. Do you see that paragraph?

A.   Yes, sir.

Q.  "Almost all bleeding can be stopped with direct pressure, usually applied with pressure from your hand directly on the wound."  That's what you're talking about?

A. Correct.

Q. Do you disagree with that statement?

A. No.

Dr. Boudreau also testified, Doc. 371-11,p.20, about the survivability of Mr. Pettaway's wound and agreed with Dr. Omalu that if the MPD police present had promptly applied sustained pressure to his torn femoral artery, it would have "either stopped or significantly substantially reduced the amount of blood loss":

Q. Do you agree that the overwhelming majority of all authoritative medical sources within the medical community agree that direct sustained pressure when applied to a cut or torn artery will either stop or greatly diminish or lessen the amount of blood loss from that type of injury?

A. It should, not always.

Q. So you agree that that's the medical community's –

A. Correct, yes.

Q. – judgment is that it will either stop or significantly substantially reduce the amount of blood loss?

20

A.  Yes.

Dr. Boudreau testified, Doc.371-11,p.103, that the cause of Mr. Pettaway's

death was "loss of blood from the tear in the femoral artery."

## III. STANDARD OF REVIEW

This Court in *Kroma Makeup EU, LLC v. Boldface Licensing + Branding,*

*Inc.*, 920 F.3d 704, 706 (11th Cir. 2019) stated the applicable standard of review:

> The district court's grant of summary judgment is reviewed *de novo*, and the United States Court of Appeals for the Eleventh Circuit applies the same legal standards that governed the district court. Summary judgment is proper when the evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, the Eleventh Circuit views the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant.

## SUMMARY OF THE ARGUMENT

### A. All Elements of a *Monell* claim were proven

Plaintiff submitted evidence opposing the City's motion for summary

judgment that presented genuine issues of material fact on all necessary elements of

a *Monell* claim, e.g., *Teel v. Lozada*, 99 F.4th 1273 at 1279 (11th Cir. 2024):

> To prove a Monell claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that

21

constitutional right; and (3) that the policy or custom caused the violation." (citation omitted)

*(1)  City's failure to provide prompt medical care was a constitutional violation*

Under *King v. Reap* and *Revere v. Mass. General Hospital*, the City had the duty to provide "prompt and proper medical care" to arrestees injured by its police.

City police inflicted an injury on Mr. Pettaway – his femoral artery was torn open by a police dog – which the City admitted required medical care "immediately" or at a minimum, within 3 to 5 minutes of its infliction or death would likely result.

The City did not provide any medical care to Mr. Pettaway until 14 minutes after that injury was inflicted by MPD police.

*(2) City policy constituted deliberate indifference to that constitutional right*

The City admitted its knowledge that:

a.  among the injuries MPD police have caused and do cause, some are life-threatening and require immediate medical attention or they will likely to cause death.

b. Written Directive 3.3.5 prohibited City police from providing any first aid/medical care to Mr. Pettaway because it prohibited persons without medical training from providing such care and the City did not train and did not employ any police with such training.

c.  To provide "prompt and proper medical care" to MPD's injured arrestee-detainees, the City relied on EMTs who had to be summoned from off-site to travel to injured arrestees to provide such care.

22

e. Because of "unavoidable" and "inevitable" delays in providing medical care to injured arrestee-detainees, if the City depended on EMTs to provide such care for its arrestees, the City would seldom, if ever, be able to provide medical care within 3 to 5 minutes.  (In this case, EMTs did not arrive to provide medical care to Mr. Pettaway until 14 minutes after the dog's attack).

In *Milledge v. Fla. Dep't of Corr. Secy*, 760 Fed. Appx. at 743 (11th Cir. 2019) this Court held that a government official is guilty of deliberate indifference when:

[W]ith knowledge of the substantial risk of serious harm, the government official knowingly or recklessly "disregard[s] that risk by failing to take reasonable measures to abate it."

The City and MPD Chief Finley who adopted Directive 3.3.5 had "knowledge of the substantial risk of serious harm" to MPD arrestees who suffer life-threatening injuries, including torn arteries that result in heavy blood loss if they are not provided first aid or medical care within 3 to 5 minutes, yet did not "take reasonable measures to abate that risk," i.e., training its police in simple measures, such as CPR or measures to stop or retard blood loss from tears or lacerations of major arteries.

Despite knowledge of these risks, the City not only "knowingly or recklessly disregarded that risk by failing to take reasonable measures to abate it" the City enacted Written Directive 3.3.5, which ensured that when such risks arose they would not be abated or diminished or avoided.

23

*Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016), states two means by which "deliberate indifference" in §1983 cases can be established, 841 F.3d at 1230:

> (a) "delaying necessary medical treatment for nonmedical reasons"
>
> or
>
> (b) creating "a policy of deficiencies in procedures . . . that effectively deny access to adequate medical care."

Written Directive 3.3.5 establishes deliberate indifference by both means: (a) there is no medical reason why MPD police cannot be trained in simple basic first aid and required to provide it; and (b) Directive 3.3.5 creates a deficiency in MPD policy that effectively denies injured arrestees access to adequate medical care.

(3) City policy caused the violation of its duty to provide prompt medical care

The evidence is undisputed. The MPD police on-site during and after the MPD police dog attack, MPD Officers Watts, Ruiz, Powell and Smith, testified that because they had no medical/first aid training, they were trained and knew that they were "prohibited" by Directive 3.3.5 from providing Mr. Pettway with any first aid.

**B.  Rule 56 was circumvented and violated**

Rule 56, F.R.C.P., requires that in resolving motions for summary judgment, district courts are required to review the evidence to determine if the evidence presented by the parties creates any "genuine issues of material fact" and if so, the district court must deny the motion and submit those issues of fact to the jury.

