# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Docket No.  25-10676

---

WALTER PETTAWAY,

*Appellant*

v.

THE CITY OF MONTGOMERY,

*Appellee*

---

On appeal from Memorandum Opinion and Order (Doc.433)
and Final Judgment (Doc. 471)
of the United States District Court for the Middle District of Alabama
Case No.  2:19-cv-00008-ECM-JTA

---

## BRIEF OF APPELLEE THE CITY OF MONTGOMERY

---

Allison Alford Ingram
Graham R. Neeley
C. Winston Sheehan, Jr.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
445 Dexter Avenue, Suite 9045 (36104)
Montgomery, AL  36102-2148
(334) 387-7680
(334) 387-3222 (Fax)
ala@ball-ball.com
gneeley@ball-ball.com
wsheehan@ball-ball.com
*Counsel for Appellee The City of Montgomery*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellee The City of Montgomery submits the following list of persons or entities which, upon information and belief of the undersigned attorneys for the Appellant have or may have an interest in the outcome of this case:

Adams, Hon. Jerusha T., United States Magistrate Judge, Middle District of Alabama

Barber, Nicholas, Defendant

Bellinger, Stacy, Counsel for Defendant/Appellee The City of Montgomery, Nicholas Barber

Chambliss, Rebecca, Counsel for Defendant, Nicholas Barber

City of Montgomery, Alabama, Defendant/Appellee

East, Chris, former Counsel for Defendant/Appellee The City of Montgomery

Finley, Ernest, Defendant

Flournoy, Neal, Defendant

Gray Jr., William Patton, Counsel for Defendant, Ryan Powell

Green, Michael, Defendant

Ingram, Allison, Counsel for Defendant/Appellee The City of Montgomery

Marks, Hon. Emily C., Chief United States District Judge, Middle District of Alabama

i

Neeley, Graham, Counsel for Defendant/Appellee The City of Montgomery

Nix Jr., H.E., Counsel for Plaintiff/Appellant, Walter Pettaway

Norris, John David, Counsel for Defendant, Neal Flournoy

Powell, Ryan, Defendant

Ruiz, Bianka, Defendant

Sheehan Jr., C. Winston, Counsel for Defendant/Appellee The City of Montgomery, Nicholas Barber

Sikes Jr., Griffin, Counsel for Plaintiff/Appellant, Walter Pettaway

Smith, Joshua Taylor, Defendant

Sydney, Brasfield, Counsel for Defendant/Appellee The City of Montgomery

Thrasher, Justin, Defendant

Watts, Keiundra, Defendant

ii

## STATEMENT REGARDING ORAL ARGUMENT

Oral Argument is not requested by the Appellee. All issues involved in this appeal are legal issues which the parties have fully briefed in the District Court and on appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ....................................................... iii

Table of Contents .....................................................................................iv

Table of Authorities ..................................................................................vi

Introduction................................................................................................1

Statement of Jurisdiction............................................................................3

Statement of the Issue ................................................................................4

Statement of the Case.................................................................................4

Statement of the Facts ...............................................................................7

  A. The House on Cresta Circle...............................................7

  B. The Break-In on July 8, 2018, at the House on Cresta Circle....................8

  C. MPD Response to Dixon's 911 Call ...........................................8

  D. Cpl. Barber and K-9 Niko Enter the House ...............................8

  E. The Reasons for the use of the K-9 dog .....................................9

  F. The Choke-Off Procedure Applied to K-9 Niko by Nicholas Barber......10

  G. The Call for Medical Treatment and Severity of Pettaway's Injuries .....11

  H. Montgomery Police Department Written Directive for Rendering Aid 3.3.5 ................................................................15

Statement of the Standard of Review.........................................................17

Summary of the Argument.........................................................................18

Argument..................................................................................................................19

I.   The District Court Properly Granted Summary Judgment on Pettaway's
     *Monell* claim against the City of Montgomery..............................................19

     A. There is no underlying Constitutional Violation because there is
        no duty to personally render medical aid ..................................................22

     B. The City was not Deliberately Indifferent..................................................25

        1. MPD Policy 3.3.5 is facially valid ......................................................26

        2. Plaintiff Failed to Establish that Pettaway's Death was a
           Highly Predictable Consequence because He Presented
           No Evidence of Prior Incidents and No Obvious Need ......................30

     C. MPD Policy 3.3.5 was not the proximate cause of Pettaway's death......34

     D. Although Plaintiff Conceded in the District Court that he was not
        asserting a Claim for Failure to Train, he has argued it on Appeal .........36

     E. Public Policy Dictates that Law Enforcement Agencies and Officers
        not be Legally Required to Render First Aid ...........................................46

Conclusion .............................................................................................................49

Certificate of Compliance .....................................................................................51

Certificate of Service .............................................................................................52

# TABLE OF AUTHORITIES

**Cases**

*Aaron as next friends of Aaron v. Hudson,*
 2022 WL 1085608 (N.D. Ala. Apr. 11, 2022)........................................................23

*Adams v. Custer,*
 2016 WL 155081 (S.D. Fla. Jan. 12, 2016) .....................................28, 32, 38, 39, 40

*Adams v. Sheriff of Palm Beach County, Fla.,*
 658 F. App'x 557 (11th Cir. 2016) ......................................................................28

*Aldridge v. Montgomery,*
 753 F.2d 970 (11th Cir. 1985) ............................................................................25

*American Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami,*
 637 F.3d 1178 (11th Cir. 2011) ..........................................................................39

*Barnett v. MacArthur,*
 956 F.3d 1291 (11th Cir. 2020) ..........................................................................22

*Beshers v. Harrison,*
 2005 WL 8156085 (N.D. Ga. Nov. 17, 2005) .................................................24, 39

*Board of County Commissioners of Bryan County, Oklahoma. v. Brown,*
 520 U.S. 397 (1997)........................................................................................26, 42

*Bozeman v. Orum,*
 422 F.3d 1265 (11th Cir. 2005) ..........................................................................20

*Brown v. Hughes,*
 894 F.2d 1533 (11th Cir. 1990) ..........................................................................28

*Brown v. City of Fort Lauderdale,*
 923 F.2d 1474 (11th Cir. 1991) ..........................................................................37

*Cannon v. Licking County,*
 2019 WL 2567732 (S.D. Ohio June 21, 2019) .....................................................45

*City of Canton, Ohio v. Harris,*
 489 U.S. 378 (1989)................................................ 30, 33, 37, 38, 41, 42, 43, 44

*City of Oklahoma City v. Tuttle,*
　471 U.S. 808 (1985) ..................................................................22

*City of Revere v. Massachusetts General Hosp.,*
　463 U.S. 239 (1983) ..........................................................27, 28, 49

*Connick v. Thompson,*
　563 U.S. 51 (2011) ...............................................................36, 38

*Craig v. Floyd County, Georgia,*
　643 F.3d 1306 (11th Cir. 2011). ...................................................26

*Crittenden v. City of Tahlequah,*
　786 F. App'x 795 (10th Cir. 2019) ...............................................20

*Davis v. Edwards,*
　2017 WL 6544847 (M.D. Ala. Sept. 5, 2017) ...........................23, 24

*Davis v. Purcell,*
　2014 WL 948345 (N.D. Ala. Mar. 11, 2014) ...............................45

*Denham v. Corizon Health, Inc.,*
　2015 WL 3509294 (M.D. Fla. June 4, 2015)...........................42, 43, 44

*Duncan v. Bibb County Sheriff's Department,*
　471 F. Supp. 3d 1243 (N.D. Ala. 2020).....................................42, 45

*Edwards v. Shanley,*
　666 F.3d 1289 (11th Cir. 2012) ...................................................31

*Farrow v. West,*
　320 F.3d 1235 (11th Cir. 2003) ...................................................35

*Fields v. Corizon Health, Inc.,*
　490 F. App'x 174 (11th Cir. 2012) ...............................................22

*Glossip v. Gross,*
　576 U.S. 863 (2015)...................................................................19

*Glowka v. Bemis,*
　2015 WL 8647702 (S.D. Ohio Dec. 14, 2015 .............................46

*Goebert v. Lee County,*
510 F.3d 1312 (11th Cir. 2007) .................................................................36

*Gold v. City of Miami,*
151 F.3d 1346 (11th Cir. 1998) ....................................................21, 38, 44

*Harper v. Lawrence County,*
592 F.3d 1227 (11th Cir. 2010) .................................................................34

*Harris v. Coweta County,*
21 F.3d 388 (11th Cir. 1994) ......................................................28, 38, 40

*Hunter v. City of Leeds,*
2021 WL 3550922 (N.D. Ala. Aug. 11, 2021) ......................................43

*James River Ins. Co. v. Ultratec Special Effects, Inc.,*
22 F.4th 1246 (11th Cir. 2022) .................................................................18

*Kingsley v. Hendrickson,*
576 U.S. 389 (2015)....................................................................................20

*Kuha v. City of Minnetonka,*
365 F.3d 590 (8th Cir. 2003) ....................................................................31

*Lewis v. City of West Palm Beach,*
561 F.3d 1288 (11th Cir. 2009) ................................................................39

*Love v. Tift County, Georgia,*
2010 WL 1257998 (M.D. Ga. Mar. 29, 2010).............................21, 40, 41

*Maddox v. Los Angeles,*
792 F.2d 1408 (9th Cir. 1986) ..................................23, 24, 27, 29, 32

*Mann v. Taser Int'l, Inc.,*
588 F.3d 1291 (11th Cir. 2009) ................................................31, 35, 36

*Marantes v. Miami-Dade County,*
649 F. App'x 665 (11th Cir. 2016) ...................................................27, 29

*Marrero–Rodriguez v. Municipality of San Juan,*
677 F.3d 497 (1st Cir. 2012)...............................................................42, 43

*Matthews v. Huntsville City Police Department,*
　2020 WL 4593782 (N.D. Ala. Aug. 11, 2020) .........................................................31

*McDowell v. Brown,*
　392 F.3d 1283 (11th Cir. 2004) ....................................................................21, 40