24

In this case, the district court, without making any review of the evidence to determine if it presented "genuine issues of material fact," disregarded the evidence and granted summary judgment to the City as a matter of law based on the court's clear errors, misinterpretations and misapplications of key case law in the case.

The district court misinterpreted *Monell v. New York City Dept. of Social Services* to hold that in order to prove a *Monell* claim, a constitutional violation committed by an individual policeman must be proven.

That is not what *Monell* held, as this Court explained in *Barnett v. Macarthur* and *Rogers v. Sheriff of Santa Rosa Cnty.*

Next, the district court misinterpreted *Revere v. Mass. General Hosp.* to have held that cities do not have any duty to provide medical care to injured arrestees beyond the duty that individual policemen have.

Again the district court erred.  Individual police have no such duty.  The Supreme Court placed the duty to provide medical care to injured arrestees **only** on city and county governments.  In both *Revere v. Mass. General Hosp.* and *Deshaney v. Winnebago County Dep't of Social Services*, the Court held the Due Process clause ***"requires the responsible government or governmental agency to provide medical care to persons."***

The Court never addressed individual police in either case and certainly did not recognize or create any duty for them in these cases, nor has this Court interpreted *Revere* to do so. *Reid v. Streit*, 697 Fed. Appx. 968, 972 (11th Cir. 2017).

The district court cited no case law supporting its claim that individual policemen have any such duty, and our case law fails to reveal any Supreme Court or Eleventh Circuit authority so holding.

The district court again erred in holding that in *Revere v. Mass. General Hosp.* the Supreme Court held that, regardless of the nature, type, degree of injury or the urgency or immediacy of the need for medical care for that injury, cities can discharge their duty to provide "prompt and proper medical care" by simply summoning EMTs to travel from off-site to come to the injured arrestee to provide medical care.

However, in *Revere*, the Court specifically disclaimed laying down such a blanket or universal "one size fits all" rule for when an action is taken "promptly."

In *Bozeman v. Orum*, this Court noted the variability of the "promptness" or "timeliness" of medical care for different types of injuries, holding that for life-threatening injuries, the duty to provide care, 422 F.3d at 1273:

> is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes.

26

Similarly, in *Wideman v. Shallowford Cmty. Hosp., Inc.*, this Court again held that *Revere* did not define a single standard for the duty owed by cities and counties to ***all*** injured arrestee-detainees in ***all*** cases, holding:

> [T]he Supreme Court in City of Revere declined to define the exact nature of the state's obligation [to provide medical care to injured arrestees].

*Bozeman v. Orum* and *Wideman v. Shallowford Cmty. Hosp., Inc.* are in accord with over a hundred years of American case law holding that issues of an action's promptness or timeliness are inherently context-sensitive, i.e., they depend upon "the particular circumstances of the case"[11] and invariably present questions of fact for a jury to decide – questions that may not be decided by courts on motion for summary judgment.

## C.  Causation was proven

The MPD police present at the time of the dog's attack and afterward testified that they were trained, instructed and direct that under Written Directive 3.3.5, because they had not been given any first aid training, they were "prohibited" from attempt-ing to stop or reduce Mr. Pettaway's loss of blood from his torn artery.

Plaintiff's expert, Dr. Omalu, testified that Mr. Pettaway's injury, a torn femoral artery, is an injury that was "highly survivable," and he would have survived

---

[11] *American Surety Co. v. Pauly, 170 U.S. 160* (1898)

this injury if very simple first aid – application of steady pressure to the wound –

had been applied promptly to the wound.

The district court's order violates Rule 56, F.R.C.P, by usurping, removing

from the jury, issues of fact that required denial of the City's motion for summary

judgment and submission of those issues of fact to a jury.

## **ARGUMENT**

### **A.  Introduction to plaintiff's *Monell* claim and its basis**

In the early hours of July 8, 2018, MPD policeman Barber released his police

dog to attack Joseph Lee Pettaway. In its attack, the dog's teeth tore open Mr.

Pettaway's femoral artery.  While MPD Lt. Carlisle, the City's Rule 30(b)(6)

witness, testified that a torn artery can be fatal within "***a matter of seconds,***"[12] the

---

[12] The City proffered MPD Lt. Andre Carlisle as its Rule 30(b)(6) designee to give the City's testimony regarding MPD officers' first aid or on-site emergency medical care.  He testified, Doc.371-20, p.38:

> Q.  Okay. Do you know how quickly a person can bleed to death from a cut or torn artery?
>
> A.  A matter of seconds.

evidence was undisputed that such an injury is "***highly survivable***"[13] if ***very simple first aid*** [14] is promptly administered to stop or reduce blood loss from the artery.

---

[13] Plaintiff's expert witness, Dr. Bennet Omalu, testified (Doc. 371-10):

> The focal vascular injury to Mr. Pettaway's left femoral artery and vein, was a highly survivable injury. The confidence interval for this opinion is 90 - 99%. Direct pressure, if applied to the injury, would have stopped or sufficiently slowed the bleeding, giving emergency physicians time to repair the damage and save Mr. Pettaway's life.

[14] To call this first aid measure "very simple" is understatement on a grand scale. It is taught to Boy Scouts and may be explained/described/defined/taught in five words: "apply pressure to the wound." The Boy Scouts' *Wilderness Guide* (2017 Edition), Doc. 233-20, p. 20, states:

> Almost all bleeding can be stopped with direct pressure, usually applied with pressure from your hand directly on the wound with a barrier between you and the wound. If there is time, place a sterile dressing on the wound before applying pressure. If there is no time, grab anything absorbent to press into the wound. In cases of severe bleeding, packing a wound initially with your fingers, then switching to and packing with absorbent material, can supplement continued direct pressure.