*McElligott v. Foley,*
　182 F.3d 1248 (11th Cir. 1999) ...........................................................................35

*Miller v. Bulloch County,*
　2009 WL 2337996 (S.D. Ga. July 27, 2009 ........................................................21

*Miller v. Calhoun County,*
　408 F.3d 803 (6th Cir. 2005) ...............................................................................40

*Monell v. Department of Social Services,*
　436 U.S. 658 (1978).................................................................................passim

*Oklahoma City v. Tuttle,*
　471 U.S. 808 (1985).............................................................................................38

*Owens v. City of Fort Lauderdale,*
　174 F. Supp. 2d 1282 (S.D. Fla. 2001) ................................................................37

*Pace v. City of Palmetto,*
　489 F. Supp. 2d 1325 (M.D. Fla. 2007).................................................................31

*Patel v. Lanier County, Georgia,*
　969 F.3d 1173 (11th Cir. 2020) ...............................................................28, 31, 34

*Peacock v. Smith,*
　2018 WL 5649899 (M.D. Ga. Oct. 31, 2018)........................................................23

*Perez v. City of Sweetwater,*
　770 F. App'x 967 (11th Cir. 2019.........................................................................36

*Revere v. Massachusetts General Hospital,*
　463 U.S. 239 (1983)........................................................................................23, 24

*Rodriguez v. City of Miami, Florida,*
　907 F. Supp. 2d 1327 (S.D. Fla. 2012) ................................................................40

ix

*Saucier v. Katz,*
  533 U.S. 194 (2001) ............................................................................20

*Signor v. Safeco Ins. Co. of Illinois,*
  72 F.4th 1223 (11th Cir. 2023) .........................................................18

*Stevens-Rucker v. City of Columbus, Ohio,*
  739 F. App'x 834 (6th Cir. 2018) ......................................................23

*Szabla v. City of Brooklyn Park, Minnesota,*
  486 F.3d 385 (8th Cir. 2007) .............................................................31

*Tagstrom v. Enockson,*
  857 F.2d 502 (8th Cir. 1988) .......................................................24, 28

*Tatum v. City & County of San Francisco,*
  441 F.3d 1090 (9th Cir. 2006) .....................................................28, 32

*Taylor v. Hughes,*
  920 F.3d 729 (11th Cir. 2019) ...........................................................35

*Thomas v. Town of Davie,*
  847 F.2d 771 (11th Cir. 1988) .....................................................25, 27

*Thompson v. Sheriff, Pinellas County, Florida,*
  542 F. App'x 826 (11th Cir. 2013) ....................................................30

*Trop v. Dulles,*
  356 U.S. 86 (1958) .............................................................................19

*Valderramma v. Rousseau,*
  780 F.3d 1108 (11th Cir. 2015) ...................................................31, 34

*Villanueva v. City of Fort Pierce, Florida,*
  24 F. Supp. 2d 1364 (S.D. Fla. 1998) ...............................................21

*Wade v. Daniels,*
  36 F.4th 1318 (11th Cir. 2022) ....................................................20, 48

*Wideman v. Shallowford Community Hospital, Inc.,*
  826 F.2d 1030 (11th Cir. 1987) ...................................................27, 28

x

*Williams v. Limestone County, Alabama,*
198 F. App'x 893 (11th Cir. 2006) ..............................................................41

*Wilson v. Meeks,*
52 F.3d 1547 (10th Cir. 1995) .....................................................................20

*Woodward v. City of Gallatin, Tennessee,*
2013 WL 6092224 (M.D. Tenn. Nov. 19, 2013 ..........................................46

*Woolfolk v. Gootee,*
2009 WL 10705815 (M.D. Fla. Jan. 28, 2009).............................................23

*Young v. City of Augusta,*
59 F.3d 1160 (11th Cir. 1995) .....................................................................37

## Statutes

42 U.S.C. § 1983 ...............................................................................................passim

28 U.S.C. § 1331 ......................................................................................................3

28 U.S.C. § 1367 ......................................................................................................4

## Other Authorities

*Officer-Involved Shooting: Reaction Patterns, Response Protocols, and Psychological Intervention Strategies,* International Journal of Emergency Mental Health, Vol. 8, No. 4, pp. 239-254 (2006).............................................................47

**INTRODUCTION**

This §1983 *Monell* case against the City of Montgomery (hereinafter "the City") arises from injuries that Joseph Pettaway received when apprehended by a Montgomery Police Department ("MPD") K-9 dog, and the treatment that he received following the injuries. In the early morning hours of July 8, 2018, Pettaway broke into a house, failed to show or identify himself, and hid from both the resident of the house and City police. MPD Corporal Nicholas Barber ("Cpl. Barber" or "Barber") twice gave the warning "Police, you in the house, identify yourself now or I'll send the dog." Cpl. Barber received no response and entered the residence with his K-9, Niko.

Garry Dixon, the resident of the house provided police with the intruder's last known location – hiding in a closet in the back bedroom where Dixon had been sleeping. Cpl. Barber and K-9 Niko entered the house and Niko began searching the residence. After a nearly four-minute-long search, Niko finally located Pettaway *hiding under a bed in a different bedroom*. Niko bit Pettaway one time and held on for approximately one minute and forty seconds. As soon as Pettaway complied with Cpl. Barber's order to come out from under the bed and show his hands, Cpl. Barber ordered Niko to release his bite. Due to Pettaway's concealed positioning under the bed, Niko bit Pettaway in the groin area causing a tear of the femoral artery. The femoral tear was not visible to the naked eye as Pettaway was wearing pants that

1

concealed the nature and severity of the injury. Medical experts confirmed that the torn femoral artery did not protrude between or through the skin.

Despite being unaware of the severe nature of Pettaway's injury, Cpl. Barber radioed for emergency medical assistance within approximately one minute after Pettaway was placed in handcuffs. In addition, none of the other officers at the scene were aware that Pettaway had suffered a life-threatening injury and/or how to treat the injury. There is no history of an MPD dog causing a fatal injury: MPD has been using K-9 dogs since the 1960s, and no MPD K-9 dog had ever caused a fatal injury.

The officers at the scene did not directly render first aid to Pettaway pursuant to MPD's Written Directive for Rendering Aid, Directive 3.3.5 ("Policy 3.3.5"), which became effective April 27, 2018, approximately two months prior to this incident. Policy 3.3.5 complied with the "gold standards" for police policy and procedure published by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). The MPD Policy mirrored the CALEA standard:

> "The purpose in this directive is to establish procedures for rendering aid after the use of force.
> POLICY:
>
> A. Personnel are required to request the Medics to provide appropriate medical aid after the use of force in the following circumstances:
>    1. To all persons with obvious injuries.
>    2. To all persons complaining of injuries.
>    3. To all persons with suspected injuries.

2

      B. Appropriate Medical Aid may include but is not limited to:

        1. Increased observation to detect obvious changes in condition;

        2. Evaluation by paramedics;

        3. Flushing chemical agents from the eyes;

        4. Removing barbs after Taser deployment

        5. Applying first aid; or

        6. For more serious or life threatening incidents, immediate aid by other medical professionals.

      C. Medical Aid is to be rendered by only those trained and/or certified to render such aid."

None of the officers at the scene that night were certified or trained to render medical aid to those who were profusely bleeding. Paramedics arrived approximately nine and a half minutes after Cpl. Barber's call for assistance. The Paramedics examined Pettaway, but they did not apply pressure and/or a tourniquet to Pettaway's wounds. Pettaway was transported to a local hospital where he was later pronounced dead.

Relevant to this appeal, Pettaway asserts a Fourteenth Amendment due process §1983 *Monell* claim against the City. The City moved for summary judgment on this claim, which the District Court granted. The City asks this Court to affirm the District Court's ruling.

## STATEMENT OF JURISDICTION

The District Court had original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331 as well as supplemental jurisdiction over the state law

3

claim under 28 U.S.C. § 1367(a). (Doc. 433 at 3)[1]. Jurisdiction and venue in the Middle District of Alabama were uncontested. (*Id*.). The District Court's order granting summary judgment was filed on January 31, 2023, (Doc. 433) and became a final order on February 28, 2025 (Docs. 470 & 471). Pettaway filed his Notice of Appeal on March 3, 2025. (Doc. 473).

## STATEMENT OF THE ISSUE

Whether the District Court properly entered summary judgment in favor of the City of Montgomery on Pettaway's 42 U.S.C. §1983 *Monell* claim because its policy on rendering medical aid complied with the requirements of the due process clause?

## STATEMENT OF THE CASE

The operative Third Amended Complaint alleged five counts and was filed on September 9, 2021 by Walter Pettaway, the brother and the Administrator of Joseph Pettaway's Estate. (*Id*. at 1, ¶4). Pertinent to this appeal, the Fourth Claim for Relief alleges a *Monell* claim against the City.

---

[1] References in the record are to the document numbers which were assigned as the documents were filed in the District Court. They are referred to by the corresponding document number as (Doc. #). Following the "Doc. #" there may be a reference to a page number in the referenced document. Or there may be a reference to deposition page which will be noted by the page and then line reference separated by a colon as "page#:line#." References to video from police bodycamera footage is designated by the document number and the time stamp reference. References to any documents filed on appeal will be referenced by the appellate case number and document number.

The parties filed cross motions for summary judgment. The Defendants filed a Motion for Summary Judgment as to all five (5) claims against all Defendants. (Docs. 374, 375, 378, 379, 380, 381, 382 & 383). Plaintiff moved for partial summary judgment and abandoned some of his claims in briefing except for (1) his Fourth Amendment excessive force against Cpl. Barber and (2) his *Monell* claim for deliberate indifference against the City of Montgomery and former MPD Chief Finley. (Docs. 371, 372 & 376). After briefing was completed, Pettaway moved to dismiss all of the individual Defendants except for Barber and Finley. (Doc. 424). The District Court granted this motion. (Doc. 425).