See also the American College of Surgeons' pamphlet "*Stop the Bleed*," at page 9, included in the Appendix herein describing how to stop such bleeding": "Apply Direct Pressure on the wound. Cover the wound with a clean cloth and apply pressure by pushing directly on it with both hands." https://emergency.utah.edu/wp-content/uploads/sites/28/2021/03/Stop-the-Bleed-Booklet-Final.pdf

However, this simple first aid was not provided to Mr. Pettaway because a city policy, Directive 3.3.5 (Doc.372-5), ***prohibited*** [15] City police from providing any medical care to injured arrestees unless the officer had medical care training. But, as the City knew, none of its police had any such training, including training in stopping or retarding loss of blood from a torn or ruptured artery.[16]

---

[15] Written Directive 3.3.5 (Doc.372-5) was the policy of the City's Police Department for "Rendering Aid" after "Use of Force."  It states in paragraph C:

> Medical aid is to be rendered by only those trained and/or certified to render such aid.

[16] City's Rule 30(b)(6) designee, Lt. Carlisle testified, Doc.371-20, p. 11-12:

> Q. Okay.  So the Montgomery Police Department doesn't require or provide any medical or first aid training to policemen, correct?
>
> A. No.
>
> Q. I'm sorry?
>
> A. No.
>
> Q. What I said is correct.
>
> A. Yes.

and testified, Doc.371-20, p.25:

> A.  [D]id the City of Montgomery require its police officers after they became police officers to receive any kind of training in first aid or medical care?
>
> A.  No.

and further testified, Doc.371-20, p.33:

30

Accordingly, as the MPD police officers present that night at the house at 3809 Cresta Circle, testified, because they had not been trained in such first aid, they each knew and understood they were "prohibited" from providing medical care or first aid to Mr. Pettaway; and therefore they did not provide any such first aid, i.e., see the testimony of MPD Police Officers Keiundra Watts depo, Doc. 371-15, p. 57-58; Joshua Smith, Doc. 371-18, p.48, and Bianka Ruiz, Doc. 371-16, p. 39-40, cited in our Statement of Facts at pages 13 and 14.

During the 14 minutes[17] that followed the dog's rupture of Mr. Pettaway's artery – an injury that the City's Police Chief and Rule 30(b)(6) designee admitted requires medical aid "immediately" and can be fatal within "a matter of seconds" –

---

Q. Were there any Montgomery Police Department officers -- prior to this directive [3.3.5] being entered in April of 2018, were there any who were trained or certified with regard to providing medical aid?

A. I'm not sure.

Q. Okay. Do you know of any?

A. I don't.

[17] From 3:15:38 AM (when the dog's teeth tore into Mr. Pettaway's upper thigh tearing open his femoral artery) and 3:29:38 AM (when the first EMT to arrive at Cresta Circle reached down and lifted his bloody shirt to attempt to locate the wound from which he was hemorrhaging)

31

the City failed to provide medical care necessary to prevent his blood loss from continuing during that 14 minutes.  As a result, Joseph Lee Pettaway bled to death.[18]

Patently, Directive 3.3.5 (Doc. 372-5), which prohibited MPD police from providing any medical aid to Mr. Pettaway, was "a moving force"[19] or a proximate cause of the City's failure to provide the "prompt and proper medical care" it was required to provide him, and was a proximate cause of his death.

### B.  All requisite elements of a *Monell* claim were established

This Court reaffirmed the elements of a §1983 *Monell* claim against cities in *Teel v. Lozada*, 99 F.4th 1273 at 1279 (11th Cir. 2024):

> To prove a Monell claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." (citation omitted)

---

[18] Dr. Stephen Boudreau, the State Medical Examiner who performed the autopsy on Mr. Pettaway, testified, Doc.371-11,p.103-04, that the cause of Mr. Pettaway's death was "loss of blood from the tear in the femoral artery."

[19] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 at 694 (1978)

*(1) A constitutional rights violation was established by the evidence*

The evidence is undisputed that Mr. Pettaway's constitutional rights were violated: the City did not provide him the "prompt and proper medical care" that the Due Process Clause requires, *King v. Reap*, 269 F. App'x 857 (11th Cir. 2008).

Both defendant MPD Chief Finley and Lt. Carlisle, the City's Rule 30(b)(6) designee, admitted that a ruptured artery requires immediate medical care.

Specifically Chief Finley testified, Doc. 371-6, p. 60:

> Q. Okay. Do you know that if a major blood vessel in a person's body is cut or severed or torn and they are bleeding heavily, that person's blood is escaping from their body, that that must be treated immediately?
>
> MR. EAST: Object to form.
>
> A. Yes.

1Lt. Carlisle, the City's Rule 30(b)(6) designee, testified, Doc.371-20, p.38:

> Q. Okay. Do you know how quickly a person can bleed to death from a cut or torn artery?
>
> A. A matter of seconds.

The actions of the MPD police after their dog attacked and tore open Mr. Pettaway's artery and the period of time over which MPD police failed to provide medical care are undisputed. Barber's body cam recording (Doc. 370) establishes

33

that no medical care was provided to Mr. Pettaway until 14 minutes[20] after the police dog tore open Pettaway's femoral artery with its teeth.

For an injury that will be or is likely to be fatal if medical care is not provided for that injury within 3 to 5 minutes of its infliction, provision of that care 14 minutes after the injury is inflicted is *ipso facto* not "prompt and proper medical care."

What is "prompt" for one action to be taken is not "prompt" for another. For example, what is a "prompt" or reasonable time to respond to a notice that one's yearly post office box fee is due is something altogether different from a "prompt" or reasonable time to respond to an oncoming car veering into your lane of traffic.