The District Court heard oral argument on the motions for summary judgment. (Doc. 429). On January 31, 2023, the District Court denied the Defendants' Motion for Summary Judgment on the Fourth Amendment excessive force claim against Barber but granted it as to all other claims and Defendants. (Doc. 433). On January 31, 2023, the District Court entered an order carrying Plaintiff's motion for partial summary judgment with the case. (Doc. 434).

On February 6, 2023, Barber appealed the denial of his qualified immunity, Appeal No, 23-10406-A. (Doc. 435) (hereinafter "first appeal"). In the trial court, Plaintiff moved for reconsideration of the District Court's order granting summary judgment on his deliberate indifference *Monell* claim against the City (Doc. 439), which was denied (Doc. 451). Defendants moved for a stay of the District Court

5

proceedings during the pending appeal on qualified immunity (Doc. 444) which was granted (Doc. 451).

After resolving the excessive force claim against Barber in the first appeal, the parties jointly moved to dismiss the first appeal on October 8, 2024 (USCA11 23-10406 Doc. 49). On November 4, 2024, while the first appeal was still pending, Pettaway filed a Notice of Appeal as to the *Monell* claim against the City of Montgomery, USCA Appeal No. 24-13617 (hereinafter the "second appeal"). (Doc. 454). On January 15, 2025, this Court granted the Joint Motion to Dismiss the first appeal. (USCA11 23-10406 Doc. 50). On January 17, 2025, this Court dismissed the second appeal. (USCA11 24-13617 Docs. 27 & 28).

After remand, on February 26, 2025, Pettaway filed a Motion to Dismiss Second Claim for Relief and for Entry of Final Judgment in the District Court. (Doc. 469). On February 28, 2025, the District Court entered an order granting the Plaintiff's Motion to Dismiss his Fourth Amendment excessive force claim against Barber, and denying all pending motions as moot.[2] (Doc. 470). Also on February 28, 2025, the District Court entered final judgment. (Doc. 471). The District Court

---

[2] Pettaway erroneously represents that "the district court never ruled on plaintiff's motion for summary judgment, but 'carried it with the case' (Doc. 434) and it remains pending." (USCA11 25-1000676, p. 56). The District Court's February 28, 2025 Order stated that "[a]ll pending motions are DENIED as moot." (Doc. 470, p. 2). Thus, Pettaway's motion was denied February 28, 2025, and incorporated into the February 28, 2025, Final Judgement. (Doc. 471).

entered judgment against Pettaway and in favor of the City of Montgomery on Pettaway's *Monell* claim (Count Four). (*Id.*).

On March 3, 2025, Pettaway filed his notice of appeal to this Court on his *Monell* claim against the City of Montgomery (hereinafter the "third appeal"). (Doc. 473).

## STATEMENT OF FACTS

### A.    The House on Cresta Circle

James Jones leased a house at 3809 Cresta Circle from Norris Harris. (Doc. 379-1, pp. 11:10–12:4). The house was small, approximately 900-1100 square feet. (Doc. 379-2, p. 81:5-14; Docs. 371-2 and 371-3). In exchange for a reduction in rent, Jones was repairing the house. (Doc. 379-1, p. 12:1-4). Jones enlisted his cousin, Garry Dixon, and Jones' friend, Joseph Pettaway, to help with the repairs. (Doc. 379-1, pp. 8:9-13, 9:14-20). In addition to the new appliances, there were other things of value in the house including a brand-new television, boxes of new hardwood flooring that had not yet been installed, and construction tools. (Doc. 379-1, pp. 31:14-21, 47:7-14).

By late June and early July, Dixon was spending the night at the house. (Doc. 379-1, pp. 22:25–23:6). Pettaway had never spent the night there before. (Doc. 379-1, p. 23:10-12). Jones knew that Dixon was spending the night at the house on July

7

7, 2018; no one other than Dixon was expected to be staying at the house that night. (Doc. 379-1, pp. 54:24–55:4).

### B.    The Break-In on July 8, 2018, at the House on Cresta Circle

Dixon heard a knocking sound during the night but did not answer the door because he did not know a reason that anyone would be at the door and the house is in a rough neighborhood. (Doc. 433 at 7). Dixon then heard a noise inside the residence and later observed an intruder's hand from a closet in the back bedroom where he was sleeping so Dixon quietly exited the house and called 911. (Doc. 379-3 at 0:02:21).

### C.    MPD Response to Dixon's 911 Call

At approximately 2:40 am on Sunday morning July 8, 2018, MPD officers responded to 3809 Cresta Circle in response to the 911 call received from Dixon advising of a suspected burglary. (Doc. 379-4). Dixon also indicated that the residence was not his but belonged to James Jones, who was not initially present at the scene. (*See* Doc. 379-3 at 0:02:58). Cpl. Barber responded to the call for a K-9 unit, arrived on the scene and spoke with Dixon, who informed him that he had seen an intruder's hand in his bedroom closet. (Doc. 379-3 at 0:08:47–0:09:12).

### D.    Cpl. Barber and K-9 Niko Enter the House

Cpl. Barber went to the front door of the residence and twice gave the warning "Police, you in the house, identify yourself now or I'll send the dog." (Doc. 379-2,

8

pp. 106:14–107:4). Cpl. Barber received no response and entered the residence with his K-9, Niko. (*Id.*). The residence was searched by Niko and Barber for almost four minutes before Pettaway was discovered by Niko hiding[3] under a bed in a different bedroom than the bedroom that Dixon had seen the intruder's hand. (Doc. 379-3 at 0:13:44–0:17:36). The room where Pettaway was apprehended was unlit, and Barber had to lift the bed to allow Pettaway to get out from under the bed where he was hiding. (Doc. 379-3 at 0:18:05–0:18:39).

### E. The Reasons for the use of the K-9 dog

Barber explained the need to release the K-9 dog:

Q. Okay. And state as convincingly as you can why there was a need to release the dog at that time.

MR. EAST: Object to the form.

A. Because the guy had already seen -- Mr. Dixon had already seen him inside there. He's the one that called. There wasn't a -- it wasn't like other burglary calls where somebody says -- they think they're breaking into this

---

[3] Pettaway had motive to hide as he had an extensive criminal record with convictions for theft of property, escape, and use of a forged instrument. (Doc. 380-1; 381-1; 381-2 at pp. 60-61). In addition, he had plead guilty to use of a Controlled Substance (Cocaine), a Class C Felony, and Use/Possession of Drug Paraphernalia, a Class A Misdemeanor. (Doc. 381-2 at pp. 46, 65, 71). He failed to appear at multiple sentencing dates and warrants were issued for his failure to appear. (*Id.* at 65, 71, 114, 120).

In addition, Pettaway's Toxicology screen revealed the presence of cocaine in his blood that night/early morning. (Doc. 382-1, pp. 186:11–187:20). A scale and a crack pipe were found under the bed where Pettaway had been hiding. (*See* Doc. 379-3 at 0:30:04; 0:31:11; *see also* Doc. 382-2 at 0:04:51; 0:09:37). These facts could have resulted in additional criminal charges against Pettaway.

house, but they didn't actually see it. They just call. So they already had called the police. He wanted to be seen. He wasn't trying to be -- a lot of times, you get people, they will call and say: I don't want to see the police. I just want them to know. So, we had a natural complainant in there that saw him in there. And that's also part of the policy to respond to burglaries and alarm calls and other felonious-type cases or calls, rather. So, given all those circumstances, it wasn't an anonymous 911 call, they don't want to be seen, no answer on call back type of call.

(Doc. 371-5, p. 166:5-24). Further, Barber explained:

Q.  Well, again, I don't -- for right now -- tell us what it is that impressed on you: We have got to use force here. There is no other alternative? What made that necessary then, when you released the dog in there? Why was that needed other than what you've told us? Any other reason?

A.  Well, also when -- *the whole purpose behind using the dog is to keep the officers safer, so the dog, which is a tool, can be used to go and find anyone that's in there without putting any officers potentially in danger*.

(Doc. 371-5, p. 167:9-19) (emphasis added).

**F.    The Choke-Off Procedure Applied to K-9 Niko by Nicholas Barber**

MPD K-9 officers were instructed to handcuff suspects who had been apprehended by the dog prior to performing the procedure to have the dog release the bite, as an officer safety measure to ensure that the suspect cannot use a weapon and hurt the officer. (Doc. 379-6, pp. 297:2–300:4). In a previous MPD incident, after the suspect had been handcuffed, it was discovered that the suspect was hiding a gun and knife out of sight and underneath his body. (Doc. 379-7, ¶2).

10

After Cpl. Barber handcuffed Pettaway, Barber made Niko release the bite by performing the standard "choke off" procedure. (Doc. 379-3 at 0:19:03); (Doc. 379-6, p. 84:7-14). Roughly a minute and forty seconds elapsed between the time Niko first bit Pettaway, Pettaway moved out from under the bed, Pettaway was handcuffed, and Barber's release of Niko's bite through the "choke-off procedure." (Doc. 379-3 at 0:17:36–0:18:58).

**G. The Call for Medical Treatment and Severity of Pettaway's Injuries**

Just over a minute after the K-9 Niko released his bite, Cpl. Barber called for medics to come to the scene. (Doc. 379-3 at 0:20:04). Officers on the scene entered the bedroom to take Pettaway into custody. (*Id.*). Unbeknown to any of the MPD officers on the scene, Niko had bitten Pettaway at or near his groin where the femoral artery goes through the pelvis. (Doc. 382-3, pp. 17:15–18:11). The femoral artery did not protrude between or through the skin so the location and extent of the bit was not visible. (*Id.*). Niko had not been trained to target any particular body part when making an apprehension; rather he was trained to bite whatever body part that he first encountered. (Doc. 379-7, ¶5). MPD has been using K-9 dogs since the 1960s, and no MPD K-9 dog had ever caused a fatal injury. (*Id.*, ¶6).