By the same token, what is the prompt provision of medical care for a bloody nose, a sprained wrist or a turned ankle is not the same as the prompt provision of medical care for a cardiac arrest, an open-head injury or heavy arterial bleeding.

Even for a fractured femur or a dislocated shoulder, provision of medical care within an hour or two after their infliction is reasonably prompt care since those injuries are not life-threatening and delays in providing care for them for 14 minutes

---

[20] The Barber video (Doc.370) establishes that dog attack occurred at 3:15:38, but the City did not provide any medical care for the injury until 3:29:38 – 14 minutes after its infliction – when EMTs arrived to provide medical care to him.

will not affect their healing, their permanence, nor have any other adverse conse-

quences to the injured person, and certainly do not threaten the injured person's life.

This Court addressed the issue of promptness in this exact context – the

prompt medical care required by *Revere* for injured arrestees – in *Bozeman v. Orum*,

422 F.3d 1265 (11th Cir. 2005).   In the case, this Court noted the variability of the

"promptness" or "timeliness" of medical care for different injuries, and held that for

life-threatening injury, the duty to provide care, 422 F.3d at 1273:

> is especially time-sensitive and must ordinarily be measured not
> in hours, but in a few minutes.

The primary determinants of what is prompt first aid or medical care for a

particular injury are obviously the nature, degree and severity of the injury and the

immediacy, urgency, and exigency of the need for medical care for that injury – the

"window" or time interval during which care for that particular injury **must** be

provided in order that, at best, the injury not increase in its severity or permanence,

or at worst, that that injury not become fatal, as it did herein.

For this reason, the Supreme Court in *Revere* specifically declined to define

or establish a single, universal standard for what constitutes medical care that will

satisfy due process, holding U.S. 239 at 244:

> We need not define, in this case, [the City of] Revere's due
> process obligation to [all] pretrial detainees or to other persons
> in its care who require medical attention.

As this Court recognized in *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030 (11th Cir. 1987), with regard to cities and counties' duty to provide medical care and the window of time within which it must be provided, one size does not fit all, and that in *Revere* the Supreme Court did not define the duty owed by cities and counties to **_all_** injured arrestee-detainees in **_all_** cases, holding, 826 F.2d 1030, 1035:

> [T]he Supreme Court in City of Revere declined to define the exact nature of the state's obligation [to provide medical care to injured arrestees].

And for good reason, the Supreme Court did not do so.  The differences in the facts between those in *Revere* and those in this case provide an excellent illustration of why there can be no universal, unvarying standard for what medical care must be provided, or more cogently, how quickly it must be provided to an injured arrestee. The facts herein that are significantly different from those in *Revere* are:

Kivlin (the arrestee in *Revere*) did not suffer a life-threatening injury.  Pettaway did.

Kivlin's injury did not require "immediate" medical attention.  Pettaway's did.

Kivlin was "provided the treatment necessary for his injury."  Pettaway was not.

Kivlin recovered in a few days and was released from the hospital. Pettaway did not.

Despite the Supreme Court clearly stating in *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983) that it was declining to set a standard for the provision

36

of medical care for all injured arrestees, the district court misinterpreted the Court to have done just that, holding, Doc. 433, p. 28:

> Montgomery's constitutional obligation to provide medical aid was satisfied when the officers on the scene promptly summoned medical aid for Pettaway.

In doing so, the district court clearly erred. We submit that any fair-minded attempt to interpret *Revere* must arrive at the conclusion that in *Revere*, as the Supreme Court expressly stated, it was declining to define for all cases and for all injuries what will satisfy a city or county's duty to provide "prompt and proper medical care" for their arrestee-detainees injured by their law enforcement officers.

Rather the Supreme Court decided only that "whatever the [undefined] standard may be," under the facts of *that* case, for *Kivlin's* particular injury, the City of Revere's transport of Kivlin who, unlike Mr. Pettaway, suffered no life-threatening injury, to a hospital where, unlike Mr. Pettaway, he received the "treatment necessary for his injury," satisfied the City of Revere's duty to Kivlin.

The district court's contrary interpretation of *Revere* was its excuse or justification for the district court *itself*, in violation of Rule 56, to decide the disputed question of fact and hold as a matter of law that the City, in summoning EMTs who took 14 minutes to arrive and provide medical care for an injury that required care within 3 to 5 minutes, provided "prompt and proper medical care."

37

The district court's Order (Doc. 433) misinterprets *Revere* to have held that <u>in all cases</u> and <u>irrespective of the type, degree, or nature of the injury, its severity, the immediacy or exigency of the need for care for that injury</u>, or <u>the injury's potential threat to the victim's life if that care is delayed</u>, a city in all cases discharges its duty to provide "prompt and proper" medical care to those injured by their police by simply summoning EMTs.

*(2) Directive 3.3.5 is deliberately indifferent to due process medical care rights*

The City, with knowledge that none of its police had any medical care training, put into force and effect a written policy, Written Directive 3.3.5, which "prohibited" its police from providing first aid or medical care to injured arrestees unless they had ***the very medical training*** that ***the City knew they did not have***.

This was more than gross negligence. It was deliberate indifference. The adoption of Written Directive 3.3.5 was a deliberate action, one taken despite actual knowledge by the City's Police Chief Finley and the City's Rule 30(b)(6) designee, Lt. Carlisle, that:

> a. City police had in the past inflicted and would in the future inflict injuries on arrestees that would be life-threatening unless medical was provided for them almost immediately, i.e., at most, within 3 to 5 minutes after the injury's infliction;
>
> b. Written Directive 3.3.5 prohibited City police from providing medical care to such persons because no MPD police had training first aid or medical care training and therefore to provide such

38

care, the City would have to summon EMTs from off-site to come to the injured person to provide that care.

c. because a delay of well beyond 3 to 5 minutes in providing medical care to such arrestees is "unavoidable and inevitable"[21] when the City relies on EMTs summoned from off-site to travel to injured arrestees and provide them with medical care, the City knew it could not thereby provide the "prompt and proper medical care" it was constitutionally required to provide to badly injured arrestees who have suffered an injury that is likely to be fatal without almost immediate medical care.