The officers at the scene did not directly render first aid to Pettaway after Cpl. Barber had called for medics because they were acting pursuant to Policy 3.3.5, effective April 27, 2018. (Doc. 382-4, pp. 35:14–36:22; Doc. 382-5). There is no

11

evidence that any of the officers were aware that Pettaway had suffered a life-threatening injury and/or how to treat such an injury[4]. (Doc. 382-6, pp. 34:8–35:4[5]; Doc. 379-2, pp. 157:2–158:1; Doc. 379-5, p. 138:9-16[6]; Doc. 382-7, pp. 39:9–40:5[7]). None of the officers were certified to render medical care to those who were profusely bleeding. (Doc. 382-6, pp. 36:25–37:11, 38:13–39:9; Doc. 379-2, p. 146:9-18; Doc. 379-5, p. 137:9-23; Doc. 382-7, pp. 45:4–46:34; Doc. 382-8, pp. 47:5–49:7, 55:21–56:21; Doc. 382-9, pp. 40:12–41:7).

---

[4] At oral argument on summary judgment the Court asked for evidence on the officer's knowledge of Pettaway's injuries:

THE COURT: Well, you've talked to the officers. Did any officer testify, Yes, I knew before the EMTs arrived that" -- and you can go back to the podium -- "that this officer [sic] was dying"?

MR. SIKES: No, ma'am. I don't think so.

(Doc. 464, p. 97:1-5)

The issue was later revisited during the hearing but no references to the record were provided to the Court.

[5] Q. Okay. Did it ever occur to you that this man may die?
  A. It did not.
  Q. And how would you not draw that conclusion?
  A. I've never seen something like that. I've never seen the outcome of something like that.

(Doc. 382-6, p. 34:9-15).

[6] "No one stopped -- tried to stop it. Like I said earlier, no one knew where he was bleeding from."

(Doc. 379-5, p. 138:12-13).

[7] Q. Do you understand that's a life-threatening circumstance?
  A. I've been to multiple calls where there have been a lot -- major loss of blood, and those individuals had not passed away.
          *     *     *
  A. Sir, I'm not able to determine the amount of volume of blood that he has lost.

(Doc. 382-7, pp. 39:12-16, 40:4-5).

12

Prior to the arrival of the paramedics and almost seven[8] minutes after Niki first bit Pettaway and over five minutes after Niko was choked off, he was carried outside onto the front walkway of the house[9]. (Doc. 379-3 at 0:25:07). After the paramedics arrived, they evaluated Pettaway, but likewise did not apply any pressure to Pettaway's wounds. (Doc. 379-3 at 0:28:50-39:00). The medics worked on Pettaway and transported him from the scene. (Doc. 382-14, pp. 34:25–35:2).

According to Dr. Stephen Boudreau, the State Medical Examiner,  Pettaway sustained major damage to the left femoral artery of his upper thigh area. (Doc. 382-15, ¶¶3-5; Doc. 382-3, p. 10:12-23). Pettaway sustained massive blood loss within minutes, whereby the artery tear was so severe that he would not have survived for very long. (Doc. 382-15, ¶8; Doc. 382-3, pp. 21:1–22:1). As Dr. Boudreau stated, the blood loss would have been rapid, and applying a tourniquet would be very difficult in this situation:

> A.    …You could apply a tourniquet, but tourniquets are extremely difficult to apply, specifically in the upper leg like that you have to try and grab that artery coming out of

---

[8] Pettaway refers to this interval as eight minutes. (USCA11 25-10676, p.23). Pettaway cites the Court to the Barbour video photo exhibits. (*Id*.). Although the Barber video was an exhibit to the summary judgment motions, the photographs were not admitted by the Court because Pettaway submitted them at oral argument after the dispositive motion deadline. The Court did not admit them so they are not part of the record. (Doc. 464, 94:7–98:6).

[9] Pettaway was brought outside of the house due to concern that the medics could not get a stretcher down the narrow hallway of the house. (Doc. 372-18, p.8:16-24).

the groin which is hard is going to be hard to get a tourniquet around it.

(Doc. 382-3, pp. 22:23–23:3). That is, Pettaway "would've gone into shock from blood loss. Loosely speaking, shock is when you do not pump enough blood to supply your peripheral organs your brain, kidneys. In this instance he would have lost blood. He would not have had enough blood to pump – to keep his kidneys going, his brain going and his heart going." (Doc. 382-3, p. 19:9-14). The tear in the femoral artery was in a location such that the application of pressure to the wound would not have prolonged Pettaway's life in any meaningful way. (Doc. 382-15, ¶6).

Dr. Boudreau agreed with the statement in the Boy Scout Wilderness Guide[10], that "*almost all* bleeding can be stopped with direct pressure." (Doc. 234 at 27; Doc. 382-3, p. 26:4-13). The key phrase Dr. Boudreau agreed with is "almost all," as Dr. Boudreau corrected Petaway's counsel's verbiage that "all bleeding" can be stopped by direct pressure. (Doc. 382-3, p. 26:4-13). While pressure may have "reduced" or "retarded" the bleeding, (Doc. 382-3, pp. 26:14–27:3), that reduction or retardation of bleeding on the scene after the application of direct pressure would not have made an ultimate difference in preserving Pettaway's life. (Doc. 382-15, ¶6). This was because Pettaway suffered a large tear of his femoral artery, rather than a puncture

---

[10] Plaintiff argues that stopping bleeding is simple because it is in the Boy Scout Wilderness Guide and infers that everyone should know what Boy Scouts should know. (USCA11 25-10676, Doc. 14, p. 42, n.14). This assertion ignores the fact that Boy Scouts are trained on this.

14

wound. (Doc. 382-16, p. 118:2-8). Dr. Boudreau estimated that Pettaway would have lost a life-threatening amount of blood within two-and-a-half to three minutes. (Doc. 382-15, ¶8). Due to the location of the dog bite, and the clothing that Pettaway was wearing, the extent of his blood loss was not immediately apparent. (Doc. 379).

### H.    Montgomery Police Department Written Directive for Rendering Aid 3.3.5

According to the MPD's accreditation manager, Lt. Raymond Carson, the Policy was developed to comply with standards published by the Commission on Accreditation for Law Enforcement Agencies ("CALEA") – the "gold standard" for police department standards of policy and procedure. (Doc. 382-10, pp. 19:19–21:2). The Policy "mirrors" language in the CALEA standards for rendering medical aid. (Doc. 382-10, pp. 29:4–30:12; Doc. 382-4, p. 27:8-23):

> "The purpose in this directive is to establish procedures for rendering aid after the use of force.
> POLICY:
>
> A. Personnel are required to request the Medics to provide appropriate medical aid after the use of force in the following circumstances:
>    1. To all persons with obvious injuries.
>    2. To all persons complaining of injuries.
>    3. To all persons with suspected injuries.
>
> B. Appropriate Medical Aid may include but is not limited to:
>    1. Increased observation to detect obvious changes in condition;
>    2. Evaluation by paramedics;
>    3. Flushing chemical agents from the eyes;

15

4.  Removing barbs after Taser deployment
5.  Applying first aid; or
6.  For more serious or life threatening incidents, immediate aid by other medical professionals.

C.  Medical Aid is to be rendered by only those trained and/or certified to render such aid."

(Doc. 382-5, Policy 3.3.5).

The Policy directive to City police officers, who are not trained medics, is sensible: once an officer has an injured suspect in custody, the officer is to promptly call for professional medical aid to treat the injured suspect. The rationale was explained by Chief Finley:

Q.  Yes. An officer on scene who actually did use hands-on first aid or medical care with a suspect who has been injured by a canine would be violating this policy.

Mr. East. Object to Form.

A.  No.

Q.  Tell me why not.

A.  I think that if the officer was comfortable enough to provide that additional training --- We do have some officers that are combat medics or had additional training prior to this incident. And I think that those officers will be – will not be in violation of what they --- of the policy based on being --- their duty being above and beyond their call of duty if they are trained and they are comfortable with providing that service.

(Doc. 382-4, pp. 98:18–99:9). The Policy was not a blanket prohibition against rendering aid; rather, if an officer was a trained combat medic, for example, he or she would be free to render aid of the type that the Plaintiff seeks to require all MPD

16

police to provide[11]. (*Id.*). The Policy was geared towards protecting officer safety, because officers who don't have medical training potentially do not know how to, in a sanitary and hygienic manner, render medical aid in a scenario like that in the case at bar, where the officer would be called to treat profuse bleeding from a torn femoral artery while running the risk of exposure to blood-borne pathogens. (Doc. 382-11). Even Plaintiff's expert William Gault has opined that officers would be justified in not applying pressure if they were aware that an individual had a communicable disease. (Doc. 382-12, pp. 100:22–103:16).  Here, it is undisputed that Pettaway had both HIV and Hepatitis C. (Doc. 382-13). In addition, the officers could be subjecting themselves to potential liability for providing medical care that they were not trained or certified to provide. (Doc. 382-14, p. 29:3-12).

## STATEMENT OF THE STANDARD OF REVIEW

This Court reviews a district court's rulings on cross-motions for summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party on each motion. *Signor v. Safeco Ins. Co. of Illinois*, 72 F.4th 1223, 1227 (11th

---

[11] Pettaway repeatedly argues that "none" of the MPD officers were trained to render first aid. (USCA11 25-10676, Doc. 14, pp. 43 & 51). Although the City's 30(b)(6) designee Lt. Carlisle testified that he was "not sure" there were any and did not personally know of any (*Id.* at pp. 26-27, n.7), Chief Finley testified that there were trained individuals. (Doc. 382-4, pp. 98:18–99:9). Although Carlisle was a 30(b)(6) representative, there is no evidence in the record that he was asked in the notice to provide the names of officers who were trained. The 30(b)(6) deposition notice is not part of the record, and a fair reading of the section identified by Pettaway is that it is seeking information on training done by MPD.

Cir. 2023) (citing *James River Ins. Co. v. Ultratec Special Effects, Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022)).