This is the epitome of, the very definition of deliberate indifference – a city's knowledge that constitutional violations will occur if measures are not taken to prevent them, but with such knowledge, that city made a conscious, deliberate decision to enact a policy that not only did not prevent these constitutional violations from occurring, but instead guaranteed that they would occur.

In *Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016), this Court not only reaffirmed the constitutional requirement that cities and counties must provide "prompt and proper medical care" to persons that its law enforcement officers cause injury to, but further explained two of the means by which "deliberate indifference" to that duty can be established, holding, 841 F.3d at 1230, that:

> "Deliberate indifference to serious medical needs may be shown by failure to provide prompt attention to those needs by ***delaying necessary medical treatment for nonmedical reasons*** or by

---

[21] Chief Finley deposition, Doc.371-6, p.79

'proving a ***policy of deficiencies in staffing or procedures*** such that the [pretrial detainee] is effectively denied access to adequate medical care.'" (citing and quoting *Thomas v. Davie*, 847 F.2d 771, 772-773 (11th Cir. 1988))

Written Directive 3.3.5 creates and codifies "deficiencies" in the City's "procedures that effectively deny pretrial detainees access to adequate medical care" and cause "delays necessary medical treatment for non-medical reasons."

Directive 3.3.5 is a policy or procedure that for no legitimate medical reason denies "prompt and proper medical care" to arrestees who have suffered an injury causing heavy or profuse bleeding, including not only a torn femoral artery, such as that suffered by Mr. Pettaway, but also, for example, for many gunshot wounds.

As such, Directive 3.3.5 is a deficient policy. For there is no "medical reason" for City police not to provide simple, basic first aid to injured arrestees, particularly when it can very easily be provided and it will save lives.[22]

---

[22] See the International Association of Chiefs of Police's 2013 monograph *Emergency Trauma Care* addressing provision of medical care by police officers, p.1, https://www.theiacp.org/sites/default/files/2018/08/Emergency%20Care.pdf:

> Frequently, law enforcement personnel arrive on scene prior to EMS and are tasked with providing basic medical care to injured individuals. In one study, ***more than 80 percent of law enforcement agencies responded to medical emergencies***, and ***approximately 50 percent of agencies provided some form of on-scene patient care***.

40

Neither the City nor district court have even suggested what such a reason might be, and for good reason: there is no plausible reason. Written Directive 3.3.5 caused an injury to fatal that should not have been.

The City's Written Directive 3.3.5 embodies and is exactly that which this Court in *Melton v. Abston*[23] proscribed: a policy that effectively denies access to adequate medical care for pretrial detainees whose injury requires immediate medical attention.

In *Milledge v. Fla. Dep't of Corr. Secy*, 760 Fed. Appx. at 743 (11th Cir. 2019) this Court held that a state government official acts with deliberate indifference when:

> [W]ith knowledge of the substantial risk of serious harm, the government official knowingly or recklessly "disregard[s] that risk by failing to take reasonable measures to abate it."

When the City adopted Written Directive 3.3.5, which "prohibited" its police from providing first aid or medical care to the City's injured arrestees, it did so:

> with knowledge of the substantial risk of serious harm and the knowing and reckless disregard of that risk by failing to take reasonable measures to abate it.

---

[23] Here is what *Melton v. Abston* proscribed, 841 F.3d at 1230:

> a policy of deficiencies in . . . procedures such that the [pretrial detainee] is effectively denied access to adequate medical care.

41

*(3) Directive 3.3.5 was a proximate cause of failure to provide prompt medical care*

Causation is undisputed.  Because the EMTs who were summoned to provide medical care to Mr. Pettaway could not and did not arrive to provide care until 14 minutes after the injury's infliction, the only persons who could have provided care to Mr. Pettaway within the critical 3 to 5 minute window of time that it must be provided were the MPD police on-site where and when the injury was inflicted.

Yet, as all of the police present that night testified, they were trained, directed and instructed that Directive 3.3.5 "prohibited" them from providing that first aid; and therefore they did not attempt to provide any. See testimony of MPD Police Keiundra Watts depo, Doc. 371-15, p. 57-58; Joshua Smith, Doc. 371-18, p.48, and Bianka Ruiz, Doc. 371-16, p. 39-40, cited in our Statement of Facts at pages 13-14.

At a minimum, this evidence precludes the summary judgment that the district court entered on plaintiff's *Monell* claim.

If, rather than granting the City summary judgment based on a series of legal errors, the district court had examined the facts, i.e., undertaken an examination of plain-tiff's evidence, it would have found that evidence to present an overwhelmingly compelling case that the City failed to provide "prompt and proper" medical care to Mr. Pettaway and that the City's policy, MPD Written Directive 3.3.5, constituted deliberate indifference to the City's Fourteenth Amendment's duty

42

to provide "prompt and proper medical care" to Mr. Pettaway, a person who its police had inflicted a grave and serious injury – one that ultimately was fatal when the City failed to provide the required "prompt and proper medical care" for it.

Indeed, there is a very strong case to be made – one which plaintiff made in our 80-plus page motion for summary judgment (Doc. 376) – that on the record and evidence before the district court, there was no genuine issue of material fact that would preclude the district court's grant of ***plaintiff's motion for summary judgment*** and that rather than granting the defendant City's motion for summary judgment, the court should have granted ***plaintiff's motion for summary judgment***.