## SUMMARY OF THE ARGUMENT

The District Court granted the City's motion for summary judgment on Pettaway's §1983 *Monell* claim because the Policy does not violate the Fourteenth Amendment's Due Process Clause. Pettaway argues that the Policy, in conjunction with MPD's custom of not training officers in first aid beyond CPR, violated Pettaway's Fourteenth Amendment right to prompt and proper medical care. Pettaway admitted that Barber promptly called for medical care and makes no claim that there was a delay in the call for medical aid. Instead, Pettaway maintains that the officers themselves are required to provide prompt medical care. He admits that there is no existing law on this issue in this Circuit or the U.S. Supreme Court, but contends that the Due Process Clause requires officers to personally render medical aid, whether they have been trained to provide that aid or not.

The District Court rejected this argument and held that the Policy did not violate the Fourteenth Amendment because neither the Eleventh Circuit nor the U.S. Supreme Court have ruled that law enforcement officers are required to personally render medical aid when they have not been trained to do so. Because Cpl. Barber promptly called for medical assistance, he fulfilled Pettaway's right to medical care. And because there is no requirement for officers to personally render medical aid

18

when they have not been trained, they did not violate Pettaway's constitutional rights and the City cannot be held liable under *Monell*.

Even if there were a constitutional requirement for officers to personally render medical aid when they have been trained, the City was not deliberately indifferent because Policy 3.3.5 calls for officers to provide medical aid when they are trained or certified. There is no evidence that application of Policy 3.3.5 resulted in the exacerbation of injuries or death prior to this case. Nor is the policy "so obviously" unconstitutional that the City did not need notice of prior incidents. There is no evidence that in the history of MPD using a K-9 dog that there had ever been a fatal injury, nor is there a history of any injuries with severe arterial bleeding. Finally, Policy 3.3.5 was not the cause of Pettaway's death.

## ARGUMENT

### I.    The District Court Properly Granted Summary Judgment on Pettaway's *Monell* claim against the City of Montgomery.

Pettaway's fourth claim challenges the Policy based on a theory of deliberate indifference, and rests upon the Plaintiff's appeal to Chief Justice Earl Warren's much criticized "evolving standards of decency" standard. *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality)); *see generally Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring) ("divin[ing]" the "evolving standards of decency" is "a task for which we are eminently ill suited."). This Court has confirmed that while a delay in summoning medical aid by law enforcement officers can give rise to a

19

deliberate indifference claim, the prompt summoning of medical aid — which Cpl. Nicholas Barber indisputably did— discharges the officer's constitutional duty. *See, e.g., Wade v. Daniels,* 36 F.4th 1318, 1327 (11th Cir. 2022) (four-minute delay in summoning medical aid for suspect shot in the head by police could constitute deliberate indifference). "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015).

As the Tenth Circuit aptly put it, "(f)ew citizens would be likely to want police officers to render medical aid. Such steps are best left to the qualified and highly trained personnel who act as paramedics or EMTs." *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 804 (10th Cir. 2019) (quoting *Wilson v. Meeks*, 52 F.3d 1547, 1555-56 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)). There is no duty to give, "*as well as summon*," medical assistance, even if the police officers are trained in CPR." *Wilson*, 52 F.3d at 1555 (emphasis added). "To pinion the police in the center of such a medical dispute is unfair and unwise." *Id*. at 1556.

A plaintiff may bring a § 1983 claim against a municipal defendant for deprivation of a federal right pursuant to an official policy, practice, or custom. *Villanueva v. City of Fort Pierce, Fla.*, 24 F. Supp. 2d 1364, 1368 (S.D. Fla. 1998)

20

(citing *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978) (citations omitted)). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "To establish that a custom or policy was the product of deliberate indifference to constitutional rights, there must be evidence showing the municipality had notice of a need to supervise." *Love v. Tift Cty., Georgia*, No. 7:08-CV-62 (HL), 2010 WL 1257998, at *11 (M.D. Ga. Mar. 29, 2010) (citing *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)). "To establish notice in a context outside of a failure to train claim, the municipality must be made aware of previous constitutional deprivations caused by its policies." *Id*. (citing *McDowell*, 392 F.3d at 1291). "In other words, there must be evidence of prior-incidents of constitutional violations in the record." *Id*. (citing *Miller v. Bulloch County*, No. 608–CV–05, 2009 WL 2337996, at *4 n. 4 (S.D. Ga. July 27, 2009)).

The U.S. Supreme Court has held that where a municipality's policy relied upon "is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality).

21

"The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue." *Id*. at 824 n.8 (emphasis in original). "When a municipal policy itself violates federal law ... resolving issues of fault and causation is straightforward." *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 182 (11th Cir. 2012) (citation omitted). "But, if the policy or custom is facially lawful, 'the plaintiff must establish that the municipal action was taken with deliberate indifference *as to its known or obvious consequences*.'" *Id*. (emphasis added).

### A. There is no underlying Constitutional Violation because there is no duty to personally render medical aid[12]

Police officers do not have a duty under the Fourteenth Amendment's Due Process Clause to directly and/or personally provide medical care to persons injured

---

[12] The District Court held that Pettaway did not clearly argue that the City of Montgomery could be held liable on a *Monell* claim despite none of the individual officers committing a constitutional violation. (Doc. 451, p.2) Pettaway had filed a motion for reconsideration citing existing authority, *Barnett v. MacArthur*, 956 F.3d 1291 (11th Cir. 2020) he had not raised in his brief. (Doc. 439). The District Court held his motion should be denied on those grounds. The Court went on to find, however, that even if the argument had been timely raised it failed on its merits because the City did not commit an underlying constitutional violation. Thus, the district Court did not err by finding no *Monell* liability because there had been no violation by the individual officers.

during an arrest. *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)[13]; *see also Davis v. Edwards*, No. 3:16-CV-855-CDL-DAB, 2017 WL 6544847, at *8 (M.D. Ala. Sept. 5, 2017), *report and recommendation adopted*, No. 3:16-CV-855-CDL-DAB, 2017 WL 6543878 (M.D. Ala. Dec. 21, 2017); *Aaron as next friends of Aaron v. Hudson*, No. 6:21-CV-01058-LSC, 2022 WL 1085608, at *3 (N.D. Ala. Apr. 11, 2022); *Peacock v. Smith*, No. 5:18-CV-00284-TES, 2018 WL 5649899, at *7 (M.D. Ga. Oct. 31, 2018); *Woolfolk v. Gootee*, No. 307CV00137J25TEM, 2009 WL 10705815, at *7 (M.D. Fla. Jan. 28, 2009); *Maddox v. Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). The government's responsibility to provide medical care to a person injured during an arrest is met by seeing that the injured person is promptly taken to a hospital, *Revere,* 463 U.S. at 245, or medical help is summoned, *Maddox*, 792 F.2d at 1415.

Here, Cpl. Barber immediately called for medics to come to the scene after he secured Pettaway in handcuffs. (*See* Doc. 379-3, at 0:20:04) ("(inaudible) on the left side stomach side dogs (inaudible) ***start the medics***. That's 10-4, he's in custody.").

---

[13] The U.S. Supreme Court had the opportunity to address the issue of whether there is an affirmative duty for a police officer to personally render medical aid in *Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834 (6th Cir. 2018), *cert. denied* 139 S.Ct. 1291 (2019). Stevens-Rucker filed a Petition for Certiorari to the U.S. Supreme Court on the sole issue of whether police officers are constitutionally obligated to personally render medical aid, 2018 WL 6179414. When given the opportunity to revisit its prior holding in *Revere* for possible reevaluation or expansion of an officer's duty to render aid, the Supreme Court declined to do so.

23

He did so just over a minute after the release of the bite and nearly two-and-a-half minutes after Niko had initially bitten Pettaway, Pettaway came out from under the bed and was handcuffed, and Niko's bite was released. (Doc. 379-3, at 0:17:38–0:20:11). Cpl. Barber began and ended the K-9 search, apprehension and release, and summoned the medics as fast as he could under the circumstances.

Pettaway argues that the police officers on the scene should have rendered medical attention themselves, but the Fourteenth Amendment's Due Process Clause does not require such. A defendant "fulfill[s] its constitutional obligation by seeing that [the injured suspect] was taken promptly to a hospital that provided the treatment necessary for [an injury caused by a police shooting]" *Beshers v. Harrison*, No. 2:04-CV-54-WCO, 2005 WL 8156085, at *8 (N.D. Ga. Nov. 17, 2005), *aff'd*, 495 F.3d 1260 (11th Cir. 2007) (citing *Revere*, 463 U.S. at 245); *Tagstrom v. Enockson*, 857 F.2d 502, 504 (8th Cir. 1988) (officer "properly performed his duty by immediately calling an ambulance. His decision not to give medical assistance to [the injured plaintiff] did not violate [the plaintiff's] right to prompt medical assistance"); *Maddox*, 792 F.2d at 1415; *Davis v. Edwards*, 2017 WL 6544847, at *8 ("there was no constitutional obligation for Edwards, Hardnett, and Fenn to personally render medical assistance to Stewart in these circumstances where there is no allegation they delayed in calling for emergency medical services.").

Pettaway cannot and did not establish the first element of his §1983 *Monell* claim because there is no underlying constitutional violation. There is no controlling law from either this Court or the Supreme Court that places a duty on government entities to require law enforcement officers who have not been trained in first aid to personally render first aid. Pettaway did not direct the Court to any such authority in the District Court[14], or in his brief on appeal. None of the cases cited by Pettaway require law enforcement officers to render first aid when they have not been trained and there is no evidence that they had any idea how to control Pettaway's bleeding. The District Court properly granted summary judgment in favor of the City.

### B.    The City was not Deliberately Indifferent

This Court has applied a "deliberate indifference" standard of care to claims of improper medical care. *See Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985). "Deliberate indifference to serious medical needs may be shown by failure to provide prompt attention to those needs by delaying necessary medical treatment for nonmedical reasons." *Thomas v. Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988). Even

---

[14] At the January 12, 2023 oral argument on summary judgment, the following exchange occurred:

> THE COURT: You don't have any authority that stands for the proposition that you're arguing here, that the City has an obligation to have a policy that requires its officers to provide hands-on medical care if the situation requires it?
>
> MR. SIKES: There is no -- Your Honor is writing on a clean slate. . .