However, the district court never ruled on plaintiff's motion for summary judgment, but "carried it with the case" (Doc. 434) and it remains pending.

It is important to keep in mind in ruling on this grant of summary judgment to the City on this *Monell* claim that the Court is not dealing with a situation in which City police failed to carry out a duty that the City had trained its police for and then ordered or directed them to carry out when they inflicted injuries on an arrestee-detainee, but which the City's police failed to carry out.

The reason MPD police did not provide Mr. Pettaway with "prompt and proper medical care" was ***not*** because MPD police ***did not*** follow City policy, but it was because MPD police ***did*** follow City policy, Written Directive 3.3.5 which

43

specifically prohibited MPD police from carrying out the duty that the City owed to Mr. Pettaway.    It was that City policy, Written Directive 3.3.5, which, when followed by MPD police, caused Mr. Pettaway's death.

## C. Rule 56 was ignored, circumvented and violated by the district court

There are few principles of civil litigation more fundamental than that of Rule 56, FRCP, which requires that defendants who move for summary judgment must negate – prove the non-existence of – any genuine issues of material fact on one or more of the elements of the claim on which summary judgment is sought.  *House, Inc. v. City of Dothan*, 2024 U.S. App. LEXIS 2142, *7 (11th Cir. 2024):

> The party seeking summary judgment bears the initial burden to demonstrate the basis for its motion, and must identify the portions of the record which it believes demonstrates the absence of a genuine issue of material fact. (citations omitted)   The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support ***an essential element of the case.*** (emphasis supplied) (citations omitted).

And if such a summary judgment movant does not prove or establish the absence of a genuine issue of material fact on an essential element of a plaintiff's claim, Rule 56 requires that the district court must deny the motion for summary judgment.  *Oxford N. Shore Med. Ctr., Inc. v. CIGNA Health*, 68 F.4th 1241, 1243 (11th Cir. 2023):

> A court should grant summary judgment ***only if*** the movant establishes that there is no genuine dispute as to any material fact. (citation omitted).

Further, in making such summary judgment determinations, the district court must draw all inferences from the evidence in favor of the non-movant; and if reasonable persons could differ over those inferences, summary judgment should be denied, *Oxford N. Shore Med. Ctr., Inc. v. CIGNA Health*, 68 F.4th 1241, 1243 (11th Cir. 2023):

> If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. (citation omitted). We review a grant of summary judgment de novo, drawing all reasonable inferences in the light most favorable to the non-moving party (citation omitted).

Yet in the scant 4½ pages of its Order (pp. 24-28, Doc. 433) in which it stated its rationale for granting the City summary judgment on the *Monell* claim – pages that are shot through with false premises – the district court never addressed or discussed Rule 56 or its requirements or whether the evidence submitted created any genuine issues of material fact on the *Monell* claim.

In those 4½ pages, the district court got no further than the first requirement of a *Monell* claim stated in *Teel v. Lozada*, 99 F.4th 1273 at 1279 (11th Cir. 2024) – the existence of a constitutional violation.

Specifically, the district court's Order held, Doc. 433, p. 28:

45

> Pettaway has not established the first requirement of a Monell claim: that a constitutional violation occurred. Thus, there is no need to inquire into Montgomery's policies or customs. Because Pettaway cannot establish the requisite constitutional violation, Montgomery's motion for summary judgment on this claim is due to be granted.

Mistakenly relying on a series of misinterpretations, misstatements, misconceptions and/or misapplications of two Supreme Court opinions, as well as a series of this Court's opinions,[24] the district court ignored the requirements of Rule 56, F.R.C.P. and itself wrongfully decided, as a matter of law,[25] the genuine issues of material fact raised by the evidence.

Here are three of the most egregious of those errors.

---

[24] As we will presently address, those misinterpreted, misstated, misconceived and/or misapplied cases include *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), and *Revere v. Massachusetts General Hosp.*, 463 U.S. 239 (1983) as well as this Court's opinions in *Barnett v. Macarthur*, 956 F.3d 1291, 1301-1302 (11th Cir. 2020); *Rogers v. Sheriff of Santa Rosa Cnty.*, 2023 U.S. App. LEXIS 6482 (11th Cir. 2023); *King v. Reap*, 269 F. App'x 857 (11th Cir. 2008); and *Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016).

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986):

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.

46

*(1) A constitutional violation by an individual policeman is not required by Monell*

The district court held at page 27 of its Order (Doc. 433):

> [A]n agent's unconstitutional act is a prerequisite to a *Monell* claim.
>
> *    *    *    *    *
>
> If the agent's act is constitutional, the municipality did not bring about an unconstitutional act.

The district court is dead wrong. An individual law enforcement officer's unconstitutional act is not a prerequisite to a city or county's liability under *Monell*; and even if no officer's act violates the Constitution, a municipality can be liable for its unconstitutional policy.

In *Barnett v. Macarthur*, 956 F.3d 1291 (11th Cir. 2020), Seminole County (Florida) Deputy Sheriff Sara Macarthur arrested Seana Barnett for DUI. Despite breathalyzer testing that soon after her arrest proved Barnett was not intoxicated, acting pursuant to a Seminole County DUI 8-hour automatic hold policy, Deputy Macarthur did not release Barnett but held her in custody for the 8 hours required by county policy.

Barnett filed suit under §1983, alleging an unlawful arrest/detention claim against Macarthur and a §1983 *Monell* claim against Seminole County based on its automatic hold policy. At the trial of Barnett's §1983 claims, the jury rendered a

47

verdict against Seminole County on the *Monell* claim, but a verdict for Deputy Macarthur on the unlawful arrest/detention claim.