(Doc. 464, p. 97).

25

if this Court were to find that there is an underlying constitutional violation, Pettaway's claim fails because he cannot establish the second element of a *Monell* claim. To establish the second element of a § 1983 *Monell* claim, a plaintiff must show either that the policy is facially unconstitutional or that a series of constitutional violations have occurred from which deliberate indifference can be inferred. *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011).

### 1.    *MPD Policy 3.3.5 is facially valid*

Where a Plaintiff makes a facial challenge to the policy (rather than a deliberate indifference *qua*-failure-to-train claim)[15], to succeed on such a challenge he "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 411 (1997). Distilled to its essence, Pettaway's claim really is that the Policy "is ineffective," i.e., that it fails to ensure injured suspects taken into custody by police receive care on the level of that provided by professionally-trained medics, which, apparently, "in turn sends an implicit message to police officers" that they can be deliberately indifferent to medical needs of injured arrestees. *See Marantes*, 649 F.

---

[15] In the District Court, Pettaway represented that he is not asserting a failure to train claim, (i.e., ˝Defendants repeatedly attempt to mischaracterize the Fourth Claim for Relief as being a failure to train case.  It is not.˝). (Doc. 403, p. 33, n.25).

App'x at 673. Pettaway "has pointed to only one incident, however, to show that" the Policy was ineffectual," by "his own experience." *Id*.

Here, Pettaway has not shown that the Policy violates the constitutional deliberate indifference standard. "In *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239[, 244] (1983), the Supreme Court held that the Due Process Clause requires 'the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police.'" *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1034–35 (11th Cir. 1987) (citing *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986)). "Although the Supreme Court in *City of Revere* declined to define the exact nature of the state's obligation in such circumstances, it held that '[w]hatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the suspect] was taken promptly to a hospital that provided the treatment necessary for his injury.'" *Wideman*, 826 F.2d at 1035 (quoting 463 U.S. at 245).

Multiple Eleventh Circuit cases regarding the prompt summoning of aid state that as long as law enforcement officers do not <u>delay</u> the provision of medical aid to an injured suspect who has been taken into custody, those officers are not subject to liability under the Fourteenth Amendment for deliberate indifference. *See, e.g., Thomas v. Town of Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988) (citing *City of Revere*, 463 U.S. at 244); *Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1190 (11th

27

Cir. 2020) (deputy failed to enlist the help of a medical professional in the face of a serious medical need and made no attempt to treat despite having first-responder training); *see also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (deliberate delay of hours in providing care for a serious and painful broken foot states a constitutional claim); *Harris v. Coweta Cty.*, 21 F.3d 388, 394 (11th Cir. 1994) ("A few hours' delay in receiving medical care for emergency needs such as … bleeding cuts may constitute deliberate indifference.").

Whatever the Plaintiff's potential quibbles with the Supreme Court's holding in *City of Revere*, the rule as stated by the Supreme Court and applied by the Eleventh Circuit is that "seeing the suspect is taken promptly to a hospital" discharges the government's constitutional obligations under the Fourteenth Amendment. *See Wideman,* 826 F.2d at 1035; *Adams v. Custer*, No. 14-CV-80403-CIV, 2016 WL 155081, at *17 (S.D. Fla. Jan. 12, 2016), *aff'd sub nom. Adams v. Sheriff of Palm Beach Cty., Fla.*, 658 F. App'x 557 (11th Cir. 2016) ("Plaintiff does not identify any case law suggesting that personal medical attention is required by the Constitution."); *see also Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006) ("Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest … neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.") (citation omitted); *Tagstrom v. Enockson*, 857 F.2d 502, 504 (8th Cir. 1988) (officer

28

properly performed his duty by immediately calling an ambulance and his decision not to personally give medical assistance did not violate right to prompt medical assistance.") (citing *Maddox, supra*)). The City's Policy did not delay medical aid for nonmedical reasons; on the contrary, per Cpl. Barber's undisputed body camera footage, medical aid was ***promptly*** summoned after Pettaway was bitten by the K-9 Niko, handcuffed, and Niko's bite released. (Doc. 379-3 at 0:20:04–0:20:13)

Even if this Court were to find that municipalities have a duty to train officers to personally provide medical care in limited circumstances, Policy 3.3.5 is still constitutionally valid on its face. Pettaway treats his § 1983 claim against the City as if there is a demonstrable constitutional violation, but that is just not so, for the Policy is not a "policy *directly encouraging*" deliberate indifference. *Marantes v. Miami-Dade Cty.*, 649 F. App'x 665, 673 (11th Cir. 2016) (emphasis added). On the contrary, the Policy requires MPD officers to call for medical assistance to all persons with obvious injuries, those who simply complain of injuries, and those with suspected injuries.

The Policy also provides other requirements such as observation, the flushing of spray from eyes and the rendering of first aid. The Policy limits the provision of first aid, however, to those who have been trained in first aid. But because the Policy requires officers to call for medical assistance and for officers to provide medical aid if they have been trained, it is constitutionally valid. As stated above, this Policy

mirrored that created by CALEA. There is simply nothing on the face of the Policy that violates the Fourteenth Amendment's Due Process Clause. The language in the Policy is analogous to that the Supreme Court has found facially constitutional: "There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall ... have [a person needing medical care] taken to a hospital for medical treatment, with permission of his supervisor. It is difficult to see what constitutional guarantees are violated by such a policy." *City of Canton*, 489 U.S. at 386-87.

### 2. *Plaintiff Failed To Establish That Pettaway's Death Was A Highly Predictable Consequence Because He Presented No Evidence Of Prior Incidents and No Obvious Need*

There is no evidence that application of Policy 3.3.5 resulted in the exacerbation of injuries or death prior to this case. Pettaway does not argue this theory. Instead, he apparently contends that Policy 3.3.5 was "so obviously" unconstitutional that the City did not need notice of prior incidents. Pettaway does not clearly articulate a single incident theory of deliberate indifference based upon the existence of the Policy. Even assuming *arguendo* that he had, that claim still "falls far short of that 'narrow range of circumstances' that the Supreme Court has suggested might rarely "reflect the city's deliberate indifference to the highly predictable consequence ... [of] violations of constitutional rights." *Thompson v. Sheriff, Pinellas Cty. FL*, 542 F. App'x 826, 831 (11th Cir. 2013) (citation omitted).

30

The instant case is not a police shooting case, for example, and police dogs are presumed not to be considered "deadly force." *Pace v. City of Palmetto*, 489 F. Supp. 2d 1325, 1333 (M.D. Fla. 2007) (citing *Kuha v. City of Minnetonka*, 365 F.3d 590, 599-600 (8th Cir. 2003), *abrogated on the issue of municipality liability by Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007)); *Matthews v. Huntsville City Police Department*, No. 5:17-cv-02195-ACA-JHE, 2020 WL 4593782, at *7 (N.D. Ala. Aug. 11, 2020) (citing *Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (use of a police dog to track and apprehend a suspect was "extraordinary but non-deadly force")). Without evidence of prior similar incidents resulting from the City's Policy as to gunshot wounds, taser use, baton use, or even physical restraints—let alone bites by a police K-9—Pettaway's challenge to the Policy on the basis that it itself evinces deliberate indifference must fail.

Furthermore, and crucially here, Cpl. Barber **quickly** called the medics after securing Pettaway in handcuffs. Barber did not wait nearly ten minutes to do so, *see Valderramma v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015), he did not fail to secure medical aid, *accord Patel*, *supra*; but rather, Barber called the medics approximately one minute after Pettaway was secured. Cpl. Barber's call to the medics completely discharged his and the City's constitutional obligation to secure treatment for a suspect put into official custody under the Due Process Clause. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009) ("*Far from being deliberately*

31

*indifferent to a serious medical need, the deputies took the precautionary measure of calling EMS* after Melinda had fallen out of the patrol car.") (emphasis added). "As expressed by the Ninth Circuit in *Maddox*:

> The due process clause requires responsible governments and their agents to *secure* medical care for persons who have been injured while in police custody. We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances. Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.

*Adams*, 2016 WL 155081, at *17 (quoting 792 F.2d at 1415). *See also Tatum v. City of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (a police officer who promptly summons necessary medical assistance has acted reasonably for purposes of the Fourth Amendment even if the officer did not personally administer care).

Pettaway argues that the City was aware of an obvious need for its officers to provide medical aid because Chief Finley testified that he was generally aware that officers can and sometimes do injure suspects in the course of apprehension and arrest, and that there are certain types of injuries for which medical care should be given immediately. (USCA11 25-10676, Doc. 14, p.14). In addition, Pettaway has

32

argued that the City knew that persons could bleed to death from a cut or torn artery in as little as three to five minutes. *See id.*, p. 28.[16]

There is no evidence, however, that there had been any due process violations from the MPD policies and procedures on rendering medical care prior to Pettaway's injuries. Chief Finley's general knowledge does not equate to the showing required to prove that there was an obvious need to which the City was deliberately indifferent. *Canton*, 489 U.S. at 390.

In this case, even if Plaintiff had asserted a "so obvious" claim, it fails because plaintiff cannot establish that an injury like Pettaway sustained with the accompanying need for medical treatment that could not timely be handled by paramedics was "highly predictable." Chief Finely has been in law enforcement for approximately 29 years and cannot recall ever being involved in a case where a person was injured during arrest who had an arterial or other major blood vessel ruptured or torn or cut. (Doc.279-8, p.55) Accordingly, there is certainly nothing that would it make it "so obvious" to him that there would be the need to train how to

---

[16] Pettaway further argues this timing comports with the American College of Surgeon's Committee on Trauma. This evidence was not presented to the District Court and is not in the record on appeal. Pettaway also improperly submitted evidence from two other publications in this appeal that were not before the trial court and are not in the record: (1) International Association of Chiefs of Police – Emergency Trauma Care, (USCA11 25-10676, Doc. 14, p. 53) and U.S. Department of Homeland Security, (*Id.*, p. 30). As a result, this evidence should not be considered by this Court on appeal.

handle this type of injury. This makes the likelihood of the need to treat this type of injury far from the "highly predictable" standard that must be proven where there is no pattern of prior constitutional violations. As such, Pettaway did not establish the second element of his due process claim.