On appeal, Seminole County argued, just as the district court held herein, that if an individual law enforcement officer did not commit a constitutional violation, then neither did the county and therefore the County could not be liable under *Monell* claim for any constitutional violation.

This Court rejected that argument in *Barnett v. Macarthur*, holding, 956 F.3d 1291, 1301-1302:

> We have held that "Monell . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government." Anderson v. City of Atlanta, 778 F.2d 678, 686 (11th Cir. 1985). For example, municipal liability can exist if a jury finds that a constitutional injury is due to a municipal policy, custom, or practice, but also finds that no officer is individually liable for the violation. See id. ("[I]f the jury were to find, as it did, that the deprivation of Mr. Anderson's constitutional rights was a result of under-staffing, then it would logically find no fault on the part of the individual arresting officers.").

*Barnett v. Macarthur* is mainstream §1983 law.  In *Barnett*, this Court cited opinions, 956 F.3d at 1301-1302, from the Second, Third, Seventh, Eighth, Ninth, and Tenth Circuit Courts of Appeal,[26] all of which hold, as this Court has, that the

---

[26] *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2nd Cir. 1999); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3rd Cir. 1994) (en banc);

commission of a constitutional violation by an individual policeman is **_not_** required or necessary to establish a county's or city's §1983 liability under *Monell*.

This Court reaffirmed this principle and again rejected the district court's analysis herein in *Rogers v. Sheriff of Santa Rosa Cnty.*, 2023 U.S. App. LEXIS 6482, *20 (11th Cir. 2023), describing the district court's rationale to be a "superficially seductive syllogism," and wrong, 2023 U.S. App. LEXIS 6482, *20:

> The issue before us, then, is whether individual liability under § 1983 is a necessary element of municipal liability under Monell. We addressed this question in Barnett v. MacArthur, 956 F.3d 1291 (11th Cir. 2020). In that case, a deputy arrested the plaintiff for driving under the influence and transported her to jail. Id. at 1295. The jail's hold policy required detaining a DUI arrestee for eight hours, even in the absence of positive test results and even if the arrestee posted bond. Id. Two breath samples showed no alcohol or drug content, and the plaintiff posted bond—but she was nonetheless detained for eight hours pursuant to the jail's hold policy. Id. at 1295-96. The plaintiff sued the arresting deputy under § 1983 and the sheriff under § 1983 and Monell, alleging against both the violation of her Fourth Amendment rights. Id. at 1293. The district court granted summary judgment to the sheriff on the Monell claim, and later, a jury returned a verdict in favor of the deputy. Id. The plaintiff appealed, and we reversed the district court's summary judgment ruling. Id.
>
> On appeal, the sheriff argued that he could not be liable because "the jury verdict mean[t] that there was no Fourth Amendment

---

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *Speer v. City of Wynne*, 276 F.3d 980, 985-86 (8th Cir. 2002); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Garcia v. Salt Lake City*, 768 F.2d 303, 310 (10th Cir. 1985).

49

violation, and without a Fourth Amendment violation there cannot be municipal liability under Monell." Id. at 1301. We rejected this "superficially seductive" "syllogism" and reiterated our prior holding that "Monell . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government." Id. (alteration in original) (quoting Anderson v. City of Atlanta, 778 F.2d 678, 686 (11th Cir. 1985)). Indeed, "municipal liability can exist if a jury finds that a constitutional injury is due to a municipal policy, custom, or practice, but also finds that no officer is individually liable for the violation." Id.

Such is the case here. The jury's verdict represents a finding that the Jail's policies—not the actions of the individual deputies— were the "'moving force' [behind] the constitutional violation." City of Canton v. Harris, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (alteration in original) (quoting Monell, 436 U.S. at 694). The Sheriff conflates the elements of a § 1983 claim against an individual officer with Monell's requirement of a constitutional violation. They are not the same. Barnett [v. MacArthur] forecloses the Sheriff's argument.

*(2) Cities, not policemen, have a duty to provide medical aid to injured arrestees*

The next error in those 4½ pages of its Order (Doc. 433) is found at page 27:

[A] municipality does not have a separate, individual constit-utional obligation to provide medical aid to suspects injured by a police officer beyond the obligation placed on individual police officers.

Again, the district court is dead wrong. The genesis of the court's error here is in its phrase, "beyond the obligation placed on individual police officers" because it incorrectly presupposes that individual police officers have such a duty.

50

The premise that individual police officers have a duty to themselves provide medical aid to persons they injure in the course of arresting is without any case law support.  There is no basis anywhere in *Revere* or elsewhere for the existence of any such obligation for individual police officers; and the district court cites no authority for this premise in its Order (Doc. 433).

While the City of Montgomery *could have* trained, as many cities do, its police in simple first aid measures, such as how to stop arterial bleeding or CPR, and required its police to administer that first aid to life-threatening injuries requiring immediate first aid ***in order to satisfy the City's obligation*** to provide such first aid or medical care, there is no basis for the district court's premise that there is an "obligation placed on individual police officers" to themselves provide medical aid to injured arrestees.

All of the Supreme Court and Eleventh Circuit authority disclosed by our research places this obligation ***solely*** on cities and counties, e.g., it cites only city and county governments as entities upon whom such a duty rests, *Revere v. Mass. General Hosp.*, 463 U.S. 239 at 244:

> The Due Process Clause  .  .  . ***require[s] the responsible government or governmental agency to provide medical care to persons*** .  .  . who have been injured while being apprehended by the police. (emphasis supplied)

And again, in *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989), the Court reaffirmed its holding in *Revere*, 489 U.S. at 199:

> [T]he Due Process Clause **requires the responsible government or governmental agency** to provide medical care to suspects in police custody who have been injured while being apprehended by the police. (emphasis supplied)

This Court has also held that it is only city and county governments, and **_not their individual law enforcement officers_**, that have the duty to provide medical care to injured arrestees, *Reid v. Streit*, 697 Fed. Appx. 968, 972 (11th Cir. 2017):

> The Fourteenth Amendment "require[s] the responsible government or governmental agency to provide medical care to [those] who have been injured while being apprehended by the police." (citing and quoting *Revere*)

The district court's Order does not cite any case from the Supreme Court or this Court supporting its mistaken premise that individual law enforcement officers have such a duty.  Likewise, our research has failed to reveal any such authority.