### C.   MPD Policy 3.3.5 was not the proximate cause of Pettaway's death.

To prove a deliberate indifference claim, the plaintiff bears the burden of proving (1) that he had an objectively serious medical need, (2) that the government official acted with subjective deliberate indifference to that serious medical need, and (3) that the plaintiff suffered an injury caused by the government official's wrongful conduct. *See Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1188 (11th Cir. 2020). A defendant is deliberately indifferent to a plaintiff's serious medical need when he "(1) ha[s] subjective knowledge of a risk of serious harm; (2) disregard[s] that risk; and (3) act[s] with more than gross negligence." *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010). *See also Valderrama*, 780 F.3d at 1116 ("The plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence.").

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted). The medical need must be one that "if left unattended, poses a substantial risk of serious harm," *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). Importantly, "(n)egligence ... even rising to the level of medical malpractice, does not constitute deliberate indifference." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999).

As stated above, the pathologist who performed the autopsy testified that the application of pressure to Pettaway's wound would have made no difference in whether he survived long enough to receive professional medical care from a medic or someone besides a police officer on the scene. (Doc. 382-15, at 1). At his initial deposition, Dr. Boudreau confirmed that applying a tourniquet to the wound, due to the wound's location, would have been *extremely difficult*. (Doc. 382-3, pp. 22:23–23:7; Doc. 382-15, ¶7[17]). Dr. Boudreau then referenced the St. John's Ambulance course and emergency medicine standards on applying direct pressure, but of course those are standards that medics and doctors train with, not police officers. Even the

---

[17] "Due to the location and nature of the wound, the only way to have preserved Mr. Pettaway's life would have been to cut open his leg and affix a clamp directly on the artery." (Doc. 382-15, ¶7).

35

paramedics who arrived on the scene made no efforts to apply direct pressure or place a tourniquet on Pettaway's wounds.

Based upon Dr. Boudreau's testimony that, in effect, Pettaway had no chance of survival due to the nature of the bite he suffered which severed his femoral artery, and **irrespective** of what kind of treatment was rendered to him following the bite short of having clamps affixed on his leg (a procedure that is difficult for physicians to perform, no less), Pettway cannot prevail on a claim of deliberate indifference against the City because Pettaway did not demonstrate causation between the Policy and his injury. *See Mann*, 588 F.3d at 1307 (citing *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007));  *Perez v. City of Sweetwater*, 770 F. App'x 967, 972 (11th Cir. 2019) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury.") (quoting *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011)).

> **D.    Although Plaintiff Conceded in the District Court that he was not asserting a Claim for Failure to Train, he has argued it on Appeal**

As stated above, in response to the Defendant's Motion for Summary Judgment, Pettaway represented that he is not asserting a failure to train claim, (i.e., "Defendants repeatedly attempt to mischaracterize the Fourth Claim for Relief as being a failure to train case.  It is not."). (Doc. 403, p. 33, n.25). He confirmed this position at oral argument on the summary judgment motions:

36

THE COURT: Do you have any authority for the proposition that in a case like this, where there is a catastrophic injury that ultimately resulted in death, that the police officer should have been trained on how --
MR. SIKES: I don't --
THE COURT: -- to treat a tear to a femoral artery?
MR. SIKES: I'm not turning this into a training case, Your Honor...

(Doc. 464, p. 90:2-21).

Despite those representations, Pettaway's appellate brief is filled with arguments about the lack of training by Chief Finley. To the extent that this could be construed as a viable claim on appeal either individually or as part of an argument on deliberate indifference under *Monell*, it is unsuccessful because there is no constitutional requirement that police departments train their officers to directly provide wound care themselves. "To impose municipal liability, the plaintiffs must show either that 'the need for a particular type of training [is] obvious because [officials] face clear constitutional duties in recurrent situations,' or that "the need for more or better training [is] obvious [because] a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.'" *Owens v. City of Fort Lauderdale*, 174 F. Supp. 2d 1282, 1293–94 (S.D. Fla. 2001) (citing *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995) (citing in turn *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 & n.10 (1989); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). A single incident standing alone is usually insufficient as a matter of law to establish a

37

failure to train violation. *See Connick v. Thompson*, 563 U.S. 51, 65 (2011) (no failure to train when the plaintiff proved only a single violation that allegedly arose from inadequate training); *Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22 (1985).

Here, there is no evidence of a pattern of incidents or incompetence on the part of the MPD, either before or after this incident, which would be a prerequisite to proving a failure to train claim. "There are limited circumstances in which an allegation of failure to train can be a basis for 1983 liability." *Adams*, 2016 WL 155081, at *20 (citing *Harris*, 489 U.S. 378). "To establish *Monell* liability on this theory, a plaintiff must show a municipality's failure to train its employees in a relevant respect is tantamount to 'deliberate indifference to the rights of persons with whom the [untrained employees] will interact.'" *Id*. (quoting *City of Canton*, 489 U.S. at 388). "Deliberate indifference sets a high standard of fault, requiring proof that a municipal actor disregarded a known, obvious consequence of his action." *Id*. (internal marks omitted). To show a "deliberate or conscious choice" tantamount to "deliberate indifference," the Plaintiff must present evidence that the municipality knew of a need to train and/or supervise in a particular practice yet made a deliberate choice not to take any action. *Id*. (citing *Gold*, 151 F.3d at 1350). "To impute such knowledge, [Pettaway] must show a pattern of similar constitutional violations by untrained employees in order to demonstrate deliberate indifference for purpose of a failure to train claim." *Id*. (citing *Connick*, 563 U.S. at 65).

"Establishing notice of a need to train or supervise is difficult." *American Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011). "A city may be put on notice in two ways. First, if the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent. Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009).

Here, Pettaway proffered no other evidence of a prior constitutional violation resulting from the implementation of Policy 3.3.5 as to an injured arrestee in the City of Montgomery. With no history of "widespread prior abuse" by MPD officers that would have put the City on notice of the need for improved training or supervision, no reasonable trier of fact could conclude that the alleged constitutional violations in this case were caused by the City's failure to train its officers. . *See Adams*, 2016 WL 155081, at *20 (collecting cases).

As the undisputed bodycam footage shows, Cpl. Barber immediately called for medics, yet Pettaway's claim alleges that the officers on the scene should have given the decedent medical attention themselves without awaiting emergency medical personnel's arrival on the scene. The Constitution does not hold the Defendants to such a standard of care. *E.g., Beshers*, 2005 WL 8156085, at *8 (citing

39

cases). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Rodriguez v. City of Miami, Fla.*, 907 F. Supp. 2d 1327, 1331 (S.D. Fla. 2012) (citing *Harris*, 489 U.S. at 389). "Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005).

Here, there is no evidence in the record showing that the Policy resulted in previous constitutional deprivations to others. At the very most, even assuming, *arguendo*, that the Policy was the product of simple negligence, there is no deliberate indifference if there is but a "showing of simple or even heightened negligence ...." *McDowell*, 392 F.3d at 1291 (citation omitted). It is undisputed that MPD officers were instructed through the Policy to call for medical aid promptly upon taking an injured suspect into custody, and again, Pettaway does not identify any case law suggesting that personal medical attention by the officers is required by the Constitution once medical aid has been summoned. *See Adams*, 2016 WL 155081, at \*17 (collecting cases). Nor can Pettaway present similar evidence of a prior incident that would have given City Policymakers notice of the potential for a constitutional violation. *See Love*, 2010 WL 1257998, at \*11. This is fatal to

40

Pettaway's claims seeking to impose liability on the Defendants for their Policy. *Id.* Quite simply, "(t)he fact that alternative procedures, such as [MPD] personnel with additional medical training, *might have better addressed* [Pettaway's] particular needs does not show that [the City] was deliberately indifferent to [Pettaway's] medical needs." *Williams v. Limestone Cty., Ala.*, 198 F. App'x 893, 898 (11th Cir. 2006) (emphasis added).

In addition, to the extent that Pettaway bases the City's liability on the "single occurrence" theory, the Supreme Court has explained that a single event is not sufficient:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. *But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.*

*Tuttle*, 471 U.S. at 823–24 (emphasis added). The Supreme Court subsequently clarified the "single occurrence" standard as applied to a deliberate indifference/failure to train claim:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply

41

> hypothesized that, in a narrow range of circumstances a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice— namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).

"Accordingly, single-incident liability is predicated on (1) the likelihood that a police officer will be confronted with a specific situation and (2) the predictability that an officer, when confronted with that situation, will violate a person's constitutional rights." *Duncan v. Bibb Cty. Sheriff's Dep't*, 471 F. Supp. 3d 1243, 1267 (N.D. Ala. 2020). However, in the single incident context, "showing that the level of training provided is not optimal or even preferable is not enough to rise to the level of deliberate indifference." *Denham v. Corizon Health, Inc.*, No. 6:13-CV-1425-ORL-40K, 2015 WL 3509294, at *7 (M.D. Fla. June 4, 2015), *aff'd*, 675 F. App'x 935 (11th Cir. 2017) (citing *City of Canton* at 391); *Marrero–Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012) ("[T]he fact that training

42

is imperfect or not in the precise form a plaintiff would prefer is insufficient to [show deliberate indifference].") (internal quotation marks omitted)).

Here, whatever may be said of implementing a policy that does not require officers to render first aid, it cannot be said that this choice exhibits deliberate indifference; the City had legitimate reasons for requiring officers to promptly summon medical aid but not necessarily directly to intervene. *See Denham*, 2015 WL 3509294, at *8 ("It might indeed be preferable to also provide medical training to corrections officers who guard inmates known to have serious medical needs. *However, the availability of more preferable policy choices is not enough to evince deliberate indifference.*") (citing *Marrero–Rodriguez*, 677 F.3d at 503) (emphasis added). As articulated by Chief Finley, requiring officers to pack a wound such as that suffered by Joseph Pettaway could endanger officer safety through the transmission of blood-borne pathogens, or further, could exacerbate the injured suspect's condition through the rendering of aid that in fact worsens the suspect's condition through no intention of the officer, but rather, due to the fact that the officer is not a trained medical professional. (Doc. 382-11).