The district court's Order is in error on this point and is due to be reversed.

*(3) Calling EMTs does not satisfy the City's duty when immediate care is needed*

As yet another example of an erroneous legal premise contained in these 4½ pages of the district court's Order (Doc. 433), the court attempts to justify its grant of summary judgment to the City on plaintiff's *Monell* claim by asserting, page 28:

> Montgomery's constitutional obligation to provide medical aid was satisfied when the officers on the scene promptly summoned medical aid for Pettaway.

Again, the district court is dead wrong. The court cites no authority for this assertion and our research reveals that it is without any case law support.

What is undisputed is in this case is that the duty of the City under *King v. Reap*, 269 F. App'x 857 (11th Cir. 2008) was to provide "prompt and proper medical care" to Mr. Pettaway.

As we have previously argued and discussed, one of the "genuine issues of material fact" that plaintiff was entitled to have resolved by a jury in this case is whether the City provided Mr. Pettaway with that "prompt and proper medical care."

The issue of whether a particular action was taken "promptly" arises not infrequently in civil litigation and is universally held to be an issue or question of fact for a jury to decide on disputed facts.

For example, over a hundred years ago, in *American Surety Co. v. Pauly, 170 U.S. 160* (1898) the Supreme Court held that whether a notice had been given "promptly" *170 U.S. at 163*:

> is a question of fact for the jury to say upon the evidence, in view of the particular circumstances of the case, whether such a notice has been given with reasonable promptness.

One hundred and twenty five years after *American Surety Co. v. Pauly*, this Court held in *Metro. Life Ins. Co. v. Liebowitz*, 2023 U.S. App. LEXIS 17326, *8 (11ᵗʰ Cir 2023):

> Whether [a party's action] constitutes "reasonable promptness" is a question of fact beyond the scope of a motion for judgment on the pleadings.

And again in *Yacht Club on the Intracoastal Condo. Ass'n v. Lexington Ins. Co.*, 599 Fed. Appx. 875, 879 (11ᵗʰ Cir 2015), this Court held:

> [W]hether notice was "prompt" under these circumstances was a question for the jury.

Similarly, district courts in the Eleventh Circuit have been unanimous on this point – promptness *vel non* is a question of fact for the jury to decide and cannot be decided on motion for summary judgment, e.g., *Meredian Holdings Grp., Inc. v. Pereira*, 2020 U.S. Dist. LEXIS 265157, *27-28 (M.D. Ga. 2020); *Phillips v. Assocs. Asset Recovery, LLC*, 2025 U.S. Dist. LEXIS 12937, *54 (N.D. Ga., 2025); *Merchs. Bonding Co. v. Hous. Auth. of the Birmingham District*, 2013 U.S. Dist. LEXIS 205743, *17 (N.D. Ala. 2013); *Bodo v. Geovera Specialty Ins. Co.*, 2019 U.S. Dist. LEXIS 232690, *17 (M.D. Fla. 2019); *Battat v. QBE Specialty Ins. Co.,* 2022 U.S. Dist. LEXIS 16984, *27-28 (N.D.Ga. 2022); *Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1333, 1339 (S.D. Fla. 2009); *Clark v. Rockhill Ins. Co.,* 2019 U.S. Dist. LEXIS 185818, *6 (M.D. Fla. 2019); *Oriole Gardens*

54

*Condos., III v. Independence Cas. & Sur. Co.*, 2012 U.S. Dist. LEXIS 29100, *26-27 (S.D. Fla. 2012); and *El Faro Assembly of God, Inc. v. Am. States Ins. Co.*, 2017 U.S. Dist. LEXIS 25350, *11 (M.D. Fla. 2017).

Nevertheless, in this case, in violation of Rule 56, F.R.C.P., the district court decided this disputed issue of fact, whether the City provided "prompt" medical care to Mr. Pettaway, as a matter of law.

It did so by misinterpreting *Revere* to hold that cities and counties can discharge their duty to provide such care in all cases by simply calling EMTs to come to provide care for their injured arrestee-detainees. It then granted the City's motion for summary judgment on the *Monell* claim by applying that misinterpretation to decide, as a matter of law, that the City of Montgomery satisfied its duty to provide "prompt and proper medical care" to Mr. Pettaway by ordering its on-site police to stand back and to do nothing and then simply summoning the EMTs.

## CONCLUSION

Upon the strength of the foregoing citation of evidence and legal authority and for the reasons cited in our arguments herein, we respectfully submit that this Court should reverse the district court's grant of summary judgment to the City on the *Monell* claim (Doc. 433) and remand the case to the district court with directions to reconsider the plaintiff's motion for summary judgment on the *Monell* claim (Doc.

55

376), a motion the district court never previously considered but deferred action upon by "carrying it with the case" (Doc. 434) and which is therefore still pending.

Respectfully Submitted,

/s/ Griffin Sikes, Jr.

Griffin Sikes, Jr.
Attorney for Walter Pettaway
3058 Bankhead Avenue
P. O. Box 6350
Montgomery, Alabama 36106
(334) 233-4070
sikeslawyer@gmail.com

### CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 11,335 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Griffin Sikes, Jr.

56