The "so obvious" method of establishing deliberate indifference is also known as the "single incident" exception. *Hunter*, 2021 WL 3550922, at *5  (N.D. Ala. Aug. 11, 2021). "In *Canton*, the Supreme Court gave a hypothetical example of when a municipality would have notice of the need to train without any widespread

43

pattern of constitutional violations: if a municipality provided firearms to police officers to aid them in arresting fleeing felons, it would be aware of the need to train those officers on the use of deadly force." *Id*. (citing *Canton*, 489 U.S. at 390 n. 10). However, "the 'single incident' exception is narrow."' *Id*.; *Gold*, 151 F.3d at 1352 (citing cases). Even in the single incident context, "showing that the level of training provided is not optimal or even preferable is not enough to rise to the level of deliberate indifference." *Denham v. Corizon Health, Inc.*, No. 6:13-CV-1425-ORL-40K, 2015 WL 3509294, at *7 (M.D. Fla. June 4, 2015), *aff'd*, 675 F. App'x 935 (11th Cir. 2017) (citing *Canton, supra,* at 391). Here, Pettaway has not proffered more than an accusation of the City's allegedly un-optimal training, based on this single experience.

In short, Pettaway's allegations are insufficient to demonstrate a claim of deliberate indifference for failure to train. As U.S. District Judge Coogler recently explained in granting a motion to dismiss based on similar allegations of insufficient medical training provided to law enforcement officers to provide medical aid to citizens injured by the use of force, here, Pettaway "has not alleged any facts showing a history of constitutional violations against persons injured by the use of excessive force such that the need for training emergency medical care would have been so obvious to [the City] that a failure to train amounted to deliberate indifference towards the constitutional rights of such persons." *Duncan*, 471 F.

Supp. 3d at 1267. Although Pettaway argues here that MPD police officers "could" encounter situations where a person was seriously harmed and in need of emergency medical care, Pettaway has not alleged or provided evidence of how often, if at all, such encounters have resulted or could result in constitutional violations. *See id.* (Plaintiff's allegations that Centreville instituted a custom or policy of deliberately failing or refusing to adequately train or instruct its officers how to properly provide emergency medical care for citizens injured by the use of excessive and/or deadly force were not detailed factual allegations, but rather are mere conclusion).

What's more, here, the Policy itself was developed to be in compliance with CALEA standards. (Doc. 382-18, ¶¶1-3). Concerning any allegation that the defendants have failed to implement policies, procedures and practices regarding failure to adequately train their officers, the fact that, at the time, the Policy was developed in compliance with CALEA training and certification "demonstrates that the [MPD] ha[d] policies in place concerning arrests, use of force and firearms, and the use of handcuffs," and thus, means that the Plaintiff's failure to train claim is without merit. *Davis v. Purcell*, No. 2:12-CV-02112-MHH, 2014 WL 948345, at *13 (N.D. Ala. Mar. 11, 2014); *see also Cannon v. Licking Cnty.*, No. 2:17-CV-004, 2019 WL 2567732, at *15 (S.D. Ohio June 21, 2019) ("CALEA sets nationwide, best-practices standards, and other courts have used CALEA accreditation as evidence of sound policies.") (citing *Woodward v. City of Gallatin, Tenn.*, No. 3:10-

45

1060, 2013 WL 6092224 (M.D. Tenn. Nov. 19, 2013); *Glowka v. Bemis*, No. 3:12-CV-345, 2015 WL 8647702 (S.D. Ohio Dec. 14, 2015)). Against this undisputed training backdrop, the Plaintiff did not show "a history of abuse by subordinates such that [the City was] on notice of the need for corrective measures in the form of additional instruction such that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Without any factual support that suggests the City was on notice that the CALEA-compliant Policy was defective, Pettaway did not establish that the City had a policy that caused Pettaway's alleged constitutional violations, and therefore, the District Court properly granted summary judgment in its favor.

### E.    Public Policy Dictates That Law Enforcement Agencies And Officers Not Be Legally Required To Render First Aid

There are many reasons why law enforcement agencies and officers should not be legally required to render first aid. First, rendering first aid is not and should not be an officer's primary responsibility. Medical treatment has primarily been handled by other first responders who have specialized training in that area such as Paramedics, Emergency Medical Technicians and Fire medics. Law enforcement officers already have many duties related to maintaining law and order, and when they are involved in an active crime scene, those duties increase exponentially. Will

46

the duty to render first aid now be added to the split-second decisions that an officer has to make – do I go after a fleeing suspect, or I am now legally required to render aid to an injured suspect or bystander? Do I consider losing my tactical advantage while I am kneeling over an injured suspect and distracted with providing medical care? In cases where there is blood loss, do I need to put on personal protective equipment to prevent contact with bloodborne pathogens? If so, do I need a face shield to prevent getting blood on my face or will that compromise my vision to those in the area?

In addition, if the injuries were caused by the police officer, the officer may be overwhelmed with emotions surrounding the incident, especially in shooting cases. "Immediate responses to a critical incident are physiological, and may include muscle tremors, nausea, chills, vomiting, rapid heart rate, hyperventilation, faintness, crying, or sweating as well as cognitive issues of being dazed and upset." International Association of Chiefs of Police, Officer-Involved Shootings: A Guide for Law Enforcement Leaders, at p. 23 (2016). The officers may have post incident psychological stress, posttraumatic stress or even a psychological breakdown. *Officer-Involved Shooting: Reaction Patterns, Response Protocols, and Psychological Intervention Strategies,* International Journal of Emergency Mental Health, Vol. 8, No. 4, pp. 239-254 (2006). Officers are often required to receive counseling by their department after such an incident occurs, yet they may now be

expected to immediately possess the mental faculties to properly assess and render first aid.

Further, if law enforcement officers are required to render medical aid, they may be subjected to liability. Although Pettaway suggests that law enforcement is protected by Alabama Peace Officer Immunity and/or Good Samaritan Laws from any such state law claims, that immunity does not apply to federal Constitutional claims. A federal claim for excessive force based upon the application of medical care by law enforcement was recently attempted in *Wade v. Daniels*, 36 F.4th 1318 (11th Cir. 2022). Wade sued several law enforcement officers alleging that they violated his constitutional rights during his arrest. He claimed that excessive force was used when he was shot three times. In addition, Wade attempted to amend his complaint to bring a claim for excessive force alleging that an officer used *excessive force in applying pressure to stop the bleeding* from two of the gunshot wounds he received. Although the Court ultimately did not allow the amendment because it was untimely and/or futile, *Wade* demonstrates that these types of claims may be alleged in the future if law enforcement is legally required to personally render first aid.

Additionally, if officers are required to render first aid, then additional medical supplies will need to be purchased and maintained. Decisions will have to be made as to what is necessary to be carried in a police vehicle, i.e., are medical gloves enough, will a stethoscope now be required to monitor pulse activity, should

48

tourniquet kits be included, should a blood pressure monitor be added, is a manual resuscitator required, and so on? Should law enforcement officers now drive ambulances so that they can carry and have access to all of the medical equipment that they might need? Once the Court goes down the slippery slope of requiring law enforcement officers who are working out of a vehicle designed for apprehending fugitives and transporting arrestees as to opposed to a well-equipped ambulance or medic truck, where does it end?

The answer is that it should begin and end pursuant to the standards set forth by Supreme Court in *City of Revere*, *supra*. While the Supreme Court declined to define the exact nature of the state's obligation in such circumstances, it held that "'[w]hatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the suspect] was taken promptly to a hospital that provided the treatment necessary for his injury.'" *Wideman*, 826 F.2d at 1035 (quoting 463 U.S. at 245).

## CONCLUSION

Mr. Joseph Lee Pettaway's death at the scene of his arrest on July 8, 2018, was tragic and unfortunate. It was not, however, the result of unconstitutional conduct and deliberate indifference by the City of Montgomery. The District Court properly entered summary judgment in the City's favor. For the foregoing reasons, the City of Montgomery respectfully requests that this Honorable Court affirm the judgment of the District Court.

Respectfully Submitted,

/s/ *Allison A. Ingram*
ALLISON A. INGRAM (ASB-6024-F68A)

/s/ *Winston Sheehan, Jr.*
C. WINSTON SHEEHAN, JR. (SHE013)

/s/ *Graham R. Neeley*
GRAHAM R. NEELEY (ASB-2312-I48V)
*Attorneys for Appellee/Defendant*
*City of Montgomery*

**OF COUNSEL:**

BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 – telephone
(334) 387-3222 – facsimile
ALA@ball-ball.com
wsheehan@ball-ball.com
gneeley@ball-ball.com

50

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitations Federal Rule of Appellate Procedure Rule 32(a)(7)(B) because it does not exceed 13,000 words, excluding those parts exempted by 11th Cir. Local Rule 32-4, and complies with the typeface and type style requirements of Rule 32(a) because it is prepared in a proportionally spaced typeface using 14-point Times New Roman font.

/s/ Allison A. Ingram
ALLISON A. INGRAM
*Attorney for the Appellee/Defendant*
*City of Montgomery*

51

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, pursuant to Rule 25 and 31 of the Federal Rules of Appellate Procedure and the Eleventh Circuit Court Rules, I have on this the 13th day of June, 2025, electronically filed the foregoing Appellant's Brief with the Court of Appeals Clerk using the CM/ECF System.  A true and correct copy of the foregoing was also served on the following via electronic mail:

Griffin Sikes, Jr.
Post Office Box 6350
Montgomery, AL 36106
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

*/s/ Allison A. Ingram*
ALLISON A. INGRAM
*Attorney for the Appellee/Defendant*
*City of Montgomery*
