# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Docket No.  25-10676

---

WALTER PETTAWAY,

*Appellant*

v.

THE CITY OF MONTGOMERY,

*Appellee*

---

On appeal from Memorandum Opinion and Order (Doc.433)
and Final Judgment (Doc. 471)
of the United States District Court for the Middle District of Alabama
Case No.  2:19-cv-00008-ECM-JTA

---

## SUPPLEMENTAL APPENDIX OF APPELLEE
## THE CITY OF MONTGOMERY
## VOLUME I of V

---

Allison Alford Ingram
Graham R. Neeley
C. Winston Sheehan, Jr.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
445 Dexter Avenue, Suite 9045 (36104)
Montgomery, AL  36102-2148
(334) 387-7680
(334) 387-3222 (Fax)
ala@ball-ball.com
gneeley@ball-ball.com
wsheehan@ball-ball.com
*Counsel for Appellee The City of Montgomery*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellee The City of Montgomery submits the following list of persons or entities which, upon information and belief of the undersigned attorneys for the Appellee, have or may have an interest in the outcome of this case:

Adams, Hon. Jerusha T., United States Magistrate Judge, Middle District of Alabama

Barber, Nicholas, Defendant

Bellinger, Stacy, Counsel for Defendant/Appellee The City of Montgomery, Nicholas Barber

Chambliss, Rebecca, Counsel for Defendant, Nicholas Barber

City of Montgomery, Alabama, Defendant/Appellee

East, Chris, former Counsel for Defendant/Appellee The City of Montgomery

Finley, Ernest, Defendant

Flournoy, Neal, Defendant

Gray Jr., William Patton, Counsel for Defendant, Ryan Powell

Green, Michael, Defendant

Ingram, Allison, Counsel for Defendant/Appellee The City of Montgomery

Marks, Hon. Emily C., Chief United States District Judge, Middle District of Alabama

C-1 of 2

Neeley, Graham, Counsel for Defendant/Appellee The City of Montgomery

Nix Jr., H.E., Counsel for Plaintiff/Appellant, Walter Pettaway

Norris, John David, Counsel for Defendant, Neal Flournoy

Powell, Ryan, Defendant

Ruiz, Bianka, Defendant

Sheehan Jr., C. Winston, Counsel for Defendant/Appellee The City of Montgomery, Nicholas Barber

Sikes Jr., Griffin, Counsel for Plaintiff/Appellant, Walter Pettaway

Smith, Joshua Taylor, Defendant

Sydney, Brasfield, Counsel for Defendant/Appellee The City of Montgomery

Thrasher, Justin, Defendant

Watts, Keiundra, Defendant

C-2 of 2

Pursuant to the F.R.A.P. 30 and 11th Cir. R. 30-1, Appellee The City of Montgomery hereby submits its Supplemental Appendix.

**INDEX OF SUPPLEMENTAL APPENDIX**

| | VOLUME I | |
|---|---|---|
| **Record #** | **Description** | **Docket/Tab #** |
| Doc. 372-18 | Deposition of Ryan Powell | 372-18 |
| Doc. 374 | Defendant Ryan Powell's Motion for Summary Judgment | 374 |
| Doc. 375 | Defendant Ryan Powell's Brief in Support of Motion for Summary Judgment | 375 |
| Doc. 376 | Plaintiff's Motions and Briefs for Summary Judgment Against Barber, The City and Finley on the Issue of their Liability on the Second and Fourth Claims for Relief | 376 |
| Doc. 378 | Defendants' Motion for Summary Judgment | 378 |
| Doc. 379 | Joint Defendants' Evidentiary Submissions (Part 1) | 379 |
| Doc. 379-1 | Exhibit 1 – Jones Deposition | 379-1 |
| Doc. 379-2 | Exhibit 2 – Barber Deposition | 379-2 |
| Doc. 379-3 | Exhibit 3 – Barber Body Cam Video (filed pursuant to F.R.A.P. 25-3(h) and delivered separately Under Seal) | 379-3 |

1

| Doc. 379-4 | Exhibit 4 – MPD Dispatch Log<br><br>(filed pursuant to F.R.A.P. 25-3(h) and delivered separately Under Seal) | 379-4 |
| Doc. 379-5 | Exhibit 5 – Deposition of Sgt. Michael D. Green | 379-5 |
| Doc. 379-6 | Exhibit 6 – Deposition of James Ezell Jr. – Vol. I | 379-6 |
| Doc. 379-7 | Exhibit 7 – Affidavit James Ezell Jr. | 379-7 |

| **VOLUME II** | | |
| --- | --- | --- |
| **Record #** | **Description** | **Docket/Tab #** |
| Doc. 380 | Joint Notice of Filing Evidentiary Materials in Support of Defendants' Joint Motion for Summary Judgment | 380 |
| Doc. 380-1 | Exhibit 9 – Pettaway Criminal Convictions (Vol. 1) | 380-1 |
| Doc. 381 | Joint Notice of Filing Evidentiary Materials in Support of Defendants' Joint Motion for Summary Judgment | 381 |
| Doc. 381-1 | Exhibit 9 – Pettaway Criminal Convictions (Vol. 2) | 381-1 |

| VOLUME III | | |
|---|---|---|
| **Record #** | **Description** | **Docket/Tab #** |
| Doc. 381-2 | Exhibit 10 – Pettaway Criminal Record | 381-2 |
| Doc. 382 | Joint Notice of Filing Evidentiary Materials in Support of Defendants' Joint Motion for Summary Judgment | 382 |
| Doc. 382-1 | Exhibit 11 – Deposition of Dr. Bennet Omalu | 382-1 |
| Doc. 382-2 | Exhibit 12 – Watts Body Cam Video (filed pursuant to F.R.A.P. 25-3(h) and delivered separately Under Seal) | 382-2 |
| Doc. 382-3 | Exhibit 13 – Deposition of Steven Boudreau, MD | 382-3 |
| Doc. 382-4 | Exhibit 14 – Deposition of Ernest N. Finley, Sr. | 382-4 |
| Doc. 382-5 | Exhibit 15 – MPD Directive | 382-5 |
| Doc. 382-6 | Exhibit 16 – Deposition of Ryan Powell | 382-6 |
| Doc. 382-7 | Exhibit 17 – Deposition of Joshua Smith | 382-7 |
| Doc. 382-8 | Exhibit 18 – Deposition of Keiundra Watts | 382-8 |
| Doc. 382-9 | Exhibit 19 – Deposition of Bianka Raquel Ruiz | 382-9 |

3

| | VOLUME IV | |
|---|---|---|
| **Record #** | **Description** | **Docket/Tab #** |
| Doc. 382-10 | Exhibit 20 – Deposition of Lt. Raymond Carson | 382-10 |
| Doc. 382-11 | Exhibit 21 – Declaration of Ernest N. Finley Jr. | 382-11 |
| Doc. 382-12 | Exhibit 22 – Deposition of Dr. William Gaut | 382-12 |
| Doc. 382-13 | Exhibit 23 – Baptist Medical Center South Records | 382-13 |
| Doc. 382-14 | Exhibit 24 – Deposition of Neal Flournoy | 382-14 |
| Doc. 382-15 | Exhibit 25 – Declaration of Dr. Stephen Boudreau | 382-15 |
| Doc. 382-16 | Exhibit 26 – Deposition of Dr. Stephen Boudreau | 382-16 |
| Doc. 382-18 | Exhibit 28 – Declaration of Andre Carlisle | 382-18 |
| Doc. 383 | Defendants City of Montgomery, Ernest Finley, Nicholas Barber, Michael Green, Ryan Powell, Bianka Ruiz, Justin Thrasher, Joshua Smith, Keiundra Watts, and Neal Flournoy's Brief in Support of Their Motion for Summary Judgment | 383 |
| Doc. 410 | Response of Defendants City of Montgomery, Ernest Finley, and Nicholas Barber to Plaintiff's Motion for Summary Judgment | 410 |
| Doc. 429 | Docket Text Entry re Oral Argument | 429 |

4

| VOLUME V | | |
|---|---|---|
| **Record #** | **Description** | **Docket/Tab #** |
| Doc. 435 | Defendant's Notice of Appeal | 435 |
| Doc. 444 | Defendants' Motion to Stay | 444 |
| Doc. 448 | Defendants' Response to Plaintiff's Motion for Reconsideration | 448 |
| Doc. 454 | Plaintiff's Notice of Appeal as to Memorandum Opinion and Order (Docs. 433 & 434) | 454 |
| Doc. 464 | Official Transcript of Oral Argument for dates 1/12/2023 before Judge Emily C. Marks | 464 |
| Doc. 473 | Plaintiff's Notice of Appeal as to Memorandum Opinion and Order (Docs. 433 & 434) | 473 |

Respectfully submitted this the 20th day of June, 2025.

/s/ Allison A. Ingram
ALLISON A. INGRAM (ASB-6024-F68A)

/s/ Winston Sheehan, Jr.
C. WINSTON SHEEHAN, JR. (ASB-0613-A57C)

/s/ Graham R. Neeley
GRAHAM R. NEELEY (ASB-2312-I48V)

*Attorneys for Appellee/Defendant*
*City of Montgomery*

**OF COUNSEL:**

BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
(334) 387-3222 – facsimile
ALA@ball-ball.com
wsheehan@ball-ball.com
gneeley@ball-ball.com

6

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of June, 2025, I electronically filed this CIP and Supplemental Appendix with the Eleventh Circuit Court of Appeals Clerk using the CM/ECF System, with a truce and correct electronic copy served upon all counsel of record as follows:

Griffin Sikes, Jr.
Post Office Box 6350
Montgomery, AL 36106
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

/s/ Allison A. Ingram
ALLISON A. INGRAM
*Attorney for the Appellee/Defendant*
*City of Montgomery*

7

# DOCKET 372-18

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


WALTER PETTAWAY, as   )

Administrator of the )

Estate of Joseph Lee )

Pettaway, deceased,  )

      Plaintiffs,   )

              )

VS.                  )CIVIL ACTION NO:

NICHOLAS B. BARBER   ) 2:19-CV-0008

and MICHAEL B. GREEN,) DEPOSITION OF:

    Defendants.   )   RYAN POWELL


S T I P U L A T I O N S


      IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

      RYAN POWELL,

may be taken before Merit Gilley, Commissioner and Notary Public, State at Large, at the Montgomery City Hall, 103 N. Perry Street, Montgomery, Alabama 36104, on the 5th day of

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

October, 2021, commencing at approximately 9:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

I, Merit Gilley, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 5th day of October, 2021, at the offices of Montgomery City Hall, 103 N. Perry Street, Montgomery, Alabama 36104, commencing at approximately 9:00 a.m., RYAN POWELL, witness in the above cause, for oral examination, whereupon the following proceedings were had:

RYAN POWELL,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SIKES:

Q        Good morning, sir.  I'm Griffin Sikes.  I'm a lawyer for -- representing the estate of Mr. Joseph Lee Pettaway.

         Tell me your full name, please, sir.

A        Ryan Wayne Powell.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

\

Okay.  And what did you -- for --
did you have employment elsewhere when you quit?

A          I started with Montgomery -- the
City of Montgomery.

Q          Were you -- you started training
with APOST; right?

A          Yes, sir.

Q          Okay.  And you did your APOST
training then --

A          I think --

Q          -- sometime during the spring or
summer of 2000 and --

A          I started with the City of
Montgomery in February of 2017.

Q          Uh-huh.

A          And I got done with academy in
August of 2017.

Q          Uh-huh.  We're here about the death
of Joseph Lee Pettaway that occurred in July of
2018?

A          Yes, sir.

Q          So you would have been a police

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

Are you presently employed by the Montgomery police Department?

A          No, sir.

Q          When did you leave the Montgomery Police Department?

A          August of 2019 -- or April of 2019.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

Q.      The time you were -- at -- at any time
after you arrived at Cresta Circle that
evening -- that night, was -- other than you
said -- you said

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

that -- I think the way you termed it was that Barber announced his presence.

You're talking about what he did at the front door just before he let the dog in; correct?

A        Correct.

Q        Okay.  Other than that, do you recall any attempt at any time by anyone out there to communicate with whoever might be inside the house?

A        I don't remember.

Q        Okay.  You don't remember any?

A        I don't remember any.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

Is that what you recollect that that's -- that there was a period of time that he lay out there on the sidewalk bleeding?

A        Correct.

Q        Okay.  During any of these times, did you or anybody else from the Montgomery Police Department or anybody else ever attempt to provide any medical care or first aid to Mr. Pettaway?

A        No.

Q        Do -- you're a high school graduate?

A        Yes, sir.

Q        Okay.  Do you know that when someone is bleeding heavily; if the amount of blood being lost is not reduced, that person is in danger of dying?

A        Correct.

Q        Okay.  You knew that in July of 2018; correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

A          Correct.

Q          I mean, that's common knowledge, isn't it?

A          Yes.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

Q          Since we filed the claim against you
and the other police officers, there has been
testimony given by former police chief Ernest
Finley -- he was the police chief at the time in

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

July of 2018; correct?

A        Correct.

Q        I'm going to ask you -- I'm going to show you what's a Montgomery Police Department directive.  It was Exhibit 3 to Mr. Finley's deposition.

        (Plaintiff's Finley Exhibit 3

        was produced for reference.)

Q        And I'm going to ask you if you can recollect seeing that?

A        Correct.

Q        I'm sorry?

        You'd seen that before?

A        I have.

        MR. SIKES:   3.3.5.

Q        Did the Montgomery Police Department

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

give you any training in first aid or certify you in first aid or any other kind of medical care?

A          Only CPR.

Q          Sorry.  And, actually, the Montgomery Police Department didn't train you in that, did they?

Wasn't that APOST?

A          Correct.

Q          At the academy?

A          Correct.

Q          And it was about a one-hour course or something like that?

A          Correct.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

Q          Other than that, do you recall any training by APOST prior to becoming a police officer?

A          No.

Q          And after you became a police officer -- sworn as a police officer, did the Montgomery Police Department ever provide you with any training in any kind of first aid or medical care?

A          No.

Q          Okay.  Do you know if it provided it to any other police officer?

A          Not that I'm aware of.

Q          Okay.  And did you consider yourself trained or certified to render aid to people who were profusely bleeding?

A          I've never been trained to stop

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

bleeding.

Q        Okay.  And so you know -- the answer is, no, you didn't consider yourself trained?

A        Correct.  That is --

Q        And, certainly, you weren't certified to stop or arrest or retard people who had suffered a wound that was -- they were bleeding heavily from; correct?

A        Correct.

Q        Look at the last line of directive 3.3.5 in front of you.

Do you see the paragraph C there?

A        Yes, sir.

Q        Would you read that?

A        Medical aid is to be rendered by only those trained and/or certified to render such aid.

Q        And you had no such training?

A        Correct.

Q        And you know -- you don't know of any other police officers that had that training; correct?

A        Correct.

Q        Well, so did you understand this to be a directive to you to not -- for you not to

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

Walter Pettaway vs Nicholas D. Barber, et al.

provide any medical care or attempt to try to provide medical care?

A          Correct.

Q          Okay.  I'm going to show you the deposition of Ernest Finley, a portion of the deposition that has been marked Plaintiff's Exhibit C to a prior deposition.

          (Plaintiff's Exhibit C was
          produced for reference.)

Q          I'll represent to you this is the deposition testimony given by Chief Finley. And the question put to Chief Finley was:  Your testimony is that MPD policy 3.3.5 did not require a policeman who caused, say, a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life; correct?

          And what was Chief Finley's answer?

A          Correct.

Q          And do you agree with Chief Finley about that?

A          I do.

Q          Okay.  Do you remember or do you

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

know Lieutenant Andre Carlisle by any chance?

A        I know him.  Yes, sir.

Q        Okay.  Did he train you, or was he head of training when you were there, or do you know?

A        He was not.

Q        Okay.  I'm going to show you Plaintiff's Exhibit B.  It's a portion of Lieutenant Carlisle's deposition.

        (Plaintiff's Exhibit B was

        produced for reference.)

Q        And Lieutenant Carlisle there was asked:  From -- from 2015 until January of 2021, during that period of time, there were no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person; correct?

        And the answer was:  You mean when there's a policy in place?

        And he answers, Yes, sir.

        And I -- he asked:  Is that what you're asking?

        Yes, sir.  Were they required by policy?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

Walter Pettaway vs Nicholas D. Barber, et al.                    Ryan Powell
                                                                  10/5/2021

And he says, To do hands on?

I said, Right.

And he said, No.

Correct?

A        Correct.

Q        I then asked:  Under no circumstances that you know of was that required?

And his answer was what?

A        Under no circumstances that I know of.

Q        Is that consistent with your understanding of what Montgomery Police Department policy was in July of 2018?

A        Yes, sir.

Q        There were no circumstances.  It didn't matter what the injury was, how severe it was, how likely it was that, if not treated, death would ensue.

Under no circumstances were you required to provide medical care; correct?

A        Correct.

Q        All right.  And, in fact, if you weren't trained for it, you were prohibited from doing it; correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

A          Correct.

Q          Is that correct?

A          Yes, sir.

The policy of Montgomery Police

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

Department was not to provide any kind of medical training or first aid to any of its police officers; correct?

A        Correct.

Q        All right.  And coupled with that, it also provided that if you weren't trained or certified in providing first aid or medical care, then you were prohibited from providing medical aid or first aid; correct?

A        Correct.

Q        In retrospect, do you think those two policies are good and wise policies?

A        In retrospect with this incident? No.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

# DOCKET 374

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISON

| | |
|---|---|
| WALTER PETTAWAY, | ) |
| as administrator of the Estate of | ) |
| Joseph Lee Pettaway, deceased | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | )   2:19-cv-0008-ECM |
| | ) |
| NICHOLAS D. BARBER, et al, | ) |
| | ) |
| | ) |
| DEFENDANTS. | ) |

## DEFENDANT RYAN POWELL'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant Ryan Powell moves for summary judgment as to all claims raised by the Plaintiff against him. There is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Defendant Powell is entitled to judgment as a matter of law on the following grounds:

1.  Powell is entitled to qualified immunity for the claim for deliberate indifference.

2.  Powel is entitled to qualified immunity on the claim for deliberate indifference because Powell was acting within his discretionary authority and there

is no clearly established right to have a law enforcement officer provide medical care.

3.    Powell is entitled to judgment as a matter of law on the claim for deliberate indifference because there is no legally sufficient evidence that Powell was deliberately indifferent to a serious medical need.

4.    Powell is entitled to judgment as a matter of law on the claim for deliberate indifference because a written directive of the Montgomery Police Department prohibited Powell from providing medical care.

5.    Powell is entitled to judgment as a matter of law on the claim for deliberate indifference because Powell did not have a subjective knowledge of the risk of a serious harm and he did not have a subjective knowledge that the injuries were life threatening.

6.    Powell is entitled to judgment as a matter of law on the claim for deliberate indifference because there is no legally sufficient evidence that Powell's alleged indifference was the proximate cause of the injuries and death.

7.    Powell is entitled to judgment as a matter of law on the claim for wrongful death because Powell owed no duty to the decedent to provide medical care.

8.   Powell is entitled to judgment as a matter of law on the claim for wrongful death because there is no legally sufficient evidence that Powell was negligent.

9.   Powell is entitled to judgment as a matter of law on the claim for wrongful death because there is no legally sufficient evidence that any action by Powell was the proximate cause of the death.

In support of this Motion, Powell relies on the contemporaneously filed Defendant Ryan Powell's Brief in Support of Summary Judgment, the motions, briefs, and evidence filed by the co-defendants, which are incorporated herein by reference, and the following evidentiary materials:

Exhibit A: Deposition of Ryan Powell

Exhibit B:  Deposition of Sgt. Michael D. Green

Exhibit C: Deposition of Nicholas D. Barber

Exhibit D: August 31, 2021 Deposition of Dr. Stephen Boudreau, M.D.

Exhibit E: Montgomery Police Department Written Directive 3.3.5 regarding rendering aid

Exhibit F: Deposition of Dr. William Gault

Exhibit G: Declaration of Dr. Stephen Boudreau

Exhibit H: August 31, 2022 Deposition of Dr. Stephen Boudreau

Exhibit I: State Bureau of Investigations Final Summary

Respectfully submitted,

*/s/ William P. Gray, Jr.*
William P. Gray, Jr.
Attorney for Officer Ryan Powell

WILLIAM P. GRAY, JR. (ASB-5268-R78W)
Gray & Associates, LLC
3500 Blue Lake Drive; Suite 455
Birmingham, Alabama 35243
Email: wpg@grayattorneys.com

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been filed on Pacer, the Court's electronic server, on this 5th day of October, 2022, for service on all counsel of record herein:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

C. Winston Sheehan, Jr. (She013)
Ball, Ball, Matthews & Novak, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
wsheehan@ball-ball.com

*/s/William P. Gray, Jr.*
William P. Gray, Jr.

5

# DOCKET 375

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISON

| | | |
|---|---|---|
| WALTER PETTAWAY,<br>as administrator of the Estate of<br>Joseph Lee Pettaway, deceased | ) ) ) | |
| PLAINTIFF, | ) ) ) | |
| v. | ) | **2:19-cv-0008-ECM** |
| NICHOLAS D. BARBER, et al, | ) ) ) | |
| DEFENDANTS. | ) ) ) | |

### DEFENDANT RYAN POWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Ryan Powell submits this brief in support of his motion for summary judgment, and adopts and incorporates herewith the other Defendant's briefs filed by Mr. Sheehan and others.

### I.    INTRODUCTION.

This case arises from the death of Joseph Lee Pettaway after a police dog apprehended him. At the time of the incident, Ryan Powell was an officer with the City of Montgomery police. Powell was not involved in the decision to deploy the K-9 unit, send in the police dog, or in the policies of the Montgomery Police Department. Rather, the sole allegation against Powell is that he did not administer

1

medical aid after Pettaway was bitten. As shown below, because the administration of medical care by a police officer is not a clearly established right, Powell is protected against the federal claims by qualified immunity. In addition, because testimony from Plaintiff's own expert establishes that Powell would not be trained on the medical care that would have been necessary, and evidence shows the care Plaintiff says should have been given would not have saved Pettaway, Powell is entitled to summary judgment on the claim for deliberate indifference and the state law wrongful death claim.

## II.   STATEMENT OF FACTS.

In the months leading up to July 2018, Gary Dixon, Joseph Lee Pettaway, and James Jones worked on the small house located at 3809 Cresta Circle in Montgomery, AL. (Third Amended Complaint, Doc. 205, ¶7). There was no water supply nor electrical power supply to the house. (Doc 205,  ¶8). James Jones had a lease agreement with the house's owner under which Jones agreed to repair it and in return would take up residence as a tenant of the owner of the house upon completion of the repairs. (Doc. 205, ¶11). During the repairs, Dixon and Pettaway occasionally would stay at the house. (Doc. 205, ¶11).

In the early morning hours of July 8, 2018, Dixon, who was staying in the house that night, called the police to report that someone was breaking into the house. (Doc. 205, ¶17). The alleged burglar turned out to be the Mr. Pettaway.  (Doc.

2

205, ¶16-17). Pettaway had entered the house through a window without Dixon's knowledge. (Doc. 205, ¶16).

Officer Powell along with other named defendants responded to dispatch by going to 3809 Cresta Circle. (Doc. 205, ¶18); Exhibit A, Deposition of Ryan Powell ("Powell Depo."), 14:11-25. Defendant Sgt. Michael Green was the senior officer on the scene. Powell Depo., 18:7-10. Powell, and other officers, set up a perimeter around the house. Powell Depo., 15:24-16:4. Powell went to the right side of the residence. Powell Depo., 16:12-20. By the time Powell arrived, other officers were already on the scene and had already set up around the house. Powell Depo., 17:20-18:6.

Sgt. Green attempted to get in touch with the homeowner to get permission to enter the home with the K-9. Powell Depo., 22:1-18. Sgt. Green testified that Mr. Jones told him that if anyone was in the house, they did not have permission to be there. Exhibit B, Deposition of Michael Green ("Green Depo."), 186:15-19. Officer Barber announced himself at the front door, and then went in with the K-9. Powell Depo., 22:22-23:4.

The police dog, who was sent in for the protection of the police officers, was trained to apprehend and he did so. Exhibit C, Deposition of Nicholas Barber ("Barber Depo."), 167:15-19. Officer Barber used the most effective means available to get the dog to release Mr. Pettaway, which is to choke the dog and make

3

that dog release the apprehended person. Barber Depo., 121:14-21. It is undisputed that Sgt. Powell played no role in the decision to deploy the canine. Barber Depo. 95:22-96:3 (Barber testified the decision to deploy dog was solely his).

Afterwards, officers went in to remove Pettaway, and medics were called. Powell Depo., 22:22-23:4. The medics arrived roughly six minutes after Pettaway was removed from the house.  Barber Depo. 142:22-143:4. Unbeknownst to Barber and unbeknownst to any of the other officers on the scene the dog had bitten Mr. Pettaway at or near his groin where the femoral artery goes through the pelvis and the femoral artery did not protrude between or through the skin so that it was visible. Exhibit D, Aug. 31, 2021Deposition of Dr. Stephen Boudreau ("Boudreau 2021 Depo."), 17:15-18:11.

Powell testified that although he saw blood, he was not aware there was a life-threatening injury:

Q. Okay. There was a lot of blood out there, wasn't there?

A. Yes.

Q. Okay. Did it ever occur to you that this man may die?

A. It did not.

Q. And how would you not draw that conclusion?

A. I've never seen something like that. I've never seen the outcome of something like that.

4

Q. I know. But I thought we just agreed that if someone is bleeding heavily; if the amount of blood loss is not retarded or stopped, then that person is in danger of dying. You knew that; correct?

A. Correct.

Q. And you saw that exact thing occurring in front of you; correct?

A. Correct.

Q. But you didn't -- it didn't occur to you that, Hey, we need to do something to stop this bleeding?

That never occurred to you?

A. It did not.

Powell Depo. 34:8-35:4.

The Montgomery Police Department written directive on rendering aid was 3.3.5 at that time and Officer Powell testified consistent with the written directive that medical aid is to be rendered by only those trained and\or certified to render such aid. Powell Depo., 39:10-40:3, Exhibit E (Last line of directive 3.3.5)

Officer Powell had no such training, and was not aware if any of the other officers on the scene had that training. Powell Depo., 39:18-23. The only medical training Officer Powell had received was CPR when he was at APOST. Powell Depo. 36:25-37:11.  After he became a police officer, Officer Powell did not receive any training on first aid or medical care, and had not been trained or certified to aid people who were profusely bleeding. Powell Depo. 38:13-39:9. Because he had no such training, Officer Powell interpreted Directive 3.3.5, stating that medical care

5

can only be given by trained individuals, to mean that he was not to provide care. Powell Depo. 39:24-40:3.

Plaintiff identified an expert Dr. William Gaut who testified that he had been on a committee that had made a recommendation to the governor's office and ultimately to the legislature where they had recommended that "we ought to train in first aid, and then from there, I personally agreed that first-aid should include basic first aid and it should include CPR. But we didn't want to go into any sort of in-depth medical training because that was inappropriate to ask a police officer to perform in-depth medical procedures." Exhibit F, Deposition of Dr. William Gaut ("Gaut Depo."), 74:23-75:8 (emphasis added).

Dr. Stephen Boudreau, state medical examiner, performed the autopsy on July 9, 2018, at the Alabama Department of Forensic Sciences in Montgomery, Alabama. Exhibit G, Boudreau Declaration, ¶3. In his role, Dr. Boudreau is charged with determining the cause and manner of death. Exhibit H, Dr. Stephen Boudreau Aug. 31, 2022 Deposition ("Boudreau 2022 Depo."), 20:13-17. The autopsy revealed that the individual sustained major damage to the left femoral artery of the upper left thigh area where the K-9 dog bit the subject. Boudreau Declaration, ¶¶3-4.

Specifically, Dr. Boudreau found that the teeth of the dog had torn the femoral artery, which is located approximately only an inch or inch and 1/2 beneath the skin's surface. Boudreau 2021 Depo. 17:15-21. When Dr Boudreau examined Pettaway,

the femoral artery did not protrude through the skin. Boudreau 2021 Depo. 17:22-18:11.

The cause of the death was the loss of blood from the wound. Boudreau 2021 Depo. 18:25-20:6.  In short, "He would've gone into shock from blood loss. Loosely speaking, shock is when you do not pump enough blood to supply your peripheral organs your brain, kidneys. In this instance he would have lost blood. He would not have had enough blood to pump – to keep his kidneys going, his brain going and his heart going." Boudreau 2021 Depo. 19:9-14.

According to Dr. Boudreau, the individual sustained massive blood loss in a short period. Dr. Boudreau stated, "based on Mr. Pettaway's height and weight, Mr. Pettaway would have lost a life-threatening amount of blood within two and a half to three minutes after the bite." Boudreau Declaration, ¶8. Under the circumstances, "due to the nature of Mr. Pettaway's wound, application of pressure to the wound would not have prolonged Mr. Pettaway's life long enough for him to survived with professional medical treatment by the medics who arrived on the scene following the dog bite." Boudreau Declaration ¶6. Dr. Boudreau stated he determined the manner of death to be an accident. (See State Bureau of Investigations final summary attached hereto as Exhibit I).

As Dr. Boudreau stated, the blood loss would have been rapid. Dr. Boudreau also testified that applying a tourniquet would be very difficult in this situation:

A.   … You could apply a tourniquet, but tourniquets are extremely difficult to apply, specifically in the upper leg like that you have to try and grab that artery coming out of the groin which is hard is going to be hard to get a tourniquet around it.

Boudreau 2021 Depo., 22:23-23:3.

Although applying pressure generally retards blood flow, Dr. Boudreau stated "Due to the location and nature of the wound, the only way to have preserved Mr. Pettaway's life would have been to cut open his leg and affix a clamp directly on the artery. I am of the opinion that such a procedure is difficult to do even for other doctors, and therefore, it would be very difficult for a layman to do the same." Boudreau Declaration, ¶7.

Dr. Boudreau was not paid for his opinion. Boudreau 2022 Depo. 52:8-14. Even though Dr. Boudreau is simply doing his job, Plaintiff demanded that Dr. Boudreau be re-deposed, and he was re-deposed by Plaintiff on August 31, 2022. In his most recent deposition, he confirmed his prior opinions given in this case.  Dr. Boudreau confirmed that, in his opinion, Pettaway would have died within a few minutes from his wounds.  Boudreau 2022 Depo. 95:12-14.

He also stated the following:

A. He was pronounced dead one hour and so many minutes later. The ambulance people who arrived could not obtain a pulse in Mr. Pettaway at 3:29. Mr. Pettaway was dead. (Boudreau Depo. 101:20-23)

8

Dr. Boudreau confirmed his opinion that Pettaway would have gone into shock because of the volume of blood lost within two and a half or three minutes. Boudreau 2022 Depo. 116:19-117:5.  And he confirmed his opinion that Pettaway's wounds were such that he would not have survived until the official medics arrived. Boudreau 2022 Depo. 158:1-5. Dr. Boudreau also said multiple times that Mr. Pettaway had no pulse when the medics arrived.

Dr. Boudreau, who as above noted is not being paid for his opinions here, testified that he maintained these opinions even in his second deposition.

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251-252 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v.*

*Allgas, Inc.*, 284 F. 3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, at* 249-251. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one- sided that one party must prevail as a matter of law." See *Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F. 3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F. 2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F. 2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof

10

at trial." *Howard v. BP Oil Company*, 32d F. 3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See *Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "A mere 'scintilla' of evidence supporting the 'non-moving' party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F. 2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F. 2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986) (internal quotation and citation omitted).

## IV.   <u>ARGUMENT AND AUTHORITIES</u>

11

    A.    <u>Powell is entitled to summary judgment on the claim for deliberate indifference.</u>

Plaintiff asserts a federal constitutional claim against Officer Powell based on an alleged constitutional violation for failure to provide medical care. In Count III, Plaintiff claims "deliberate indifference" to a serious medical need in that Powell, and others, failed to provide medical care. Powell is entitled to summary judgment because of qualified immunity and because the facts do not support the claim.

    1.    <u>Powell has qualified immunity.</u>

"Qualified immunity from suit is intended to 'allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010), *quoting Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

A qualified immunity determination requires the application of a two-part test. First, the defendants must establish that they were acting within their discretionary authority as a public employee when that conduct occurred. *Townsend v. Jefferson Cty.,* 601 F.3d 1152, 1158 (11th Cir. 2010).

Second, the burden shifts to plaintiff to demonstrate that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* Courts apply the underlying standards of the relevant

particular constitutional provisions to determine whether a constitutional violation actually occurred. *Graham v. Connor*, 490 U.S. 386 (1989).

a.   It is undisputed that Powell was acting within his discretionary authority.

Discretionary authority includes all acts of an official "that were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Howell v. City of Lithonia,* 397 F. App'x 618, 620 (11th Cir. 2010). Here, the police officers were effectuating an arrest, and it is well-settled that actions during an arrest are within the discretionary authority of the police officers. *Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir. 2004) ("Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby.").

b.   The "right" to have police officers administer medical care is not clearly established.

As the Third Amended Complaint plainly states, Plaintiff alleges that the defendants, including Powell, violated Pettaway's constitutional rights by failing to administer medical attention to Pettaway. There is, however, no clearly established right to have police officers themselves administer aid.

Plaintiff must demonstrate clearly established law in either of two ways. First, a plaintiff can point to a case with materially similar facts holding that the conduct engaged in was illegal. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1317 (11th

13

Cir. 2003). Second, in absence of case law, a plaintiff must demonstrate that a pertinent federal statute or constitutional provision is specific enough to demonstrate their conduct was illegal. *Storck*, 354 F.3d at 1317.

Generally, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). While there is no requirement that a plaintiff find a case precisely on point, the Eleventh Circuit has stated that "a clearly established right is one that is sufficiently clear that <u>every reasonable official</u> would have understood that what he is doing violates that right." *Young v. Borders*, 850 F.3d 1274, 1282 (11th Cir. 2017) (emphasis in original).

"Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Storck*, 354 F.3d 1307, 1318 (11th Cir. 2003). Indeed, the Supreme Court has recently cautioned courts to avoid defining clearly established law at a "high level of generality" and that "[i]t is not enough that the rule is suggested by then-existing precedent." *District of Columbia v. Wesby*, _ U.S. _, 138 S. Ct. 577, 590 (2018). Instead, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590.

14

Here, while Plaintiff's complaint cites a case which says that there is a clearly established right to have police officers summon aid, *Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015), there is no such right to have the officers themselves provide treatment. For example, in *Davis v. Edwards*, 2017 U.S. Dist. LEXIS 144140 (M.D. Ala. Sept. 5, 2017), a case from within this district, the decedent was shot and killed by a police officer. Like the plaintiff does here, the plaintiff in *Davis* argued that the defendants were deliberately indifferent because the defendants failed to stop the bleeding. The district court dismissed the count under qualified immunity, noting that "Plaintiff concedes there is no clearly established constitutional obligation to be trained in or to provide medical care. Thus, there was no constitutional violation in failing to render medical aid…" *Davis*, 2017 U.S. Dist. LEXIS 144140 at *25. The court went on to state "there was no constitutional obligation for Edwards, Hardnett, and Fenn to personally render medical assistance to Stewart in these circumstances . . ." *Davis*, 2017 U.S. Dist. LEXIS 144140 at *26.

Other courts similarly hold. Earlier this year, the Northern District of Alabama agreed with the *Davis* court from this district. In *Aaron v. Hudson*, 2022 U.S. Dist. LEXIS 66502 (N.D. Ala. April 22, 2022), the decedent was killed when he was struck by an on-duty deputy sheriff who was driving his sheriff's car while intoxicated. After the intoxicated deputy struck the decedent, he provided no medical assistance. The court dismissed the case pursuant to qualified immunity. The court

found "[g]iven that all relevant and binding case law holds there is no obligation for a police officer to personally provide medical care, it cannot be said that the constitutional right in question was clearly established." *Aaron*, 2022 U.S. Dist. LEXIS 66502 at *9.

That is dispositive here. The allegation is that Powell did not provide care. Because there was no clearly established right Officer Powell to personally provide care, Officer Powell is entitled to qualified immunity and summary judgment.

Indeed, this result is consistent with the limitations the courts have placed on allegations of constitutional violations. In reality, the Plaintiff is seeking a constitutional requirement that the Montgomery Police Department train its police officers to perform complex in-depth medical training. This is not required by the United States Supreme Court's admonition that the due process clause of the 14th amendment, "as we have said many times, does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago County,* 489 U.S. 189 (1989). The court also commented the 14th amendment is not "a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

In the 14th amendment due process "deliberate indifference" context, "(a)s a general matter, the [supreme] court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-

16

making in this uncharted area are scarce and open height – ended". *Collins v. the City of Harker Heights, Tex.*, 503 US 115, 125 (1992).

The truth is that even Plaintiff's expert agrees that requiring police officers to administer extensive medical care is a bad idea. As Dr. Gaut stated, "we didn't want to go into any sort of in-depth medical training because that was inappropriate to ask a police officer to perform in-depth medical procedures." Gaut Depo., 74:23-75:8 (emphasis added).

There was no established right here, and the Court need not expand the parameters set by the courts. Powell is entitled to summary judgment on the claim for deliberate indifference.

> 2.   The evidence does not support the claim for deliberate indifference.

Even if Powell were not immune from suit which he is, Powell still is entitled to summary judgment. "In order to prevail on a claim of deliberate indifference to a serious medical need, a plaintiff must show: '(1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury.'" *Thomas v. City of Jacksonville*, 731 Fed. Appx. 877, 881 (11th Cir. 2018) (citation omitted). To show "deliberate indifference," the plaintiff must establish "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.* (citation omitted). The evidence does not support this claim.

17

First, Officer Powell did not have the subjective knowledge that there was a life-threatening situation. As he stated in his deposition, he had never seen that situation before and it did not occur to him that there was a danger that Pettaway could die:

Q. Okay. There was a lot of blood out there, wasn't there?

A. Yes.

Q. Okay. Did it ever occur to you that this man may die?

A. It did not.

Q. And how would you not draw that conclusion?

A. I've never seen something like that. I've never seen the outcome of something like that.

Q. I know. But I thought we just agreed that if someone is bleeding heavily; if the amount of blood loss is not retarded or stopped, then that person is in danger of dying. You knew that; correct?

A. Correct.

Q. And you saw that exact thing occurring in front of you; correct?

A. Correct.

Q. But you didn't -- it didn't occur to you that, Hey, we need to do something to stop this bleeding?

That never occurred to you?

A. It did not.

Powell Depo. 34:8-35:4. Without evidence of subjective, as opposed to objective knowledge, the claim fails.

Second, Officer Powell was not negligent, let alone guilty of "more than mere negligence."   As the evidence shows, Powell was prohibited by Department Directives from providing aid: "Medical Aid is to be rendered by only those trained and/or certified to render such aid."   Directive 3.3.5(C). Officer Powell was not trained to administer the aid required for Pettaway, so he was by directive prohibited from taking any such action. Powell Depo. 39:24-40:3.

Finally, any deliberate indifference was not the cause of death. The State's medical examiner testified that applying a tourniquet would not have saved Pettaway's life. Even if a tourniquet had been applied, it would not have prolonged Pettaway's life long enough for trained professionals to perform treatment. Boudreau Declaration, ¶7. As Dr. Boudreau stated, "Mr. Pettaway would've lost a life-threatening amount of blood within 2 1/2 to 3 minutes after the bite." Boudreau Declaration, ¶8. Thus, even if Powell was permitted to act and had done so, Pettaway still would not have survived. Powell therefore is entitled to summary judgment.

> B.   Powell is entitled to summary judgment on the state law wrongful death claim.

Plaintiff asserts a state law claim for wrongful death based on Powell's, and others', alleged negligence in the failure to provide medical care. "The elements of a negligence claim are a duty, a breach of that duty, causation, and damage." *Prill v. Marrone*, 23 So. 3d 1, 6 (Ala. 2009), quoting *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001). Here, Powell is entitled to summary

judgment because the evidence establishes there was no duty and Powell's actions were not the proximate cause of Pettaway's death.

As above established, there was no clearly established right placing a duty on Officer Powell, or any other officer, to personally provide aid. But in addition to that, Officer Powell did not owe a duty under these facts.

First, it is undisputed that Officer Powell complied with Montgomery Police Department Written Directive 3.3.5 regarding the rendering of aid. Directive 3.3.5(C) states "Medical Aid is to be rendered by only those trained and/or certified to render such aid." Officer Powell was not trained to administer the aid required for Pettaway, so he was by directive prohibited from taking any such action. Powell Depo. 39:24-40:3. So rather than having a duty to provide aid, Officer Powell actually had a duty not to.

Further, Plaintiff's own expert agreed that it would be inappropriate to train police officers on complicated medical procedures. The plaintiff's expert, Dr. William Gaut, testified that he had helped develop the required training, that first aid includes basic first aid and it should include CPR, stating "I personally agree that first aid should include basic first aid and it should include CPR. But we didn't want to go into any sort of in-depth medical training because that was inappropriate to ask a police officer to perform in-depth medical procedures." Gaut Depo. 75:1-8.

Here, saving Pettaway would have required in depth procedures. As Alabama State Medical Examiner, Stephen Boudreau, M.D., has testified, applying a tourniquet in the area of the dog bite, the upper leg, is extremely difficult to apply, because you have to try and grab that artery coming out of the groin. Boudreau Depo. 22:23-23:3.

In fact, Dr. Boudreau further testified that because it was the femoral artery that was punctured, a tourniquet would have been ineffective. Rather, according to Dr. Boudreau, "Due to the location and nature of the wound, the only way to have preserved Mr. Pettaway's life would've been to cut open his leg and affix a clamp directly on the artery." Boudreau Declaration, ¶7. Even Plaintiff's expert does not think that a police officer must be trained to perform surgery in the field. Officer Powell thus had no duty.

But even if there were a duty to provide the treatment suggested by Plaintiff, i.e., applying a tourniquet, the evidence shows that the failure to do so was not the proximate cause of the death. As previously noted, the State's medical examiner testified that applying a tourniquet would not have saved Pettaway's life. Boudreau Declaration, ¶7-8. Because applying a tourniquet would not have saved Pettaway's life, the failure to apply a tourniquet was not the proximate cause of death, and Officer Powell is entitled to summary judgment.

21

V.      **CONCLUSION**

As shown above, Defendant Officer Ryan Powell is entitled to summary judgment on the claims stated against him. He is immune from suit pursuant to qualified immunity, and the stated claims for deliberate indifference and wrongful death fail on the merits.

Respectfully submitted,

*/s/ William P. Gray, Jr.*
William P. Gray, Jr.
Attorney for Officer Ryan Powell

WILLIAM P. GRAY, JR. (ASB-5268-R78W)
Gray & Associates, LLC
3500 Blue Lake Drive; Suite 455
Birmingham, Alabama 35243
Email: wpg@grayattorneys.com

22

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been filed on Pacer, the Court's electronic server, on this 5th day of October, 2022, for service on all counsel of record herein:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

C. Winston Sheehan, Jr. (She013)
Ball, Ball, Matthews & Novak, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
wsheehan@ball-ball.com

*/s/William P. Gray, Jr.*
William P. Gray, Jr.

# DOCKET 376

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

WALTER PETTAWAY
as administrator of the Estate
of Joseph Lee Pettaway, deceased,

                    Plaintiff,

     *versus*

NICHOLAS D. BARBER,
MICHAEL GREEN, JUSTIN
THRASHER, RYAN POWELL,
JOSHUA SMITH, KEIUNDRA
WATTS, BIANKA RUIZ and
NEAL FLOURNOY, ERNEST
N. FINLEY and THE CITY OF
MONTGOMERY, ALABAMA,

                 Defendants.

Civil Action

2:19-cv-0008-ECM

Jury Trial Demanded

PLAINTIFF'S MOTIONS AND BRIEFS FOR SUMMARY JUDGMENT
AGAINST BARBER, THE CITY AND FINLEY ON THE ISSUE
OF THEIR LIABILITY ON THE SECOND AND FOURTH CLAIMS FOR RELIEF

Comes now plaintiff and moves for summary judgments on the issue of the liability of defendant Nicholas Barber on the Second Claim for Relief and the liability of the defendant City and Ernest Finley on the Fourth Claim for Relief of the Complaint, as last amended (Doc. 205), and files this consolidated brief in support of his motions on those claims for relief.

1. The Second Claim for Relief is a §1983 claim alleging defendant Barber's excessive and unlawful use of force in violation of the Fourth Amendment against plaintiff's decedent Joseph Lee Pettaway which was a proximate cause of Mr. Pettaway's death.

1

2. The Fourth Claim for Relief is a §1983 *Monell* [1] claim based on a written policy of City of Montgomery Police Department, Written Directive 3.3.5 (Doc. 371-4) created and ordered by MPD Police Chief Ernest Finley, as the City's policymaker on police customs and policies, which official policy was a proximate cause and moving force behind the Fourth and Fourteenth Amendment violations that caused the death of plaintiff's decedent Joseph Lee Pettaway.

3. The facts and evidence cited in the following section "**A. Statement of Undisputed Facts**" are taken primarily from five sources, the first four of which were testimony, documents, or evidence produced in discovery by defendants in this case:

> (1) Doc. 370-26, the video recording made by the body camera of MPD defendant Nicholas Barber produced by defendants in discovery in this case and labelled by defense counsel as COM 000002 and filed conventionally with the Court in August, 2022 as Doc. 371-26 under seal;
>
> (2) Doc. 370-27, the video recording made by the body camera of MPD defendant Keiundra Watts produced by defendants as COM 000007 and contemporaneously filed conventionally herewith under seal;
>
> (3) Doc. 371-5, excerpts from the deposition of former MPD policeman Nicholas Barber;
>
> (4) Doc. 371-6, excerpts from the deposition of former MPD Police Chief Ernest N. Finley; and
>
> (5) Doc. 371-7, excerpts from the deposition and Doc. 371-8 and 371-9, affidavits of James B. Jones, a private citizen who in the months prior to July, 2018, was employing Mr. Pettaway to help repair the house into which Barber released the police dog for the purpose and with intent that the dog attack whoever was in the house, and in which house the police dog fatally attacked Mr. Pettaway.

4. The best and most reliable evidence in this case is found in Doc. 370-26, MPD policeman Barber's video cam recording and, MPD policewoman Watts video camera recording, Doc. 370-27, the former of which was previously submitted to the Court as Doc. 371-26 both of which have

---

[1] See *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) holding that municipalities are liable under §1983 for "acts which the municipality has officially sanctioned or ordered." (cited in *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 943 (11th Cir. 2017))

been previously conventionally under seal filed pursuant to the Court order in support of these Motions for Summary Judgment.  These body cameras recorded the critical actions, inactions, events and circumstances in this case, including the dog's fatal attack on Mr. Pettaway on July 8, 2018 and the events and circumstances existing at the time of and which preceded and followed that attack.

5. Additional sources for the facts recited in section A. include excerpts from the depositions of defendant MPD policeman Nicholas Barber Doc. 371-5, former MPD Police Chief Finley Doc. 371-6, former MPD policemen Keiundra Watts Doc. 371-15, Bianka Ruiz Doc. 371-16, Ryan Powell Doc. 371-17,  Joshua Smith Doc. 371-18, and Neal Flournoy Doc. 371-19, the Rule 30(b)(6) depositions of the City given by the City's designees, Lt. Andre Carlisle, Doc. 371-20, and Lt. Raymond Carson, Doc. 371-21; and the August 31, 2021 deposition of Dr. Stephen Boudreau, Doc. 371-11, the Alabama Department of Forensic Sciences Medical Examiner, who performed and wrote the autopsy report, Doc. 371-12, on Mr. Pettaway.

6. Following after section "**A. Statement of Undisputed Facts**" is section "**B. Law and Application of Facts to the Second and Fourth Claims for Relief**" (see page 39, infra) which addresses and cites the controlling law and legal authority applicable to the Second and Fourth Claims for Relief; provides argument applying that law and legal authority to the facts relevant to those claims; and supports the entry of summary judgment on these two claims against the respective defendants against whom they are made.

## A.
### Statement of Undisputed Facts

7. Beginning in early 2018, James B. Jones, a Montgomery resident, hired plaintiff's decedent, Joseph Lee Pettaway (Doc. 371-1) age 49, and Gary Dixon, to help him repair a small, abandoned, vacant house located at the 3809 Cresta Circle in west Montgomery. (Doc. 371-7, Jones depo, p. 14 and Doc. 371-8 and Doc. 371-9, affidavits of James B. Jones).  They worked on repairing that house for several months preceding July 8, 2018.   Doc. 371-2 is a photograph of this house and Doc. 371-3 is a diagram of arrangement of the rooms in that house made by the Alabama Bureau of Investigation (ABI) which accurately depicts the layout of the rooms in this small house (Doc. 371-7, Jones depo, p. 10-11) (Doc. 371-5, Barber depo, p. 79)

8. Mr. Jones had known Joseph Lee Pettaway since Mr. Pettaway was five years old and Mr. Jones was seven years old growing up together in west Montgomery. (Doc. 371-7, Jones depo, p. 8-9). Gary Dixon is Mr. Jones' cousin (Doc. 371-7, Jones depo, p. 9).

9. The small house that they began to repair together in early 2018 on Cresta Circle had been unoccupied for some time and in the early part of 2018, was in disrepair and was not habitable (Doc. 371-7, Jones depo, p. 13) (Doc. 371-8 and Doc. 371-9, affidavits of James B. Jones). Specifically, Mr. Jones testified "you couldn't live in the house," it was "tore up" (Doc. 371-7, Jones depo, p. 11-12) and "it wasn't even in living condition" (Doc. 371-7, Jones depo, p. 13); "there just wasn't any sheetrock"; you could "see between the studs in the wall"; there "was just holes everywhere" and you "could go in the kitchen and you could see to the bathroom" (Doc. 371-7, Jones depo, p. 19) and both the water and power supply to the house had been turned off. (Doc. 371-7, Jones depo, p. 15-16).

10. According to the testimony of Mr. Jones, on July 8, 2018, there was nothing of value in the house other than a TV and some of their work tools. (Doc. 371-7, Jones depo, p. 31).   In addition, on the Barber video (Doc. 371-26), Gary Dixon also told Barber as they stood in the front yard of the house before Barber released the dog into the house, that there were no valuables, guns or weapons in the house.  (Doc. 371-7, Jones depo, 76-77)

11.  Mr. Jones hired and had been paying Mr. Pettaway and Mr. Dixon to work on the house under an agreement Mr. Jones had with Norris Harris, a local minister and the owner of the house (Doc. 371-7, Jones depo, p. 11).  Under that agreement, if Mr. Jones would make the repairs necessary to make the house habitable again, Mr. Norris would rent the house to Mr. Jones at a reduced rate. (Doc. 371-7, Jones depo, p. 16-18) (Doc. 371-8 and Doc. 371-9, affidavits of James B. Jones)

12.  In the months before July, 2018, Jones, Pettaway and Dixon did carpentry work, sheet-rocking, painting, installed new plumbing and flooring and did other repair work (Doc. 371-7, Jones depo, p. 10, 22) to make the house habitable and ready for occupancy by Mr. Jones, his girlfriend and their small child, who planned on moving into the house when the repairs were completed. (Doc. 371-7, Jones depo, p. 17-18) (Doc. 371-8 and Doc. 371-9, affidavits of James B. Jones)

4

13. On Saturday, July 7, 2018, Mr. Pettaway, Mr. Jones and Mr. Dixon worked together at the house (Doc. 371-7, Jones depo, p. 23). That evening after work, together with Mr. Jones' girlfriend and "a bunch of folks," they had a barbeque supper in the backyard of the house (Doc. 371-7, Jones depo, p. 24) (Doc. 371-8 and Doc. 371-9, affidavits of James B. Jones).

14. After they had eaten supper, their friends left to go to their homes. (Doc. 371-7, Jones depo, p. 25). Mr. Jones testified that at about 10:30 to 11:00 PM, he and his girlfriend left the house to go to their east Montgomery apartment to spend the night. (Doc. 371-7, Jones depo, p. 25-26) (Doc. 371-9 and Doc. 371-9, affidavits of James B. Jones).

15. Mr. Dixon either remained at the house or left and later returned to the house to spend the night. He was asleep in the house around 2:30 AM when someone knocked on the front door of the house. Mr. Dixon did not answer the door. [2]

16. Unknown to Mr. Dixon, Mr. Pettaway had also returned to the house at 3809 Cresta Circle that they had been working on the repair of earlier that day, to also spend the night. When there was no answer to his knock at the door, Mr. Pettaway is believed to have gone around to the back of the house and entered the house through a window from which the window pane which was not broken, but which had been previously removed or from which Mr. Pettaway removed the pane. In any event, the whole unbroken window pane was lying next to the window at the back of the house in the ABI photos taken of the house only a few hours after Mr. Pettaway's death. Doc. 371-23, ABI Photo.

---

[2] Mr. Dixon stated between 3:05:28 to 3:05:42 on the audio portion of Barber's body cam recording (Doc. 371-26), while Mr. Dixon is standing outside the house:

| Garry Dixon: | I just heard a strange sound, man, like at first, somebody was knockin'. Tap, tap, tap, tap, tap, uh, but I, I don't know these people back here |
| --- | --- |
| Nicholas Barber: | Mm hmm. |
| Garry Dixon: | So I say I'm not gonna answer no door. |

5

17.  Dixon heard a noise in the house and when Dixon went to investigate the noise, he saw a hand sticking out of a closet in one of the rooms.  Dixon told Barber that this hand was all that Dixon ever saw of the person in the house (Doc. 371-5, Barber depo, p. 73-74).

18.  Mr. Dixon did not raise any alarm or attempt any communication with the person in the closet.  Instead Mr. Dixon quickly walked outside and called the police.  (Doc. 371-5 , Barber, p. 73-74)

19.  Mr. Dixon's phone call to the police was recorded and an electronic audio copy of it has been previously conventionally (Doc. xx).  In his call to the police Dixon reported the presence of an unknown person in the house, but he made no report of any threat or physical assault; he did not report any theft, nor any sighting of any weapon; nor did he report any communication or physical contact between himself and the person whose hand he saw in the closet.  Gary Dixon reported only that there was an unknown person who had entered the house.

20. Gary Dixon did not know that the person in a closet at the house who had entered the house was his co-worker Joseph Lee Pettaway with whom Dixon had worked all day at the house that day and with whom Dixon had just eaten a barbeque supper only a few hours previously.

21.  In addition to the police, Mr. Dixon also called Mr. Jones and told him about an unknown person entering the house (Doc. 371-7, Jones depo, p. 56).  Mr. Jones then left the east Montgomery apartment to come to the house at 3809 Cresta Circle. (Doc. 371-7, Jones depo, p. 26-27)

22.  A number of MPD policemen responded to the radio call for assistance at 3809 Cresta Circle.  Arriving separately within a few minutes of each other at around 2:45 to 2:55 AM in four or five police cruisers, they quietly came to the small house and silently surrounded it.  These policemen included the defendants in this case, MPD Policemen Nicholas Barber, Neal Flournoy, Michael Green, Ryan Powell, Bianka Ruiz, Joshua Smith, Justin Thrasher, and Keiundra Watts.

23.  Nicholas Barber was a new MPD Canine Unit handler assigned to the unit only a few months previously. (Doc. 371-5, Barber depo, p. 100-101).  The others — Flournoy, Green, Powell, Ruiz, Smith, Thrasher and Watts — were regular patrolmen assigned to the MPD Patrol Division.

24.  Barber, the new MPD canine unit policeman, brought a police dog to the house in his police vehicle.  When Barber arrived at the house, he activated his body cam inside his vehicle at approximately 2:59:00 AM and it began the video recording that is hereinafter referred to as the Barber body cam video (Doc. 371-26).   Barber body cam made an audio and video recording all of the events that occurred in front of Barber between Barber's 2:59:00 AM arrival at the house and 3:29:39 AM when the first EMT medic reached down and touched Mr. Pettaway's unconscious, bleeding body lying on the sidewalk in front of the house as well as events after Mr. Pettaway left in an ambulance for the hospital.

25.  The police surrounded the small house.  In doing so, each of the five MPD police patrolmen testified they made no attempt and had no recollection of any other policeman making any attempt to communicate with whoever was in the house, i.e., they did not make, nor did they hear or see or know of any other MPD policeman make any attempt to communicate with any person inside the house until just as Barber released a police dog into the house.  (Watts depo, Doc. 371-15, p. 21-22; Ruiz depo, Doc. 371-16, p. 22-23, Powell depo, Doc. 371-17, p. 16; and Smith depo, Doc. 371-18, p. 33).

26. Although their police vehicles were equipped with loudspeakers (Doc. 371-5, Barber depo, p. 87-88), no MPD officer used their loudspeaker to identify themselves to whoever was in the house, or to announce that they had surrounded the house or to order the person in the house to come out, identify themselves and speak with them.  These policemen testified as follows: Doc. 371-17, Powell depo, p. 27:

> Q  I think the way you termed it was that Barber announced his presence. You're talking about what he did at the front door just before he let the dog in; correct?
>
> A  Correct.
>
> Q  Okay.  Other than that, do you recall any attempt at any time by anyone out there to communicate with whoever might be inside the house?
>
> A  I don't remember.
>
> Q  Okay.  You don't remember any?
>
> A  I don't remember any.

Doc. 371-17, Powell depo, p. 29-31

Q  There is no indication on Barber's recording that anybody attempted -- anybody from the police department or otherwise attempted to communicate with Mr. Pettaway who was inside the house at the time prior to the time that, as you say, Barber announced his presence.  And you don't know anything different than that; correct?

A  Correct.

Q  Okay.  You didn't hear anybody try to communicate?

A  I don't recall.

Q  Right.  You don't recall that that occurred?

A  I -- I don't -- correct.  I don't recall that that occurred.

Q  That occurred?  That's fine.  And do you have a loud speaker or something to amplify your voice on your police cruiser?

A  Yes, sir.

Q  Do most all of the police vehicles have that feature?

A  Correct.

Q  Okay.  So there was plenty of opportunity for the police, if they wanted to, to announce something like "We have -- we don't know your intent.  If you're inside the house, please come out."  Nobody ever did anything like that, did they, on the loud speaker or otherwise that you know of; correct?

A  Correct.

Doc. 371-18 Smith depo, p. 23-24

Q  Okay.  Do Montgomery Police Department vehicles have loud speakers in them, things to amplify your voice?

A  I believe they do, sir.

Q  Okay.  Did yours, or do you know?

A  I can't recall, sir.

8

Q  Whether yours did or not?

A  Yes, sir.

Q  Okay.  But that's a common feature on a lot of the police vehicles; correct?

A  Yes, sir.

Q  Okay.  While you were there, at any time did you hear anybody attempt to communicate in any way with whoever might be inside the house other than, I think you said, when Barber went there he made some announcement of some sort; correct?

A  Yes, sir.

Q  Anybody else at any time ever make any attempt to communicate with anybody in the house that you can recollect?

A  I -- I don't remember.

Q  If it occurred, you don't remember it; correct?

A  Yes, sir.

Doc. 371-15, Watts depo, p. 30-31

Q  Okay.  You had -- you mentioned that Mr. Barber made some announce-ment of his presence?

A  Yes, sir.

Q  You recall that?

A  Yes, sir.

Q  Okay.  Other than that, do you recall at any time anybody from the police department or otherwise trying to communicate with the person in the house before the dog went into the house?

A  I can't recall.

Q  Okay.  Does your vehicle have a loud speaker on it, a microphone that allows you to speak into it and have your voice amplified?

9

A  Yes, sir.

DOC. 371-16, Ruiz depo, p. 19-20

Q  Right.  And other than what – and we have it on -- on another body cam video audio of whatever it is that Officer Barber said at the front door.  We have that on video.  I know about that.   Other than that, did you ever hear any police officer make any attempt to   communicate with whoever maybe inside the house?

A  Before Officer Barber announced himself?

Q  Yes.

A  To my knowledge, I don't recall.  I don't think anybody did.

Q   Okay.  Do you have a microphone, a loud speaker, or amplification device on your police vehicle?

A  That's correct.

Q  Okay.  Did most all of the police vehicles have that kind of device on there so that they could take a microphone and amplify -- make their voice louder and heard a greater distance from their vehicles?

A  To the best of my -- to the best of my knowledge; yes, sir.

Doc. 371-19, Flournoy depo, p. 43:

Q.  Do you know or have any reason to believe that any police officer attempted to communicate with whoever the unknown person was in the house prior to the dog being released into the house?

A.  I have no clue.

27.  Barber further confirmed this in his deposition: no MPD policeman made any effort to communicate by any means with whoever was in the house until Barber gave his so-called "warning" in a strange, sing-song chant, in which Barber admitted that he "*slurred his words*" and "*ran them together*" just seconds before entering the house.[3]  Barber depo, Doc. 371-5, p. 108.

---

[3] Doc. 371-5, Barber depo, p. 88-89:

We invite the Court to listen to Barber's incantation of what he calls his "warning" in the audio portion of Barber's video camera recording (Doc. 371-26) at 3:11:34 to 3:11:44 AM of that recording.

28. There is no evidence or testimony that Mr. Pettaway, who was inside the house, ever knew of the presence of these policemen outside the house that night or that these police wanted or needed him to come out of the house and speak with them.

25. As the Barber video shows, Barber spoke with Mr. Dixon outside the house after he arrived. However, as addressed hereafter, the information Mr. Dixon provided to Barber not only did not support the use of force, it negated the lawfulness of the police dog's release.

29. When Mr. Jones arrived, they asked for and received his permission to release the dog into the house. This is required by MPD policy to avoid claims for property damage inside the house by the dog. Mr. Jones testified that he gave permission because he "really didn't believe nobody was in the house." (Doc. 371-7, Jones depo, p. 33)

30. Barber made the decision to release the police dog into the house. Barber testified that he was the sole and final authority over whether to release the dog into the house and it was solely Barber's decision to deploy the dog as a use of force. (Doc. 371-5, Barber depo, p. 95).

---

Q. Okay. I want to make certain I am clear about this. To the best of your knowledge, there was no effort or attempt made by any Montgomery Police Department policeman to communicate with any person in the house before you went to the door of the house with your dog and just before you released the dog, correct?

A. Yeah, besides my warnings.

Q. I know. We1re going to get to your, quote, warnings in a moment. But other than whatever it is you said at the front door, prior to that time, you know of no attempt by anybody out there with the Montgomery Police Department to try to communicate with whoever was inside the house, correct?

A. Correct.

31.  Barber testified that the deployment of the dog was a use of force and that Barber knew and intended when he released the dog into the house that the dog would attack whoever the dog encountered in the house with his teeth (Doc. 371-5, Barber depo, p. 116):

> Q.  The release of the dog is a use of force, correct?
> A.  Correct.
> Q.  When you released the dog into the house, you knew and intended that the dog would attack whoever it found in the house with its teeth, correct?
> A.  Correct.

32.  Barber's deployment or release of the dog as a use of force violated a number of the policies of MPD Canine Bureau Policies and Procedures Manual, Doc. 371-23, page 5:

> VI. CANINE APPREHENSIONS
>
> (A) Because the Handler has the best knowledge of the capabilities of his Partner, he will be the only person other than his Unit Supervisors, to decide and direct the actions to be taken by the Canine team.
>
> (B) A Canine Unit may use force when:
>
> 1) In protection of the Handler, other Officers or citizens.
> 2) Hiding Felony suspects who refuse to surrender after warning.
> 3) Fleeing Felony suspects who refuse to stop after warning.
> 4) When the Canine is being assaulted.
>
> NOTE: The word Felony is used in parts (2) and (3) above and unless required by the particular situation. Canines are not used in the apprehension of Misdemeanor suspects.
>
> (C) All suspects whether hidden or fleeing will be given the opportunity to surrender.

33. Specifically, none of circumstances listed in subparagraph (B) authorizing a canine to be deployed as use of force were present:

> a. Neither Barber, the dog's handler, nor anyone else on site needed any "protection," as there had been no threat or overt act by Mr. Pettaway indicating or posing any immediate danger to anyone prior to Barber's release of the dog;

12

b. There was no basis for any reasonable belief that there was a "hiding felony suspect" on premises who had received and had "refused to surrender" after being fairly warned to surrender.

c. There was no "fleeing felon" who had "refused to stop" after being given a fair warning on the premises.

d. No canine was being assaulted.

e. There was no felony suspect on the premises.[4]

f. Mr. Pettaway was not given a real opportunity to surrender to the police.

34. Barber testified that the only sources of information about the events and the situation at 3809 Cresta Circuit that he had that night prior to releasing the dog into the house[5] were:

(1) in the dispatcher's call (Doc. 371-5, Barber depo, p. 58-59),

(2) from Dixon in the few minutes he spoke with him while standing in the front yard of the house just before Barber released the dog into the house, all of which was recorded on the Barber video (Doc. 371-26) (Doc. 371-5, Barber depo, p. 67),

---

[4] As Barber admitted (Doc. 371-5, Barber depo, p. 163-64), the only offense he had arguable probable cause to believe may be occurring at the house was trespassing, which is a misdemeanor, i.e., the Alabama Code provision for the criminal offense of trespassing provide that even First Degree Trespassing, §13A-7-2, is only a misdemeanor.

[5] Doc. 371-5, Barber depo, p. 69:

Q. All of the information you received, I would suppose would be you received it verbally? Somebody said it in front of you or to you, correct?

A. Correct.

Q. No other written materials of any sort or recorded materials of any sort. You had no source of information from any of those.

A. Correct.

Q. The sole course of information was what you saw or heard from the dispatcher, Sergeant Green, Gary Dickson and the person who is the homeowner, correct?

A. Correct.

13

(3) from James Jones in the front yard after he arrived just prior to Barber's release of the dog, all of which was recorded on the Barber video (Doc. 371-26),

(4) Barber's observations in the 12 minutes and 45 seconds between the time that Barber's body cam video shows he arrived at 3809 Cresta Circle (2:59:00 AM) and the time that Barber's body cam video shows that he released the dog into the house (3:11:45 AM).

### (1) Source 1 – from the dispatcher's call

35.   The only relevant information in the dispatcher's call was that the dispatcher had received a call about a report of a possible burglary at 3809 Cresta Circle and there was a request for a canine unit.  (Doc. 371-5, Barber depo, p. 58-59 and p. 64)

### (2) Source 2 – from Gary Dixon

36.   A review of the Barber video (Doc. 370-26) establishes that the only significant information Barber got from Dixon was that (a) there were no animals, valuables, weapons or guns in the house; (b) Dixon had heard a knocking at the door but Dixon had not gone to answer the knock; and (c) the location of bedroom in which Dixon saw a hand in the closet.[6]

---

[6] Barber body cam recording, Doc. 370-26:

| | |
|---|---|
| Barber: | No animals in there at all? |
| Dixon: | No.  No, no valuables ****.  I just heard a strange sound, man, like at first, somebody was knockin'.  Tap, tap, tap, tap, tap, uh, but I, I don't know these people back here ****. |
| Barber: | Mm hmm. |
| Dixon: | So I say I'm not gonna answer no door. |

and

| | |
|---|---|
| Barber: | Y'all have any weapons in there though? |
| Dixon: | No. |
| Barber: | No guns? |
| Dixon: | Mm mm.  Not that I know of.  **** |
| Barber: | When you go in the house, the back bedroom's to your right or left? |
| Dixon: | When you go in there and go down the hall, it's the bathroom sittin' there.  You gonna, you gonna pass some, some **** in the hallway. |

14

### (3) Source 3 – from James Jones

37.  The only information that Barber testified that he received from "the homeowner," Mr. Jones (who Barber mistakenly believed to be the owner of the house) was that no one else was allowed inside the house and that there were no weapons or pets in the house, Doc. 371-7,Jones depo, p. 76-77:

> Q.  All right.  Tell me all of what the homeowner told you.
>
> A.  I overheard him telling Sergeant Green that no one else is allowed inside the house.  And I asked him if there was any weapons or pets inside, and which he replied no.
>
> Q.  Anything else?
>
> A.  Not that I recall.
>
> Q.  Take a moment, if you want.
>
> A.  That was basically it.  He said no one should be in there.  Only Mr. Dickson was allowed in there, no weapons, no pets, yes.  And I need to take a break at some point.
>
> Q.  And certainly there was nothing else of significance that he told you.  You would recall it if it was a significant factor that involved your decision about whether to deploy the dog or not, correct?
>
> > MR. EAST:  Object to the form.
>
> A.  Correct.  I believe so, yes.

### (4) Source 4 – Barber's observations

38.  Barber testified that he made no significant observations at the house that would bear on the issue of whether "deployment of the dog would be appropriate or useful or lawful" (Doc. 371-5, Barber depo, p. 78-79):

> Bathroom's sittin' there.  Okay, here we go.  Goin' down the hallway.  Here's the bathroom.  That **** that bedroom there.
>
> Barber:     On your right-hand side.
>
> Dixon:      On the other side.
>
> Barber:     And you said he's in the closet?
>
> Dixon:      Yeah, I seen him.  I seen his hand.

15

Q. What other information did you get from your observations at the scene prior to releasing the dog?

A. Just looking at the house. I really don't understand.

Q. Did you see anything – you're taking in and you're trying to process what is going on here and is the deployment of a dog lawful or appropriate here, I suppose. Is that part of what you were looking at, taking in the scene, so to speak?

A. Yes, I can say yeah.

Q. What did you see in that regard that had any significance to whether it looked like the deployment of the dog would be appropriate or useful or lawful? Anything else that you saw in particular that sticks out in your memory about that?

A. No, nothing sticking out.

39. It is difficult to overstate the importance and significance of the fact that at the time Barber released the dog to attack Mr. Pettaway, Barber had been provided information from both Dixon and Jones that there were **no animals**, **no valuables**, **no weapons** and **no guns** in the house.

40. First, the fact that Barber was told there were no animals, no weapons and no guns in the house ***prior to Barber's release of the dog*** into the house when coupled with the other circumstances and facts known to Barber, completely obliterates any claim that Barber's release of this dog to attack Mr. Pettaway was a lawful use of force.

41. Barber's knowing that there was no any animal, weapon or gun in the house would essentially eliminate any serious concern that whoever was in the house could pose any real threat to the 5 or 6 armed policemen present at and surrounding the house.

42. There is absolutely no case to be made that the release of the police dog for the purpose and with the intent that it attack Mr. Pettaway was lawful.

43. Second, the fact that before releasing the dog to attack Mr. Pettaway, Barber had the information that there were **no "valuables"** in the house is also extremely significant.

44. Barber being twice told (by both Gary Dixon and James Jones) that there were no valuables in the house. This information when combined with the obvious condition of the house (dilapidated, obviously under extensive repair and uninhabited as a residence) and its location (in

16

an extremely economically depressed section of the city) would have informed any reasonable policeman that there was very little possibility that the house was the target of a burglary.

45.  Barber knew these things and the two obvious conclusions they compel: there was no burglary occurring at the house and entry into the house by police posed no serious danger.

46.  On the latter point, Barber admitted in his deposition he learned after Mr. Pettaway's death, that Mr. Pettaway was not burglarizing the house.[7]   Barber testified at page 125 of his deposition, Doc. 371-5:

> Q.  Did you subsequently learn that Mr. Pettaway was a workman who had been working at that house that day and had eaten supper with Mr. Dickson and the fellow you call the homeowner earlier that afternoon?   Did you learn that later?
>
> A.  People -- I didn't hear it there on the scene, so --
>
> Q.  Just -- you've learned that since then?
>
> A.  I've heard it.  I'm not sure if it's true or not, but, yes, I've heard it.
>
> Q.  And how soon after the event did you hear that?
>
> A.  I'd say a few months.
>
> Q.  And did you understand and then know that Mr. Pettaway was not a burglar there that night?  Did you know that?
>
> MR. EAST:  Object to the form.
>
> A.  Did I find out later on that --
>
> Q.  Yes, yes.
>
> A.  Yes.

47.  There is no reason why any reasonable policeman or Barber, if he had made any effort to do so, could not have discovered that "*Mr. Pettaway was a workman who had been working at that house that day and had eaten supper with Mr. Dickson and [Mr. Jones] earlier that afternoon*" or that "*Mr. Pettaway was not a burglar there that night*" before Mr. Pettaway's death.  This

---

[7]  While it is only information that police have that can be used to evaluate the lawfulness of their actions, the fact that Mr. Pettaway was not burglarizing the house confirms that minimal inquiry by Barber and the other police on site could have very easily determined that no burglary was occurring and that this use of force, i.e., release of the dog, was unnecessary and excessive.

17

information would have been readily available had Barber made the inquiries or investigation he should have before resorting to a use of force that proved fatal.

48.  Yet, Barber did not take these obvious and minimal steps necessary to discover these facts.  Barber testified to the reason why.  Barber testified that he was eager to "get his first bite," Barber, p. 103; and as a result, Mr. Pettaway died that night from a vicious attack inflicted on him by a dog that Barber sicc'ed [8] his dog on Mr. Pettaway.

49. Barber testified that he was aware of the ugly history we have in the South of white policemen sicc'ing police dogs on black men (Doc. 371-5, Barber, p. 93):

> Q. Okay.  I know you didn't grow up in the South, but do you know that we have an ugly history here in the South about white policemen sicc'ing police dogs on black men?  Do you know about that?
>
> MR. EAST:  Object to the form.
>
> A.  A little bit.  I've seen it on TV.

---

[8]   Barber testified that his command to the dog that attacked Mr. Pettaway was the German word, "Voran," and that there was no practical difference in the command, "Sic' em" and "Voran." (DOC. 371-5, Barber depo, p. 92-93):

> Q. Okay.  You're familiar with the term, "Sic'em," then?
>
> A. Yes.
>
> Q. "Sic 'em, Fido," you're familiar with that?
>
> A. Correct.
>
> Q. Okay.  Is there any practical difference in "Voran" and "Sic 'em"?
>
> MR. EAST:  Object to the form.
>
> A. "Voran," you don't even know if someone is there or not, but I see what you're talking about.
>
> Q. Okay.  Is there any practical difference in the word "Sic 'em" and "Voran"?
>
> MR. EAST:  Object to the form.
>
> A. Not that I can think of right now.

18

50. The only two things that distinguish Nicholas Barber and Bull Connor are the passage of 60 years and that, unlike Barber, Bull Connor did not kill anyone.

51. To summarize, at the time Barber released the dog to attack whoever was in the house, Barber knew almost nothing about the person believed to be in the house.   Specifically, Barber had no knowledge or reliable information about that person's identity, age, gender, purpose, intent, reason or license to enter or be in the house; and Barber was told there were no weapons in the house and had, no reasonable basis to believe that any person who might be in the house was armed with a weapon nor any reasonable basis to believe that any person in the house had committed or was committing any crime and certainly not any serious, dangerous or violent crime.

52. Barber testified as follows about the universe of possible crimes that the police had solid, reliable evidence of that night and he admitted that trespassing was the only such crime there was probable cause to believe had been or was occurring.  Specifically, Barber testified, Doc. 371-5, p. 128:

> Q.  Right.  And what is entry into a house that you don't have license or right to be in?  What is that standing alone?
>
> A.  Standing alone, it's trespassing.
>
> Q.  Okay.  So, in order for it to be burglary, there had to be some evidence that there was intent to steal something, correct?
>
> A.  Or --
>
>    MR. EAST:  Object to the form.
>
> Q.  Huh?
>
> A.  Or commit a crime therein.
>
> Q.  Right, right.  And you didn't have any information about that, did you?
>
> A.  No, I didn't.

53. Barber reiterated that testimony, again affirming that the only possible crime the police could even *imagine* was being committed was third degree burglary, but that the only possible crime they had probable cause to believe might be occurring was criminal trespass (Doc. 371-5, Barber depo, p. 163-64):

19

Q. Okay. Let me ask you -- I want to make certain I'm clear about all this, now. The most severe crime that you could imagine Mr. Pettaway or reasonably claim that he was committing was third-degree burglary, correct?

MR. EAST: Object to the form.

A. Correct.

Q. And that would depend upon whether you had probable cause to believe there was an intent to steal something, correct?

MR. EAST: Object to the form.

A. Or commit a crime therein.

Q. And you had no reliable evidence of either of those, correct?

A. It was confirmed that -- the way we would -- a way that we -- I'm trying to think of the right way to say it.

Q. You're not answering my question. My question is, did you have reliable evidence of an intent to steal or to commit a crime?

A. Not that I can recall.

Q. Okay. So, the other crime, if it wasn't burglary, it would have been trespassing, correct; that is, going on a piece of property that you had no right to be on, legal right to be on, or license?

A. Yes.

Q. Okay. So, those are the only two crimes that were within the universe of what this might have been, correct?

MR. EAST: Object to the form.

A. Yes.

Q. I realize that to most people, I guess, any crime is serious in some sense. But within the police and law enforcement community, is trespass[9] considered a serious crime?

---

[9] The Alabama Code provisions for the criminal offense of trespassing provide that even First Degree Trespassing is only a misdemeanor:

§ 13A-7-2. Criminal trespass; first degree.

20

A.  Yes, but no.

54. Without resorting to unsupported and unsupportable speculation, there was no reasonable basis to believe that any person in the house:

> a. had committed, was committing or intended to commit any crime, with the possible exception of trespassing,
>
> b.  had any criminal intent,
>
> c.  was armed with any type of weapon,
>
> d.  posed any danger, either immediate or otherwise, to anyone.

55.  The Barber video shows that at the 3:11:25 AM mark (Doc. 371-26), Barber and his dog approached the front door of the house.

56.  Until that time, there had been no attempt by any policeman to communicate with anyone in the house and no policeman had any reason to believe that whoever was in the house was aware of the presence of the police at the house.

57.  At 3:11:34 to 3:11:44 on the Barber video, Barber uttered his strange, sing-song, unintelligible chant, which Barber contends was the warning, only twice.

58. More specifically, Barber admitted in his deposition and/or the Barber video shows, the following:

> (a) contrary to MPD Canine Unit written policy, which requires three verbal warnings be given before releasing a dog, Barber gave only two warnings, Barber, p. 106;
>
> (b) that in giving these two warnings Barber "slurred" or "ran his words together," Barber, p. 108;
>
> (c) that the purpose of giving the warnings is defeated if there is no pause after the warnings to allow a time for compliance, Doc. 371-5, Barber depo, p. 104-05;
>
> (d) that Barber released his dog immediately, i.e., after only "right around a second" (Doc. 371-5, Barber depo, p. 108) after the last chanted "warning" was given; and

---

(a) A person is guilty of criminal trespass in the first degree if he knowingly enters or remains unlawfully in a dwelling.

(b) Criminal trespass in the first degree is a Class A misdemeanor.

21

(e) that after Barber listened to his "warnings," on his body cam recording, he understood how someone "could think" that he intentionally made his warnings unintelligible so they would not be heard and so that he could release his dog and "get a bite," Barber, p. 109

59. Barber's decision to release the dog, which Barber knew would attack and he intended to attack whoever was in the house, was motivated by his desire to "get a bite," Doc. 371-5, Barber, p. 103.

60. Specifically, Barber testified that in July, 2018, he had "only been a K-9 unit team for a little over five months"; that he and his dog were at the time the "most inexperienced K-9 team" Doc. 371-5, Barber depo, p. 93-94, and that he and his dog had not yet "gotten a bite," i.e., his dog had not yet attacked a person with his teeth, Doc. 371-5, Barber depo, p. 103.

61. Barber further admitted that it was a "rite of passage" in the canine unit for new dog handlers to "get their first bite," and admitted that he was "eager" to release his dog to "get a bite." Doc. 371-5, Barber depo, p. 103:

> Q. Is that sort of a rite of passage with a new dog handler, to -- and his team to get their first bite?
>
> A. I guess you could say that, yeah.
>
> Q. Okay. In any of [your] previous ten deployments, had you gotten a bite?
>
> A. No.
>
> Q. Were you eager to get a bite?
>
> A. I mean, everyone would be, so --
>
> Q. I take that as a "yes," correct?
>
> A. Yes.
>
> Q. Okay. And in order to get a bite, you've got to turn your dog loose and tell him to go bite somebody, don't you?
>
> A. Correct.

62. Before releasing his dog to attack, Barber made no attempt to investigate or determine who was in the house, what that person's intention or purpose for entering the house was, what right or claimed right that person may have had to be in the house, or any other of the circumstances

22

surrounding that person's presence in the house.   Barber was eager to get his bite. Doc. 371-5, Barber depo, p. 103

63. Barber's body cam's time stamp establishes that it was 12 minutes and 45 seconds after Barber arrived at the house at 2:59:00 AM that he released his dog into the house at 3:11:45 (Doc. 371-26 and Barber, p. 66-67).

64.  Again, Barber and Green both testified that the decision to release the police dog into the house as a use of force was solely and completely Barber's decision, Doc. 371-5, Barber depo, p. 95 and Green depo, p. 83 and 202; and that Barber he deployed the dog as an intentional use of force, i.e., that Barber knew and intended when he released the dog into the house that the dog would attack whoever the dog encountered in the house with his teeth.[10]

65.  When Barber entered the house after the dog, he entered it by himself, with no back-up officers.  This violates standard police department canine unit policies, as plaintiff's expert has opined and will testify, and violates MPD Canine Unit policy (Doc. 371-23, MPD Canine Bureau Policy and Procedure Manual, p. 7), which recommends that "*two handlers conduct all searches when possible*," i.e., have back up police accompany the dog and handler when the dog is deployed. The purpose of this policy is to avoid the dog handler having to deal with both the subject and with the police dog, i.e., the handler can give his primary attention to controlling the dog, avoiding any prolonged attack by the dog, while the back-up officers can give their full attention to securing the subject in the event the subject resists, a circumstance that did not occur here.

66.  In the Barber video, the dog appears to be in a frenzy running through the house, heavily panting. Several minutes after entering the house, the dog located Mr. Pettaway underneath a bed in one of the rooms and attacked Mr. Pettaway for almost two minutes, as Barber stood by and watched as his dog "got his bite," ripping into Mr. Pettaway's high thigh or crotch area with

---

[10]  Doc. 371-5, Barber depo, p. 116:

> Q.  When you released the dog into the house, you knew and intended that the dog would attack whoever it found in the house with its teeth, correct?
>
> A.  Correct.

its teeth with its teeth, violently shaking its head and driving its teeth deeper and deeper into his thigh lacerating or tearing Mr. Pettaway's femoral artery.

67. The dog's attack on Mr. Pettaway beginning at 3:15:38 AM on Barber's video is barbarous. Barber allowed the dog's vicious attack on Mr. Pettaway to go on for almost two minutes despite Mr. Pettaway's total lack of resistance; his repeated agonized cries of pain; his abject compliance with Barber's shouted orders—to the extent that Mr. Pettaway, who was trapped underneath a bed with a dog's jaws locked onto his groin, was able to comply with Barber's directions—and Mr. Pettaway's repeated pleas for Barber to call off the dog's attack.

68. The transcript[11] of the audio portion of Barber's body cam recording (Doc. 371-29, Doc. 371-26) does not capture the barbarity of this attack. To start to understand that, listening to the two minutes of the audio portion of the body cam recording (from the 3:15:38 AM mark to the 3:17:37 AM mark) is required. During that two minutes, the dog's jaws were locked onto Mr. Pettaway's groin tearing deeper into his torso just above his left thigh.

69. As the dog violently shook its head its teeth tore deeper and deeper into his flesh, tearing or cutting his femoral artery. During this two minutes, Mr. Pettaway repeatedly and agonizingly screamed in pain, yelled out that he was trying to come out from under the bed, that he had been bitten and was bleeding, and begged Barber to get the dog off of him.

70. Photographs of the wound caused by the dog's bite were made by Dr. Boudreau as a part of his autopsy report. Dr. Boudreau identified these photos of Mr. Pettaway's fatal wound and described it in his deposition Copies of two of those photos identified as Exhibits 4 and 5 to Dr. Boudreau's deposition are submitted as Doc. 371-13 and Doc. 371-14.

71. Not only does Barber not attempt to have the dog release its bite, on the audio portion of the recording, during most of the two minutes of the dog's attack, the Court will hear Barber repeatedly yell the word, "*Voran*," at the dog.

---

[11] Attached are transcripts of the audio portions of Barber's and Watts' body cam video recordings. They intended at this point not as evidence, but are offered as a guide to the Court in listening to the audio to better understand and guide the Court through what is being said on the recording (Doc. 370-26 and Doc. 370-27)

24

72.   Barber testified that the dog command, "*Voran*," is the equivalent of the English language command, "*Sic'em*." Doc. 371-5, Barber depo, p. 92-93:

> Q. Okay.  You're familiar with the term, "Sic 'em," then?
>
> A. Yes.
>
> Q. "Sic 'em, Fido," you're familiar with that?
>
> A. Correct.
>
> Q. Okay.  Is there any practical difference in "Voran" and "Sic 'em"?
>
> MR. EAST:  Object to the form.
>
> A. "Voran," you don't even know if someone is there or not, but I see what you're talking about.
>
> Q.  Okay. Is there any practical difference in the word "Sic 'em" and Voran"?
>
> MR. EAST:  Object to the form.
>
> A. Not that I can think of right now.

73. Thus, as can be heard on the Barber video (Doc. 371-26) Barber was repeatedly "sic'cing" his dog on Mr. Pettaway almost continuously throughout the dog's almost two minute attack on Mr. Pettaway.

74.  As the dog's attack continued, Barber struggled to put handcuffs on Mr. Pettaway, who is writhing in agony and continuing to plead with Officer Barber to call off the dog.

75.  The evidence is undisputed that when Barber released his leash on the dog and sent it to attack Mr. Pettaway, Barber essentially lost all control of the dog.

76.  Barber testified he had to choke the dog into unconsciousness in order to get the dog to cease its attack on Mr. Pettaway and release his jaws from his groin, i.e., Barber placed his hands around the dog's throat and constricted the dog's airway to cut off the dog's breathing.  He

25

did so until the dog was unconscious[12] as a way to have the dog involuntarily release its teeth from Mr. Pettaway's thigh.

77.   After Barber wrestled and choked the dog off of Mr. Pettaway, Barber then left the house leaving Mr. Pettaway lying unconscious[13] and without medical or first aid attention for almost six minutes on the floor of the room in which the dog had attacked him.  Barber never checked on Mr. Pettaway or his injuries from the dog bite, but left Mr. Pettaway lying on the floor, walked the dog back to his police vehicle and secured the dog inside the vehicle.

78.   Barber then did not go back into the house to assess and attend to Mr. Pettaway and his dog bite wound, but stood around chatting and joking with other policemen outside the house, joking at one point that Mr. Pettaway "is not too happy right now."

75.   Then, one of the policemen asks whether they should bring Mr. Pettaway out of the house or just "leave him for the medics."   Initially Barber directs them to bring Mr. Pettaway out of the house, but then tells them to wait and let him go inside the house and take a picture of Mr. Pettaway's unconscious body which has been lying unattended since Barber left to take his dog to his vehicle.

79.   Barber takes his picture of Mr. Pettaway's body lying unconscious on the floor, after which Barber says, "*Awesome*."  Barber then walked out of the room, leaving Mr. Pettaway lying on the floor unconscious, unattended and profusely bleeding.

---

[12] Doc. 371-5, Barber depo, p. 163:

> Q. [W]hat you did was, you choked the dog until it lost consciousness, and when the dog lost consciousness, it released its bite; is that accurate?
>
> A.  Yes.

[13] Heavy blood loss in a short period of time like that suffered by Mr. Pettaway will often cause the victim to go into shock and lose consciousness.  (Doc. 371-11, Boudreau depo, p. 19)
There is blood, Mr. Pettaway's blood, everywhere in the video.  As Dr. Boudreau testified, the wound from the dog's attack, located high on Mr. Pettaway's torso in the groin area tore into his femoral artery causing the heavy bleeding that appears throughout the body cam videos, (Doc. 370-26 and Doc. 370-27, Boudreau depo, p. 14 – 20 and which caused him to go into shock.

80.   After Mr. Pettaway had been lying on the floor in the house alone for almost six minutes, at approximately 3:23:14 AM, two policemen dragged Mr. Pettaway's unconscious body out the front door of the house, leaving a bloody trail on the floor of the house as they dragged him out of the house and lay him on the concrete sidewalk at the front of the house.  (Doc. 371-5, 3:23:14 AM)

81.   In addition to the approximate six minutes that Mr. Pettaway lay bleeding and unattended in the house, Mr. Pettaway lay on the sidewalk for an additional six minutes from 3:23:40 AM to 3:29:38 AM, unconscious and bleeding heavily onto the sidewalk (Doc. 371-5, 3:23:40 AM) also unattended.

82.   During this second six minute-plus period of time, Mr. Pettaway continued to bleed heavily, his blood soaked his pants and shirt and glistened in the light of the policemen's flashlights and as Mr. Pettaway's blood continued to pool around and underneath him as he lay unconscious on the sidewalk in the midst of unconcerned, laughing and wise-cracking policemen that hovered over him, lighting him with their flashlights.  See photos, Doc. 370-28 from Barber and Watts' body camera video recordings, Doc. 370-26 and Doc. 370-27.

83.   As with the prior six minutes that Mr. Pettaway lay unattended and untreated in the house, during this following six minutes, as Mr. Pettaway lay on the sidewalk outside the house, no defendant made any attempt or effort to provide first aid to Mr. Pettaway or to reduce, retard or diminish his loss of blood as he lay unconscious and bleeding in front of them.

84.   As the Barber video shows, this situation continued as Mr. Pettaway lay unconscious and bleeding on the sidewalk for another six minutes until the ambulance and EMT personnel finally arrived.

85.   Instead, during this time, MPD policemen Barber, Green, Thrasher, Powell, Smith, Watts, Ruiz and Flournoy stood over and shone their flashlights down on Mr. Pettaway while they chatted and joked.  Laughter and joking by these policemen can be distinctly heard on numerous occasions on the audio portion of the Barber video (Doc. 371-26), as Barber admitted in his deposition, Doc. 371-5, Barber, p. 155-56.

86.   Combining the six plus minutes that Mr. Pettaway was left inside the house without first aid or medical attention with the additional six plus minutes that Mr. Pettaway lay on the

27

sidewalk, it was almost thirteen minutes between the time Barber pulled the dog off Mr. Pettaway and the time any of the EMTs first touched Mr. Pettaway. (see body cam photos, Doc. 370-28)

87.  During the entire 12 plus minutes from the time Officer Barber choked the dog off the bite at approximately 3:17:32 AM and the time the first EMT reached down at 3:29.38 AM and touched Mr. Pettaway, no policeman ever attempted to provide any first aid or care to try to prevent or slow Mr. Pettaway's loss of blood from the dog bite wound.

88.  It was only at 3:29.38 AM according to Barber's time stamped body cam video (Doc. 370-26) when one of the EMT team members who had arrived to provide medical care reached down and touched Mr. Pettaway that Mr. Pettaway finally began to be provided with medical care for his injuries.   This was 14 minutes after the dog first bit Mr. Pettaway at 3:15:38 AM.

89. Plaintiff's expert, Dr. Benjamin Omalu, testified that the injury sustained by Mr. Pettaway should not have caused and would not have caused his death if basic, elementary first aid measures to diminish, retard or reduce his heavy and uncontrolled bleeding had been administered to him by MPD police.  He testified that to a 90 to 99 degree of certainty and well beyond a reasonable degree of medical certainty that Mr. Pettaway would have survived this wound if the basic, simple first aid measure of applying pressure to the wound and/or packing the wound with any available absorbent material, such as a T-shirt or any other available item of clothing, had been made.[14]   Dr. Omalu's testimony is the only qualified medical testimony on this

---

[14]  Dr. Omalu testified both in his deposition and in his declaration (Doc. 371-10) at page 8, ¶¶ 4 and 5 that:

> 4.  The focal vascular injury to Mr. Pettaway's left femoral artery and vein, was a highly survivable injury. The confidence interval for this opinion is 90 – 99%. Direct pressure, if applied to the injury, would have stopped or sufficiently slowed the bleeding, giving emergency physicians time to repair the damage and save Mr. Pettaway's life.

> 5.  To a 90 – 99% confidence interval and well beyond a reasonable degree of medical certainty Mr. Pettaway would have survived this wound if the basic, simple first aid measure of applying steady pressure to the wound and/or packing the wound with any available absorbent material, such as a

28

point and thus, there is no genuine issue of fact regarding the survivability of Mr. Pettaway's wound if the prompt and proper[15] medical care or, at the very least, first aid of the type that Boy Scouts are trained to give, had been provided to Mr. Pettaway.

90. Dr. Boudreau, the State Medical Examiner[16] who performed the autopsy on Mr. Pettaway, testified, Doc. 371-11, p. 21-22, that although he didn't know and could not say, it would

---

T-shirt or any other available item of clothing had been made emergency medical personnel arrived.

[15] It is well settled in this circuit that the Fourteenth Amendment's Due Process Clause requires police to provide "*prompt and proper*" medical care for injuries to pretrial detainees, *King v. Reap*, 269 F. App'x 857, 860 (11th Cir. 2008):

> This Court has held that the denial of prompt and proper medical care to a pretrial detainee violates the detainee's due process rights. Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988). (underlining supplied)

[16] This spring, defendants gave notice that they propose to offer expert witness testimony from Dr. Boudreau on this and other points that not only is Dr. Boudreau not competent or qualified to give under Rule 26, but opinions which amazingly and possibly perjuriously directly contradict his prior deposition testimony, given in August of last year, not as an expert witness, but as a fact witness, arising from the fact that he performed the autopsy for the State of Alabama on Mr. Pettaway.

We had previously challenged this proposed expert witness testimony from Dr. Boudreau with a motion to strike (Doc. 324) on grounds, among others, that this proposed expert testimony was a sham, was in contradiction of his prior sworn testimony, and was testimony that Dr. Boudreau was not qualified by either training or experience, to give under Rule 26, F.R.C.P., among other grounds

The Court subsequently entered an Order (Doc. 336) denying plaintiff's motion with leave to refile that motion once Dr. Boudreau's opinions had been specifically offered by defendants "on a future motion for summary judgment or other filing," i.e. the Court holding, Doc. 336, p. 3, that:

> for the Court to rule on the Plaintiff's motion now . . . the Court would have to speculate as to whether and how a party might rely on Dr. Boudreau's declaration or opinions in a future motion for summary judgment or other filing.

We will refile that motion once the defendants offer or cite any of Dr. Boudreau's opinions in the areas defendants gave notice of their intent to offer such testimony has been either offered in support of their own motion for summary judgment or in opposition to our motion for summary judgment.

certainly have taken more than six minutes of uncontrolled bleeding from Mr. Pettaway's wound to cause his death:

> Q.  Did you form any opinions on how long it would take -- if no efforts were made to diminish or retard the flow of blood, how long would it have taken for this wound to cause death?
>
> A.  It would only take a very short time, minutes.
>
> Q.  Okay.  Can you quantify "minutes" at all?  Three, five, six --
>
> A.  Well, no.  It wouldn't have been an instant death.  I mean, he would have to bleed for a while.    How many minutes, I can't exactly say.  I don't know.
>
> Q.  Okay.  What are the things that can be done to a wound of this type to reduce or diminish the loss of blood?
>
> A. Well, the only thing you could do if you were there would be apply direct pressure.  I mean, that's all -- that's it.  I mean, you know, unless you've got hemostats and other things to grab the artery, the only thing you've got is direct pressure.

91. Dr. Boudreau further testified that he agreed that almost all bleeding can be stopped by direct pressure to the wound, Doc. 371-11, p. 23-24:

> Q.  Okay.  I'm going to show you an exhibit to the complaint.  And I will tell you this is a -- this is a Boy Scout Wilderness Guide[17] -- First Aid for, among other things, stopping or retarding blood flow.  Look at the next to last paragraph.
>
> A.  By direct pressure.
>
> Q.  Yes, sir.  But the next to last paragraph talks about almost all bleeding.  Do you see that paragraph?
>
> A.  Yes, sir.
>
> Q.  "Almost all bleeding can be stopped with direct pressure, usually applied with pressure from your hand directly on the wound."  That's what you're talking about?
>
> A. Correct.

---

[17]  The Boy Scout Wilderness Guide attached to the Complaint (Doc. 205) as an exhibit and introduced as Exhibit 8 to Dr. Boudreau' s deposition.

30

Q. Do you disagree with that statement?

A. No.

92. Dr. Boudreau also testified that if these basic measures to stop or retard bleeding had been applied he knew of no reason why they would not have worked and that if applied, they "should have" stopped or significantly retarded Mr. Pettaway's loss of blood, Doc. 371-11, p. 26-27:

> Q.   Pardon me. Do you know of any reason if one of these measures they're talking about, direct pressure or packing the wound, do you know of any reason that if they had been applied or taken within a few minutes after the dog bites were inflicted, that they would not have stopped the bleeding or significantly reduced it?
>
> A.   They may have reduced it. I wasn't there.  I can't tell you how badly it was bleeding or, you know, how much pressure was applied or -- do you know of any reason that would not have significantly retarded the flow of blood?
>
> Q.   I know. Well, the testimony is going to be there wasn't any. But I'm saying if that was applied,
>
> A.   **It should have retarded the flow of blood**.[18] (emphasis supplied)

93. However, those life-saving measures—simple, basic actions that are taught to Boy Scouts—were not performed by MPD police to save Mr. Pettaway's life because MPD Written Directive 3.3.5 (Doc. 371-4) not only **did not require** MPD policemen to perform them, but **prohibited and prevented** MPD policemen from performing any of these life-saving measures because, as Chief Finley knew, MPD police had not training in first aid or medical aid necessary to address heavy blood loss to prevent loss of life.

---

[18]  Dr. Boudreau has subsequently inexplicably and possibly perjuriously contradicted his prior testimony on this point and others, in a "declaration" (Doc. 279-6) that he filed seven months later, but then agreed to withdraw (Doc. 333-1) but then reversed himself again and then did not withdraw.

This sham testimony by Dr. Boudreau has been previously addressed by plaintiff's motion (Doc. 324) which the Court declined to rule upon at that time (Doc. 336) but granted plaintiff the right to raise the issue again and which plaintiff will again raise by appropriate motion.

31

94. The direct causal link or connection between this MPD policy and the constitutional deprivation or violation herein could hardly be clearer.

95. All of the five police defendants have testified that they understood the policy to prohibit them from providing any type of aid to a person injured by police and that it was because of this policy that they did not attempt to provide first aid to Mr. Pettaway, i.e., attempt to retard, diminish or prevent his loss of blood from the police dog's tear or cut of Mr. Pettaway's femoral artery. Keiundra Watts, p. 57-58, Doc. 371-15; Joshua Smith, Doc. 371-18, p. 47-49; Bianka Ruiz, Doc. 371-16, p. 39-40; Ryan Powell, Doc. 371-17, p. 42-43; and Neal Flournoy, Doc. 371-19, p. 27-28

96. The failure of MPD policemen to be trained and required to provide basic first aid, i.e., to attempt to retard, diminish or prevent the heavy arterial bleeding by Mr. Pettaway was also caused by policy, procedures and customs of the City of Montgomery ordered and sanctioned by Ernest Finley, as MPD Police Chief:

> (a) written policy 3.3.5 of the City's Police Department (Doc. 371-4) which prohibited police who were not trained and/or certified to render medical aid to make any effort to reduce, retard or diminish blood loss from heavy profusely bleeding wound.
>
> and
>
> (b) the custom or policy of the City's Police Department to not train or require its policemen to be trained in basic elementary first aid measures to reduce, retard or diminish blood loss from heavy profusely bleeding wound.

97. The combination of these two policies and customs:

> (a) MPD policy 3.3.5 (Doc. 371-4) which did not require and, in fact, prohibited MPD police who were not trained or certified in first aid from attempting to diminish, reduce, retard or lessen Mr. Pettaway's bleeding,
>
> and
>
> (b) the MPD custom or policy of not training or requiring its police to be trained in the basic, elementary first aid measures required to diminish, retard or reduce heavy and uncontrolled bleeding from an open wound

were a proximate cause of and the moving force behind Mr. Pettaway's death, i.e., it caused the failure of MPD police to provide to Joseph Lee Pettaway first aid or any of the most basic,

rudimentary forms of the medical care that the Due Process Clause of the Fourteenth Amendment required to be provided to him and were a proximate cause and the moving force behind Mr. Pettaway's death.

98. This twelve plus minute delay in providing medical care to persons injured by MPD police was a delay that Ernest Finley testified that he knew would be "inevitable," (Deposition of Ernest Finley, Doc. 371-6, p. 79) at the time that Finley ordered and sanctioned the City Police Department's Written Directive 3.3.5 (Doc. 371-4)

99. It is undisputed that Ernest Finley knew and understood that Written Directive 3.3.5 (Doc. 371-4) would inevitably cause delays in providing medical care.

100. MPD policy 3.3.5 (Doc. 371-4) states that its "purpose . . . is to establish procedures for rendering aid after the use of force."

101. However, according to the testimony of both (a) Chief Ernest Finley,[19] the City's final policymaker, and (b) Lt. Andre Carlisle,[20] the City of Montgomery's Rule 30(b)(6) designee

---

[19] Deposition testimony of Chief Ernest Finley, DOC. 371-6, p. 39:

> Q. Okay. Your testimony is that MPD policy 3.3.5 did not require MPD policemen who cause say a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life, correct?
>
> MR. EAST:  Object to form.
>
> A.  Correct.

[20] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee (see Notice of Rule 30(b)(6) deposition notice testified for the City in his deposition as follows: Doc. 371-20, p. 42-43:

> Q. From 2015 until January of 2021, during that period of time, there were no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person, correct?
>
> A. You mean where there's a policy in place?
>
> Q. Yes, sir.
>
> A. Is that what you're asking?
>
> Q. Yes, sir. Were they required by policy to --

on MPD police training, under MPD customs and policies in effect in July, 2018, <u>under no circumstances were MPD policemen required or allowed to themselves render aid or perform basic, elementary first aid measures to diminish, reduce, or retard heavy and uncontrolled bleeding from a wound they had caused, even if such efforts were necessary to prevent that person's death</u>.

102. Amplifying and making the MPD policy clearer on this specific point, Chief Finley so testified, despite his admitting knowledge that if a major blood vessel is cut or torn or severed, that person must be treated "immediately"[21] and also admitting that if the policeman on site does not provide that treatment, it will not be treated "immediately," but that treatment will be delayed until EMTs are both summoned and arrive.[22]

103. Thus undisputedly, the policies and procedures of the MPD in force and effect in July, 2018, not only ***did not require*** MPD policemen to provide any type of first aid or medical aid to persons that the police seriously or even potentially fatally injured, MPD policies and

---

A. To do hands-on?

Q. Right.

A. No.

Q. Okay.  Under no circumstances that you know of was that required.

A. Under no circumstances that I know of, yes.

[21]  Deposition testimony of Chief Ernest Finley, Doc. 371-6, p. 60:

Q. Okay.  Do you know that if a major blood vessel in a person's body is cut or severed or torn and they are bleeding heavily, that person's blood is escaping from their body, that that must be treated immediately?

MR. EAST:  Object to form.

A. Yes.

[22] Deposition testimony of Chief Ernest Finley, Doc. 371-6, p. 79:

Q. All right.  Would you agree that there are unavoidable and inevitable delays between when someone suffers an injury at the hands of the police somewhere in the City of Montgomery and when these two calls, at least two calls have to be made and then the EMT unit has to go out to the location? There's an inevitable delay in getting there, correct?

A. Yes.

34

procedures ***effectively prohibited or prevented*** MPD policeman from providing any type of first aid or medical aid for the most serious and life-threatening of those injuries.

104.   This prohibition resulted from MPD policy 3.3.5 (Doc. 371-4) which states that "*Medical Aid is to be rendered by only those trained and/or certified to render such aid*."  This policy was ordered and sanctioned by Chief Finley with full knowledge that the MPD did not train its policemen in first aid or medical care and did not require its policemen to receive training in first aid or medical care[23] and that therefore, the MPD had no policemen trained or certified to render such aid.[24]

---

[23] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee who gave the testimony of the City on MPD police training, testified by deposition, Doc. 371-20, p. 11-12:

> Q. Okay.  So the Montgomery Police Department doesn't require or provide any medical or first aid training to policemen, correct?
>
> MR. EAST:  Object to form.
>
> A. No.
>
> Q. I'm sorry?
>
> A. No.
>
> Q. What I said is correct.
>
> A. Yes.

and deposition testimony of Lt. Carlisle, Doc. 371-20, p.25:

> A.  [D]id the City of Montgomery require its police officers after they became police officers to receive any kind of training in first aid or medical care?
>
> A.  No.

[24] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee to give the testimony of the City on MPD police training, testified, by deposition, Doc. 371-20, p. 33:

> Q. Were there any Montgomery Police Department officers -- prior to this directive [3.3.5] being entered in April of 2018, were there any who were trained or certified with regard to providing medical aid?
>
> A.  I'm not sure.
>
> Q. Okay.  Do you know of any?

35

105.   This policy, custom or practice of the MPD, which not only **did not require** its policemen to provide first aid to heavily bleeding persons they had injured, but effectively **prohibited** its policemen from providing first aid to such persons, is a policy violates the Fourteenth Amendment by denying to pretrial detainees that denies that which the Fourteenth Amendment requires.[25]

106.   Further confirming this policy, defendant Finley testified that the limit of what MPD policemen are required to do when they have seriously injured a person who is bleeding profusely is to place a radio call for EMTs and that MPD police do not have any duty or obligation "to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life." [26]

---

A.  I don't.

Q.  Okay.  Did you consider persons who had had APOST training in first aid, did you consider those persons to be persons who were required to give first aid to persons injured by the police under this policy?

      MR. EAST:  Object to form.

A.  No.

[25]   It is well settled in this circuit that the Fourteenth Amendment's Due Process Clause requires police to provide "*prompt and proper medical care to a pretrial detainee*,", *King v. Reap*, 269 F. App'x 857, 860 (11th Cir. 2008):

> This Court has held that the denial of prompt and proper medical care to a pretrial detainee violates the detainee's due process rights. Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988). (underlining supplied)

[26] Deposition testimony of Police Chief Ernest Finley, Doc. 371-6, p. 39:

> Q.  Okay.  Your testimony is that MPD policy 3.3.5 did not require MPD policemen who cause say a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life, correct?
>
>       MR. EAST:  Object to form.
>
> A.  Correct..

36

107. Similarly, the testimony of the City itself, given by its Rule 30(b)(6) designee, Lt. Andre Carlisle, was that under no circumstances did MPD police have a duty to themselves render aid to a seriously injured and profusely bleeding person the police had injured.[27]

108.  The testimony in June and July, 2021, of former Chief Finlay and Lt. Carlisle first revealed facts both unthinkable and unconscionable: in the twenty-first century, in the capital city of a U.S. state, the persons in charge of the city's police department knowingly chose, created and allowed police department policies to exist that when its policemen had inflicted a life-threatening injury, not only did policy require its police to themselves provide basic rudimentary first aid of the type taught to Boy Scouts, to reduce, diminish or eliminate the likelihood of loss of life of the person injured by the police, but, in fact, the prohibited the provision of such first aid to that person unless the policemen on site had received medical training or certification—training and certification which the police department did not provide to its policemen or require its policemen to have.

109. The injury sustained by Mr. Pettaway was an injury that should not have caused his death and Mr. Pettaway would not have died if basic, elementary first aid measures to diminish, retard or reduce his heavy and uncontrolled bleeding had been administered to him by MPD police.

110. Dr. Boudreau, who performed Mr. Pettaway's autopsy, testified, Doc. 371-11, p. 21-22:

> Q.  Did you form any opinions on how long it would take -- if no efforts were made to diminish or retard the flow of blood, how long would it have taken for this wound to cause death?

---

[27] See the Rule 30(b)(6) testimony of the City's designee, Lt. Andre Carlisle, at Doc. 371-p. 26, p. 42-43:

> Q.  From 2015 until January of 2021, during that period of time, there were no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person, correct?
>
> *       *       *       *       *
>
> A.  No.
>
> Q.  Okay.  Under no circumstances that you know of was that required.
>
> A.  Under no circumstances that I know of, yes.

A.  It would only take a very short time, minutes.

Q.  Okay.  *Can you quantify "minutes" at all?  Three, five, six --*

A.  *Well, no*.  It wouldn't have been an instant death.  I mean, *he would have to bleed for a while*.     How many minutes, I can't exactly say.  I don't know.

Q.  Okay.  What are the things that can be done to a wound of this type to reduce or diminish the loss of blood?

A. Well, the only thing you could do if you were there would be *apply direct pressure*.  I mean, that's all -- that's it.  I mean, you know, unless you've got hemostats and other things to grab the artery, *the only thing you've got is direct pressure.* (emphasis supplied)

111. Dr. Boudreau then testified that he agreed that almost all bleeding can be stopped by direct pressure to the wound, Doc. 371-11, p. 23-24:

Q.  Okay.  I'm going to show you an exhibit to the complaint.  And I will tell you this is a -- this is a Boy Scout Wilderness Guide -- First Aid for, among other things, stopping or retarding blood flow.  Look at the next to last paragraph.

A.  By direct pressure.

Q.  Yes, sir.  But the next to last paragraph talks about almost all bleeding.  *Do you see that paragraph?*

A.  *Yes, sir.*

Q.  *"Almost all bleeding can be stopped with direct pressure, usually applied with pressure from your hand directly on the wound."  That's what you're talking about*?

A. *Correct.*

Q. *Do you disagree with that statement?*

A. *No.* (emphasis supplied)

112. However, those life-saving measures—simple, basic actions that are taught to Boy Scouts—were not performed by MPD police to save Mr. Pettaway's life because MPD policy 3.3.5 (Doc. 371-4) not only **did not require** MPD policemen to perform them, but **prohibited and prevented** MPD policemen from performing any of these life-saving measures because as Chief Finley knew none of his police had any training in first aid or medical aid necessary to prevent loss of life.

38

113. The direct causal link or connection between these MPD policies and customs and the constitutional deprivation or violation herein could hardly be clearer.

114. All of the five police defendants have testified that they understood the policy to prohibit them from providing any type of aid to a person injured by police and that it was because of this policy that they did not attempt to provide first aid to Mr. Pettaway, i.e., attempt to retard, diminish or prevent his loss of blood from the police dog's tear or cut of Mr. Pettaway's femoral artery. Keiundra Watts, p. 57-58; Joshua Smith, p. 47-49; Bianka Ruiz, p. 39-40; Ryan Powell, p. 42-43; and Neal Flournoy, p. 27-28

115. The inability and/or failure of MPD policemen to provide basic first aid, i.e., to attempt to retard, diminish or prevent the heavy arterial bleeding by Mr. Pettaway was caused by policy, procedures and customs of the City of Montgomery ordered and sanctioned by Ernest Finley, as MPD Police Chief:

> (a) written policy 3.3.5 of the City's Police Department (Doc. 371-4) which prohibited police who were not trained and/or certified to render medical aid to make any effort to reduce, retard or diminish blood loss from heavy profusely bleeding wound.

> and

> (b) the custom or policy of the City's Police Department to not train or require its policemen to be trained in basic elementary first aid measures to reduce, retard or diminish blood loss from heavy profusely bleeding wound.

116. This prohibition was the known and intended result of the combination of these two policies and customs:

> (a) the MPD custom or policy of not training or requiring its police to be trained in the basic, elementary first aid measures required to diminish, retard or reduce heavy and uncontrolled bleeding from an open wound

> and

> (b) MPD policy 3.3.5 (Doc. 371-4) which prohibited MPD police who were not trained or certified in first aid from attempting to diminish, reduce, retard or lessen Mr. Pettaway's bleeding.

These policies and customs of the Montgomery Police Department were a proximate cause of and the moving force behind the failure of MPD police to provide to Joseph Lee Pettaway first aid or any of the most basic, rudimentary forms of the medical care that the Due Process Clause

of the Fourteenth Amendment required to be provided to him and were a proximate cause of and the moving force behind Mr. Pettaway's death.

**B.**

**Law and Application of Facts to the Second and Fourth Claims for Relief**

**1.**

**Summary Judgment on the Second Claim for Relief**

117.  The Second Claim for Relief of the Complaint as last amended (Doc. 205) alleges a §1983 excessive use of force claim against Nicholas Barber which caused the death of plaintiff's decedent, Joseph Lee Pettaway.

118.  The Fourth Amendment prohibits and is violated by a policeman's use of excessive force in the course of making an arrest. *Huebner v. Bradshaw*, 935 F.3d 1183, 1190 (11th Cir. 2019):

> The Fourth Amendment prohibits "the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

119. Because the defendant Nicholas Barber has asserted the qualified immunity defense, plaintiff is required to show that in the circumstances under which Nicholas Barber used force against Mr. Pettaway it had been previously clearly established that his use of force was unlawful or in violation of the Fourth Amendment under those or materially similar circumstances.

120. There are several means by which a plaintiff can make this showing.  One of those means and perhaps the most familiar one is to cite prior case law with very similar facts in which the Eleventh Circuit held that under those or very similar facts, the police defendant's use of force was excessive.

121. The other two means articulated by the Eleventh Circuit in *Brown v. Nocco*, 788 F. App'x 669 at 675 (11th Cir. 2019) are to either:

> cite "a broader, clearly established principle [that] should control the novel facts in the situation,"

or

show that the policeman's conduct "was so far beyond the hazy border between excessive and acceptable force that [the policeman] had to know he was violating the Constitution even without caselaw on point."

122. We will examine the facts of this case and evaluate Barber's use of force against Mr. Pettaway had under both (a) case law in which the Eleventh Circuit Court "clearly established" that the deployment of a police dog for the purpose and with the intent that the dog attack a suspect under circumstances indistinguishable from those herein in any meaningful way was an excessive use of force and (b) one or both of the other two ways cited in *Brown v. Nocco*, 788 F. App'x 669 at 675 (11th Cir. 2019) that the Eleventh Circuit has prescribed for evaluations of the use of force by a policeman.

**(a)**

**Three ways in which §1983 plaintiff can show that the law was "clearly established"**

123. The Eleventh Circuit has repeatedly held that there are three ways in which a plaintiff alleging excessive force can establish that at the time of that use of force it had been clearly established that that use of force in those circumstances was excessive.[28]

---

[28] *Brown v. Nocco*, 788 F. App'x 669, 675 (11th Cir. 2019):

> There are three ways in which a plaintiff can demonstrate that a constitutional right was clearly established: (1) by producing "a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state"; (2) by pointing to a "broader, clearly established principle [that] should control the novel facts in [his] situation"; or (3) by showing that "an official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." Morton v. Kirkwood, 707 F.3d 1276, 1282 (11th Cir. 2013) (alterations in original) (citations and internal quotation marks omitted).

and *Mighty v. Miami-Dade Cty.*, 728 F. App'x 974, 978 (11th Cir. 2018):

> There are three ways for Plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly

124. A plaintiff need only show the law to be clearly established in any one of these three means in order to defeat a claim of qualified immunity.

125. We will first examine the pre-existing case law that clearly established Barber's violation of the Fourth Amendment.

**(1)**

**Case law previously decided on indistinguishable and distinguishable facts**

126. The pertinent case law decided in the Eleventh Circuit prior to May, 2018 on §1983 excessive force claims arising from a policeman releasing a police dog to attack a suspect consists principally of four cases, *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000); *Crenshaw v. Lister,* 556 F.3d 1283 (11th Cir. 2009); *Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012); and *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017).

127. In this case, the Eleventh Circuit's opinion in *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) is decisive.  There, in a case decided on facts that cannot be distinguished in any meaningful away from those herein, the Eleventh Circuit clearly established that the use of force herein against Mr. Pettaway was excessive and that Mr. Pettaway, the plaintiff herein, is entitled to summary judgment on his Fourth Amendment claim of excessive force against Barber as a matter of law, just as the plaintiff was in *Priester*.

---

> violated, even in the total absence of case law." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted).

and *Pena v. Marcus*, 715 F. App'x 981, 985 (11th Cir. 2017):

> There are three ways for a plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right, (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted).

42

## *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000)

128. Both the plaintiffs Priester and Pettaway alleged that the police violated the Fourth Amendment by using excessive force against them.   The similarities on all of the essential core facts are startling – on the key elements the cases are virtually identical.   Like Robert Priester, Joseph Lee Pettaway:

* was attacked by a police dog and suffered a significant bite injury.

* was allegedly suspected of burglary,[29] a charge later determined to be unfounded.

* was not fleeing or resisting arrest when the dog was released, nor when it attacked.[30]

* but instead was passively hiding from the police when the dog led the police to him.[31]

* when found, submitted to the police without resistance. [32]

* was not armed, nor was there any reasonable basis to believe he was armed.[33]

* did not make or pose any threat of bodily harm to the police or others by word or action.[34]

* when given orders, he complied with them insofar has he could during the dog's attack.[35]

* was unlawfully attacked by the dog for "as long as *two minutes*."[36] (italics in original)

---

[29] 208 F.3d at 927:

"Plaintiff [Priester] was a suspect in the burglary of a golf shop."

[30] 208 F.3d at 927:

"was not attempting to flee or to resist arrest."

[31] 208 F.3d at 923:

"the dog led the officers to a canal where Plaintiff was hiding."

[32] 208 F.3d at 927:

"he submitted immediately to the police."

[33] The words, "gun," "weapon," or "armed" do not appear in opinion in *Priester*.

[34] 208 F.3d at 927:

"did not pose a threat of bodily harm to the officers or to anyone else."

[35] 208 F.3d at 927:

"When ordered . . . to get down on the ground, Plaintiff complied."

[36] 208 F.3d at 923-24:

129. The similarities in the essential, core facts in *Priester* and in this case are remarkable. On every single significant point, the cases mirror each other. To find differences, one must go to insignificant minutiae. If *Priester* is not "on all fours" with this case, it is difficult to imagine how any case could be.

130. It is also significant that when *Priester* was decided it was in the absence of prior case law that clearly established the constitutional violation on these facts. That is, in 2000, there was no pre-existing case law involving use of excessive force arising from police dog attacks. The Court took the facts in *Priester*—which as just recited, are indistinguishable on any significant point from the facts herein—and held that *even in absence of pre-existing case law*, the use of police dog to attack a suspect was an excessive use of force that violated the Fourth Amendment.

131. Thus, in deciding the qualified immunity issue in *Priester*, the Eleventh Circuit did not have the equivalent to the *Priester* opinion that clearly established that the use of the police dog in the same circumstances in *Priester*, as in the present case, violated the Fourth Amendment. To quote *Brown v. Nocco*, 788 F. App'x 669 at 675 (11th Cir. 2019), when the Eleventh Circuit decided *Priester* it did not have "a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state" holding that very similar conduct violated the Fourth Amendment.

132. Therefore, in *Priester*, in order for the Eleventh Circuit to hold that the police were not entitled to claim qualified immunity, the Court had to employ one of the other two ways to show the law was clearly established, i.e., to again quote *Brown v. Nocco*, 788 F. App'x 669 at 675 (11th Cir. 2019), to either cite "a broader, clearly established principle [that] should control the novel facts in the situation," or show that the policeman's conduct "was so far beyond the hazy border between excessive and acceptable force that [the policeman] had to know he was violating the Constitution even without caselaw on point."

---

"the dog's attack on Plaintiff may have lasted as long as two minutes" (The Eleventh Circuit characterized this two minutes of enduring the dog bite to be "an eternity," 208 F.3d at 923-24)

44

133. And the Eleventh Circuit did exactly that in *Priester* – it found that the facts in *Priester*, <u>which are virtually identical to those herein on every important point</u>, clearly established a Fourth Amendment violation <u>even in absence of a prior opinion like what would become the Priester opinion</u> under one or both of the other two means of clearly establishing the law, i.e., "a broader, clearly established principle [that] should control the novel facts in the situation," or that the policeman's conduct "was so far beyond the hazy border between excessive and acceptable force that [the policeman] had to know he was violating the Constitution even without caselaw on point."

134. In *Priester*, even though at that time there had been no "particularized" or "controlling and materially similar case declar[ing] that [the police] conduct unconstitutional,"[37] that the policeman in *Priester* was nevertheless <u>*not*</u> entitled to qualified immunity on the excessive use of force claim, the Court holding, 208 F.3d at 927:

> Considering these facts, no particularized preexisting case law was necessary for it to be clearly established that what Defendant Wheeler did violated Plaintiff's constitutional right to be free from the excessive use of force. No reasonable police officer could believe that this force was permissible given these straightforward circumstances.

135. Of course, almost twenty years later in 2018, when Mr. Pettaway was killed by Barber's release of his police dog, the law **had been clearly established** by *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) and constituted **that which did not exist at the time Priester was decided**, i.e., "particularized preexisting case law . . . clearly establishing that "what Defendant Wheeler did (which is indistinguishable from what defendant Barber did herein) violated Plaintiff's constitutional right to be free from the excessive use of force."

136. Thus, this is an easy case because of the holding in *Priester*.

137. Next for the sake of completeness, we examine the opinions and the facts in the two cases cited by defendants, *Crenshaw v. Lister,* 556 F.3d 1283 (11th Cir. 2009) and *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017), in which the Eleventh held that the police officers who released the dogs to attack a suspect were entitled to qualified immunity to show that the facts in those two cases are distinguishable and that they do not support defendant Barber's motion for summary

---

[37] *Priester,* 208 F.3d 919 at 926

judgment herein because the facts in both *Crenshaw v. Lister* and *Jones v. Fransen* are clearly distinguishable in so many ways from those herein.

### *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017)

138. At the outset, we note that *Jones v. Fransen* should have no precedential value since it was a forfeited or "no-contest" decision and opinion.

139. Specifically, the Court's opinion in *Jones v. Fransen* states that the plaintiff Jones, who appeared *pro se* in his appeal to the Eleventh Circuit, did not even file a brief in his appeal.[38] This fact, when coupled with the fact that to oppose the defendant Wheeler's claim of qualified immunity Jones ***had the burden of proof***, i.e., Jones was required to "demonstrate that qualified immunity is inappropriate,"[39] make the case one that was not so much decided as it was forfeited: Jones made no attempt to make the showing of matters he was required to adduce proof of before the police defendant Fransen even had to reply.

140. By failing to file a brief in his appeal in a case where he had the burden of making an affirmative showing, the police defendant won by default, i.e. Jones forfeited his appeal, the Court had  only one side of the case presented, and given that Jones had the burden of going forward and making a showing necessary to deny the qualified immunity defense, the Court had no basis to find anything other than that qualified immunity did not apply in *Jones v. Fransen*, and hence, the

---

[38] 857 F.3d at 849:

> Despite notice, however, Jones has not filed a brief or otherwise appeared in the appeal proceedings.

[39] 857 F.3d at 851:

> Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to Jones to demonstrate that qualified immunity is inappropriate. See id. To do that, Jones must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated Jones's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. (citations omitted) [and that] to survive a qualified-immunity defense, Jones must satisfy both showings.

46

Court's opinion in that case has no precedential value on the qualified immunity defense raised herein.

141. Still further, even if the opinion in *Jones v. Fransen* could be considered, on the *Graham* factors, *Jones v. Fransen* is also easily distinguishable from the case herein.

142. First, regarding the severity of the crime, the Court noted that Jones' crime, which the Court characterized as a "domestic related crime," is one that the Eleventh Circuit noted was potentially fraught with "extreme danger"[40] a factor that was certainly not present in our case.

143. Second, the police had concrete evidence of Jones' commission of a second, additional crime. In addition to the domestic related crime, the police in *Jones v. Fransen* had an eyewitness report of burglary, i.e., that Jones was "carrying a television to his car" 857 F.3d at 848 from his girlfriend's apartment. Herein there is nothing of that sort of evidence – in our case there was only that there was the unexplained presence of an unknown person in the Cresta Circle house who was mistakenly believed not to have the right or license to be in the house.

144. Herein, it is undisputed that the house under repair at 3809 Cresta Circle was unoccupied as anyone's residence on July 8, 2018. Further, there was no evidence or report that Mr. Pettaway had removed or was removing anything from the house under repair at 3809 Cresta Circle or committing any other crime at that house.

145. Third, Jones was "actively fleeing" a policeman into "heavy brush" 857 F.3d at 854 in a wide expansive outdoor area. In our case Mr. Pettaway was confined underneath a bed in a very small, one-story house that was surrounded by at least six policemen. Still further, there was nothing like Jones' active flight into heavy brush in which an ambush of the police could be made. Mr. Pettaway was trapped underneath a bed.

146. This brings up the fourth and highly significant additional distinguishing fact or circumstance – that in *Jones v. Fransen* there was an immediate threat to officer safety. The Court noted that Jones created a situation in "physically challenging terrain with brush and boulders"

---

[40] The Eleventh Circuit held, 857 F.3d at 854:

> domestic-related crimes certainly have the potential to be extremely serious and dangerous [although] nothing about this particular incident indicated that it fell into that category.

where a policeman pursuing Jones could reasonably consider themselves to be at risk of harm, i.e., in a situation where police could have been concerned about a "potential ambush", 857 F.3d at 854:

> Jones fled police . . . into physically challenging terrain with brush and boulders [where] a reasonable officer in one of Defendants' places could have been concerned, at the time [the police dog] Draco was released, about entering the heavy brush to apprehend Jones and being met by a potential ambush.

### *Crenshaw v. Lister,* 556 F.3d 1283 (11th Cir. 2009)

147. In the last paragraph of the Court's opinion in *Crenshaw v. Lister,* 556 F.3d 1283 (11th Cir. 2009) the Eleventh Circuit succinctly summarized the basis for the Court's affirming the grant of  the policeman Lister's qualified immunity defense, 556 F.3d 1283 at 1294 (11th Cir. 2009):

> [I]t was objectively reasonable for Lister to use the canine to apprehend Crenshaw, an ***armed robbery suspect*** who was ***actively fleeing from the police***.

148. In so holding, the Eleventh Circuit cited the decisive factors in *Crenshaw v. Lister*—severity of the crime, the suspect's posing an immediate threat the safety of the police or others, and active flight by the suspect—that the U.S. Supreme Court provided in *Graham v. Connor*, 490 U.S. 386 (1989)[41] to lower courts to use to assess claims of excessive force by police.

149. These four factors specified by the Supreme Court in *Graham* have since been repeatedly and consistently cited by the Eleventh Circuit in innumerable subsequent cases in cases involving claims of excessive force.   At least three of these four factors were present in *Crenshaw v. Lister*.   None are present herein.

150. In *Crenshaw v. Lister*, the Eleventh Circuit initially cited the first of these four factors—the severity of the crime involved, i.e., the fact that Crenshaw was a double "armed robbery suspect" as a basis for qualified immunity.  The Court then cited another of these four

---

[41] In *Graham*, the Court held that "the test of reasonableness under the Fourth Amendment" requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

factors—the fact that Crenshaw was "actively fleeing from the police" to conclude the police in *Crenshaw v. Lister* were entitled to qualified immunity.

151. Thus, Robert Crenshaw, the plaintiff in *Crenshaw v. Lister*, and the facts in his case are readily distinguishable from Joseph Lee Pettaway and the facts in this case on almost all these significant facts cited by the Eleventh Circuit: Mr. Pettaway was **not** a double "armed robbery suspect," but a mere suspected trespasser at worst; and Mr. Pettaway was **not** armed nor reasonably believed to be armed, and Mr. Pettaway was **not** "violently and "actively fleeing from the police" but passively hiding underneath a bed.

152. The Eleventh Circuit itself in its later opinion in *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017), characterized the facts supporting qualified immunity in *Crenshaw v. Lister,* 556 F.3d 1283 (11th Cir. 2009) as follows, 857 F.3d at 853-54:

> Crenshaw was believed to have committed at least one, and possibly two, armed robberies. Id. at 1292. Crenshaw also violently fled police, crashing his car into a marked police vehicle before running into very dense woods and hiding in brush. Id. As a result, officers reasonably thought Crenshaw posed an immediate threat to at least themselves. See id. And because it was dark and officers had lost track of Crenshaw before Crenshaw yelled out, "I am over here," we found it reasonable for the officers to be concerned about a possible ambush and to continue to consider themselves at immediate risk from Crenshaw when they released the dog.

153. Nothing in this case begins to approach this type of situation. Accordingly, *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009) is easily distinguishable from the case herein and is not authority for denying plaintiff's motion for summary judgment.

**(2)**
**General law of use of force in Fourth Amendment excessive force cases**

154. Even if the *Priester* opinion did not exist and did not constitute "particularized" or "controlling and materially similar case declar[ing] that [the police] conduct unconstitutional,"[42] on the facts herein—indistinguishable from those in Priester—Barber's use of force was excessive

---

[42] *Priester,* 208 F.3d 919 at 926

under one or both of the <u>other</u> two ways[43] to clearly establish that fact and would mandate denial of Barber's motion for summary judgment and the grant of plaintiff's motion for summary judgment.

155.   To begin to examine the law regarding excessive force, generally, there are few principles of §1983 law that are as well-established or as well-defined as the factors that courts consider and use in determining whether a policeman's use of force was unwarranted or excessive and violated the Fourth Amendment.

156.   In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court stated three factors that courts should use for those determinations.   After *Graham v. Connor* was decided, the Eleventh Circuit has consistently cited these three factors in dozens of cases[44] using the following

---

[43]  *Pena v. Marcus*, 715 F. App'x 981, 985 (11th Cir. 2017):

> There are three ways for a plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right, (2) **a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right**; or (3) **conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."** (citations omitted)

[44] e.g., *Helm v. Rainbow City*, *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019); *Hall v. McGhee*, 762 F. App'x 837, 841 (11th Cir. 2019); *Longino v. Henry Cty.*, 791 F. App'x 828, 836 (11th Cir. 2019); *Hinson v. Bias*, 927 F.3d 1103, 1117 (11th Cir. 2019); *Horn v. Barron*, 720 F. App'x 557, 563 (11th Cir. 2018); *Harrigan v. Metro Dade Police Dep't Station #4*, 636 F. App'x 470, 474 (11th Cir. 2015); *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015); *Teal v. Campbell*, 603 F. App'x 820, 821 (11th Cir. 2015); *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014); *Lenning v. Brantley Cty.*, 579 F. App'x 727, 731 (11th Cir. 2014); *Sevostiyanova v. Cobb Cty.*, 484 F. App'x 355, 359-60 (11th Cir. 2012); *Sanchez v. Hialeah Police Dep't*, 357 F. App'x 229, 231 (11th Cir. 2009); *Howell v. Sheriff of Palm Beach Cty.*, 349 F. App'x 399, 404 (11th Cir. 2009); *Secondo v. Campbell*, 327 F. App'x 126, 131 (11th Cir. 2009); *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009); *Lloyd v. Tassell*, 318 F. App'x 755, 757 (11th Cir. 2009); *Buckley v. Haddock*, 292 F. App'x 791, 793 (11th Cir. 2008); *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008); *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004); *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002)

language quoted verbatim from the opinion in *Graham v. Connor*, as the polestars for deciding whether a particular policeman's use of force violated the Fourth Amendment, 490 U.S. 386, 396:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. [45]

157.   Subsequently, in addition to consistently citing and using these three *Graham v. Connor* factors in deciding excessive force claims, the Eleventh Circuit has also added several additional closely related factors that it uses and considers in evaluating whether, under the circumstances of that case before it, the policeman violated the Fourth Amendment in his/her use of force.

158.  In June of the past year in *J.I.W. v. Dorminey*, 2021 U.S. Dist. LEXIS 109884 (M.D. Ala. June 11, 2021), Your Honor cited these combined six factors—both the three established by the Supreme Court in *Graham v. Connor* and reaffirmed in *Kisela v. Hughes*, 200 L. Ed. 2d 449 (2018) and those added by the Eleventh Circuit.

159. The factors cited in *Graham v. Connor* and *Kisela v. Hughes* and the three additional factors established thereafter by the Eleventh Circuit in its case law—were cited by Your Honor in denying qualified immunity to Blake Dorminey, a City of Slocumb law enforcement officer alleged to have used excessive force in violation of the Fourth Amendment, 2021 U.S. Dist. LEXIS 109884*13-*14:

> In evaluating the use of force, the factors to consider include (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether

---

[45] The Supreme Court reaffirmed these three factors in its 2018 opinion in *Kisela v. Hughes*, | 200 L. Ed. 2d 449 (2018), as the factors to be used in making excessive force determinations:

> In Graham v. Connor, 490 U. S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the ***severity of the crime at issue***, ***whether the suspect poses an immediate threat to the safety of the officers or others***, and ***whether he is actively resisting arrest or attempting to evade arrest by flight***. (emphasis supplied)

the force was applied in good faith or maliciously and sadistically.[46]  Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). Courts additionally consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

160.  In most §1983 cases, there will be conflicting evidence and/or disputed facts about some of these factors that could require submission to a jury to resolve.

161. However, this case is an anomaly.  Here, there are no genuine issues of material fact regarding any of these six factors.

162. Barber has **admitted** all of the material facts necessary to establish all six of those factors to support plaintiff's allegation that there was no objectively reasonable basis for any use of force or that the force used by Barber herein was clearly excessive.

163.  Still further, in addition to Barber's testimony admitting each of these factors, the Barber video (Doc. 370-26) confirms Barber's testimony and further negates any genuine issue of material fact about most of these factors used to determine if Barber's use of force was excessive.

164.  We now review Barber's deposition testimony on each of these six factors.

---

[46] This last factor has been eliminated.  In *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347 (11th Cir. 2015), the Eleventh Circuit eliminated whether the policeman had "malicious and sadistic" intent as a factor to be considered in evaluating Fourth Amendment excessive force claims, the Court holding, 783 F.3d 1347, 1354:

> [O]n the issue of whether the subjective intent of the officer, specifically whether he acted maliciously and sadistically, is to be considered in a Fourth Amendment excessive force case . . . it is not to be considered. The test is not a subjective one but asks whether the officer's actions in applying the force were objectively reasonable. We do not consider whether an officer acted in good faith or sadistically and maliciously. Graham, 490 U.S. at 397, 109 S. Ct. at 1872; Lee, 284 F.3d at 1198 n.7; Samples, 916 F.2d at 1550.

**A. "the severity of the crime"**

165.  Doc. 371-22, the MPD Case Report Detail, produced by the City (COM 000879 to 000884) identified the alleged crime to be "***Burglary 3rd.***"

166.  However, as Barber admitted, he had no evidence, information or probable cause to believe that a burglary was occurring, Doc. 371-5, Barber depo, p. 128:

> Q. Right.  And what is entry into a house that you don't have license or right to be in?  What is that standing alone?
>
> A. Standing alone, it's trespassing.
>
> Q. Okay.  *So, in order for it to be burglary, there had to be some evidence that there was intent to steal something, correct*?
>
> A. Or --
>     MR. EAST:  Object to the form.
>
> Q. Huh?
>
> A. Or commit a crime therein.
>
> Q. Right, right.  *And you didn't have any information about that, did you*?
>
> A. *No, I didn't.*

Doc. 371-5, Barber depo, p. 164

> Q.  Okay.  Let me ask you -- I want to make certain I'm clear about all this, now.  The most severe crime that you could imagine Mr. Pettaway or reasonably claim that he was committing was third-degree burglary, correct?
>
>     MR. EAST:  Object to the form.
>
> A. Correct.
>
> Q. And that would depend upon whether you had probable cause to believe there was an intent to steal something, correct?
>
>     MR. EAST:  Object to the form.
>
> A. Or commit a crime therein.
>
> Q. And you had no reliable evidence of either of those, correct?

53

A. It was confirmed that -- the way we would -- a way that we -- I'm trying to think of the right way to say it.

Q. You're not answering my question.  My question is, *did you have reliable evidence of an intent to steal or to commit a crime?*

A. *Not that I can recall.*

167.  And further, as Barber could have determined *before he released the dog to attack Mr. Pettaway*, that *there was no burglary occurring*, i.e, *Mr. Pettaway was not a burglar*.[47]

168.  Still further, Barber, having negated the possibility of arguable probable cause for burglary, admitted that the only possible crime remaining was trespassing and that trespassing is not a serious crime:

Doc. 371-5, Barber depo, p. 165

Q. Okay.  So, the other crime, if it wasn't burglary, it would have been trespassing, correct; that is, going on a piece of property that you had no right to be on, legal right to be on, or license?

A. Yes.

Q. Okay.  So, those are the only two crimes that were within the universe of what this might have been, correct?

MR. EAST:  Object to the form.

A. Yes.

Doc. 371-5, Barber depo, p. 165:

---

[47]  Doc. 371-5, Barber depo., p. 125:

Q.  And did you understand and then know that Mr. Pettaway was not a burglar there that night?  Did you know that?

MR. EAST:  Object to the form.

A.  Did I find out later on that --

Q.  Yes, yes.

A.  Yes.

> Q. I realize that to most people, I guess, any crime is serious in some sense. But within the police and law enforcement community, is trespass considered a serious crime?
>
> A. Yes, but no.

169. Moreover, even accepting the defendant's position on what crime Mr. Pettaway was suspected of committing, the Montgomery Police Department records establish that even if the circumstances created arguable probable cause to a burglary, it would have been third degree burglary,[48] a crime that is not considered a violent offense.

**(ii) "whether the individual poses immediate threat to the safety of the officers or others"**

170. Barber admitted that Mr. Pettaway did not pose an immediate threat to anyone. Doc. 371-5, Barber depo, p. 165-66 and p. 130-31:

> Barber depo, p.165-66:
>
> Q. At the time you released the dog to attack Mr. Pettaway, *was Mr. Pettaway posing an immediate threat to the safety of officers or others*?
>
> A. *Immediately, no.*

> Doc. 371-5, Barber depo, p. 130-31:
>
> Q. Mr. Pettaway *didn't make any verbal threats* to the police, did he?
>
> A. *Correct.*
>
> Q. And he made no -- *took no threatening actions*?  He manifested *no intent to strike or harm anyone*, and certainly no police officer, did he?
>
>     MR. EAST:  Object to the form.
>
> A. *Correct.*
>
> Q. So, *he took no threatening actions*, correct?
>
> A. *Correct.*
>
> Q. And *you had absolutely no reason -- reasonable belief that he was armed* in any way, correct?

---

[48] See Doc. 371-22, "MPD Case Report Detail" stating the offense to be "Burglary 3rd" (COM 000887 – 000892) citing §13A-7-7, Code of Alabama, 1975

55

A. *Correct.*

**(iii.) "whether the individual actively resists or tries to evade arrest by flight"**

171.   Barber admitted Mr. Pettaway did not actively resist arrest and he made no attempt to flee from the police. Doc. 371-5, Barber depo, p. 129:

> Q. You *didn't have any information that he actively resisted* the police, did you?
>
> A. *Correct, I did not*.

Doc. 371-5, Barber depo, p. 165-66:

> Q.  At the time you released the dog to attack Mr. Pettaway, Mr. Pettaway *was not actively resisting arrest*, was he?
>
> A. *Actively, no, he wasn't*.

Doc. 371-5, Barber depo, p. 131:

> Q. And *he made no attempt to flee* from the police, did he?
>
> A. *Correct*.

Doc. 371-5, Barber depo, p. 166:

> Q. And at that time, *he was not trying to evade arrest by flight*, was he?
>
> A. *By flight, no.*

**(iv.) "the need for force to be applied"**

172.   There was no evidence and testimony indicating that there was any need for force to be applied.

173. Barber admitted that Mr. Pettaway was not posing an immediate threat to police or others; admitted Mr. Pettaway never made any verbal threats; admitted Mr. Pettaway took no threatening actions toward anyone; admitted Mr. Pettaway manifested no intention to cause harm to anyone; and admitted that Barber had absolutely no reason to believe Mr. Pettaway was armed in any way.  See Doc. 371-5, Barber, p 130-31:

> Q.  Mr. Pettaway didn't make any verbal threats to the police, did he?
>
> A.  Correct.

Q. And he made no -- took no threatening actions? He manifested no intent to strike or harm anyone, and certainly no police officer, did he?

MR. EAST: Object to the form.

A. Correct.

Q. So, he took no threatening actions, correct?

A. Correct.

Q. And you had absolutely no reason --  reasonable belief that he was armed in any way, correct?

A. Correct.

Q. And he made no attempt to flee from the police, did he?

A. Correct.

and Doc. 371-5, Barber depo, p. 165-66:

Q At the time you released the dog to attack Mr. Pettaway, was Mr. Pettaway posing an immediate threat to the safety of officers or others?

A. Immediately, no.

Q At the time you released the dog to attack Mr. Pettaway, Mr. Pettaway was not actively resisting arrest, was he?

A. Actively, no, he wasn't.

Q. And at that time, he was not trying to evade arrest by flight, was he?

A. By flight, no.

**(v.) "the amount of force applied" v. "the nature of the need"**

174.   This factor is intended as a balancing test.  However, no balancing test can be performed in this case because there is nothing on one side of the scales.

175.   Here, _on one side of the scales_ there is an intentional, vicious attack by a police dog—a very significant amount of force that caused a death—a very weighty factor.

176.   However, _on the other side of the scales_, there is nothing: Barber's testimony conclusively establishes no need for any use of force, i.e., Barber admitted he had no information or knowledge of any facts or circumstances that would support any objectively reasonable

policeman's belief that there was any need for the use of force against Mr. Pettaway.  See Barber's deposition testimony previously quoted at ¶¶ 52 and 53, Doc. 371-5, p. 128 and 163-64).

177. Nonviolent misdemeanors are "crime[s] of 'minor severity' for which less force is generally appropriate." *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008); "More force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (citation and internal quotation marks omitted) and *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) (holding that the charges for nonviolent misdemeanors against the victim of an assault by an officer weighed in favor of ruling that the force used against him was excessive).

**(vi.) "the severity of the injury"**

178.  Death is obviously the most severe injury that police can inflict.  Barber intentionally released his dog with the knowledge and intention that the dog would attack whoever was in the house.   Its teeth tore or cut Mr. Pettaway's femoral artery which caused Mr. Pettaway's death.

179.  Dr. Stephen Boudreau, the Department of Forensic Sciences' Medical Examiner who conducted Mr. Pettaway's autopsy, stated in his autopsy report (Doc. 371-12) that the cause of Mr. Pettaway's death was a "dog bite"; and also testified at page 10 of his deposition, Doc. 371-11, Boudreau depo, p. 10:

> Q  All right, sir.  And on Plaintiff's Exhibit 3, your autopsy report, this is on Joseph Pettaway?
>
> A.  Correct.
>
> Q.  And you did that when?
>
> A.  On July 9, 2018.
>
> Q.  And the report -- the date you have reported as the date of death is the day before, July 8?
>
> A  Correct.
>
> Q  The cause of death is stated on there to be dog attack?
>
> A  Correct.
>
> Q  More specifically, was it a cut or tear of the femoral artery sustained in a dog attack that you believe caused the death?

MR. EAST:  Object to the form.

A  Yes.  There was tearing of the femoral artery, vein and nerve in the left groin.

Q  Okay.  And that was a yes, you -- that was the cause of death, you determined?

A      Yes, sir.

And at pages 20 of Dr. Boudreau's deposition (Doc. 371-11):

Q.  Are you certain to a reasonable degree of medical certainty that it was loss of blood from this dog bite wound that caused Mr. Pettaway's death?

A.  Yes.

**(b)**

**Conclusion regarding the Second Claim for Relief**

180.  Plaintiff's proof of the facts supporting the unlawfulness of Barber's use of force against Mr. Pettaway on each of these decisive six factors governing the determination of the lawfulness of Barber's actions goes beyond being undisputed.  As we have shown in citing Barber's deposition testimony, Barber admitted them all.  Still further, virtually all of Barber's admissions are confirmed by Barber's body cam video recording, (Doc. 370-26)

181.  There are no genuine issues of material fact regarding the excessive and unlawful use of force by defendant Nicholas Barber and his violation of the Fourth Amendment; and the plaintiff is entitled to summary judgment as a matter of law on defendant Nicholas Barber's liability to plaintiff on the Second Claim for Relief.

182. On the strength of the foregoing and contemporaneously filed brief and evidentiary submission, and the evidence, legal authority and arguments made therein, plaintiff submits that there is no genuine issue of material fact regarding the liability of Nicholas Barber on the Second Claim for Relief and requests that the Court enter an Order granting plaintiff a partial summary judgment against defendant Nicholas Barber on his liability to plaintiff on the Second Claim for Relief, i.e., holding that the defendant Nicholas Barber used excessive force, thereby violated the Fourth Amendment, and is liable to plaintiff for damages to plaintiff, but reserve the determination of the amount of that award of damages for a jury to make at trial.

**2.**

**Summary Judgment on the Fourth Claim for Relief**

183. The Fourth Claim for Relief states a §1983 *Monell* claim[49] based on a City Police Department policies ordered and sanctioned[50] by MPD Police Chief Ernest Finley, as the City's final policymaker,[51] which effectively prohibited MPD police from providing prompt, proper medical aid to persons upon whom MPD police had inflicted an injury which would be fatal unless such prompt, proper medical aid was provided.

184. The Fourth Claim for Relief is based on the City's policy 3.3.5 (Doc. 371-4), which prohibits MPD policemen who are not trained in first aid for injuries causing a serious loss of blood from attempting to provide such first aid.  This policy when coupled with the City's policy of not requiring or providing such first aid training to its police results in prohibiting all MPD police from providing such persons with any first aid.

---

[49] *Monell v. Department of Social Services*, 436 U.S. 658 (1978)

[50] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) holds that municipalities are liable under §1983 for "acts which the municipality has officially sanctioned or ordered." (cited with approval in *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 943 (11th Cir. 2017))

[51] The City's testimony on this point, given by its Rule 30(b)(6) designee, Lt. Carson, appears at pages 17 and 19 of the City's deposition (Doc. 371-21).  Lt. Carson testified on behalf of the City, Doc. 371-21, p. 27:

> Q.  Who was the final policy maker for the City of Montgomery Police Department in July, 2018?
>
> A. That would have been Chief Ernest Finley.

See also deposition testimony of Chief Ernest Finley, Doc. 371-6, p. 39:

> Q.  You were the policymaker who made or created or put 3.3.5 into effect as MPD policy, correct?
>
> A.  Correct.

185. Chief Finley made and ordered this City policy, Written Directive 3.3.5 (Doc. 371-4) into force and effect despite his admission that MPD police do and will continue to inevitably encounter and cause such injuries; and that without the "prompt and proper" first aid that the Fourteenth Amendment requires being provided immediately to some of these injuries, deaths will result; and that there will inevitably be such a delay if the police rather than providing this first aid themselves simply call and await the arrival of EMTs or trained medical professionals.

186. At the outset, in discussing the *Monell* claim stated in the Fourth Claim for Relief we note that the defense of qualified immunity is not available to municipalities or governmental entities as a defense to *Monell* claims. See *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *Saunders v. Sheriff of Brevard Cty.*, 735 F. App'x 559, 563 (11th Cir. 2018); and *Martin v. Howard*, 799 F. App'x 815, 821 (11th Cir. 2020)

187. Thus, unlike §1983 claims against individual police officers for failure to provide "prompt and proper" medical care to injured pretrial detainees, there is no requirement that there have been pre-existing law decided that requires cities and their police departments to provide immediate prompt and proper medical care for such life-threatening injuries, i.e., it is not a condition precedent to cities' liability for failing to provide such care that there have been pre-existing law that "clearly established" in circumstances that are similar or indistinguishable on any significant ground. *Saunders v. Sheriff of Brevard Cty.*, 735 F. App'x 559, 563 (11th Cir. 2018):

> [T]hese forms of liability [individual police liability and cities' *Monell* liability] are subject to different standards. For instance, if officers violated a plaintiff's constitutional rights but those rights were not "clearly established," then *Monell* liability could survive even though qualified immunity would preclude individual liability.

Similarly, in *Martin v. Howard*, 799 F. App'x 815, 821 (11th Cir. 2020) the Court held:

> The question of whether a municipality is liable for a section 1983 claim concerns a determination as to whether "the execution of a government's policy or custom . . . inflicts [an] injury," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 696, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), is entirely separate from our qualified immunity analysis, which questions whether an individual public official violated a plaintiff's clearly established constitutional rights. See Hudson, 231 F.3d at 1292 n.1.

188. The liability of a municipality under *Monell* is established for the actions or inactions of its police where the plaintiff adduces proof (1) that the police perpetrated a constitutional violation on the plaintiff, (2) that a custom or policy of the city constituted deliberate indifference to that constitutional right and (3) that the custom or policy caused that violation, e.g., *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004):

> [T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.[52]

189.  We address those three requirements.

**(a) 14th Amendment requires prompt and proper medical care**

190.  It is well settled in this circuit that the Fourteenth Amendment's Due Process Clause requires police to provide "*prompt and proper*" medical care for injuries to pretrial detainees, *King v. Reap*, 269 F. App'x 857, 860 (11th Cir. 2008):

> This Court has held that the denial of <u>prompt and proper</u> medical care to a pretrial detainee violates the detainee's due process rights. Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988). (underlining supplied)

and *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015):

> The Due Process Clause of the Fourteenth Amendment requires government officials to provide medical care to individuals who have been injured during apprehension by the police.

---

[52] See also *Estate of Eddings v. Wexford Health Sources, Inc.*, 2022 U.S. Dist. LEXIS 26829, at *6 n.2 (M.D. Ala. Feb. 15, 2022):

> In Monell, the Supreme Court explained that municipalities cannot be held liable under § 1983 on a theory of *respondeat superior*. Id. at 691. Instead, municipal liability requires the plaintiff to show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004).

191.  A Due Process violation occurs both when police *fail to provide* prompt and proper medical care to such persons, and also when police *delay in providing* that care to pretrial detainees.  *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015):

> Delay in care is, itself, a wanton infliction of pain and a constitutional violation.[53]

192. The standard of proof for municipal liability under *Monell* is deliberate indifference. In the Eleventh Circuit deliberate indifference can be established in two ways, as specifically addressed in the context of the failure to provide prompt medical attention to pre-trial detainees in *Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016), 841 F.3d 1207, 1230:

> "Deliberate indifference to serious medical needs may be shown by failure to provide ***prompt*** attention to those needs by ***delaying necessary medical treatment for nonmedical reasons*** or by 'proving ***a policy of deficiencies in*** staffing ***or procedures*** such that the [pretrial detainee] ***is effectively denied access to adequate medical care***.'" Town of Davie, 847 F.2d at 772-73 (emphasis supplied) (bold print supplied)

and *Thomas v. Davie*, 847 F.2d 771, 772-73 (1988):

> Deliberate indifference to serious medical needs may be shown by failure to provide ***prompt*** attention to those needs by ***delaying necessary medical treatment for nonmedical reasons*** or by "proving ***a policy of deficiencies in*** staffing ***or procedures*** such that the [pretrial detainee] ***is effectively denied access to adequate medical care***." (citations omitted) (bold print supplied)

193.  Both of these two means of proving deliberate indifference—"***delay in necessary medical treatment for nonmedical reasons***" and "***a policy of deficiencies in . . .  procedure effectively den[ying] access to adequate medical care***"—were established by the evidence herein.

---

[53] See also *Duff v. Steub*, 378 F. App'x 868, 871 (11th Cir. 2010): "Although not all pain constitutes a serious medical need, failing to treat pain can violate the Fourteenth Amendment."

194.  First, there is no conceivable "medical reason" for the delay of over twelve minutes[54] between (1) the police dog's release of its bite that ruptured or tore Mr. Pettaway's femoral artery and (2) the initial provision of medical aid to Mr. Pettaway by the EMTs when they finally arrived.

195.  If there was no medical reason for this delay, the reason for the delay must then necessarily have been caused by a "*non-medical*" reason.  That "non-medical reason" for the delay was the City's Written Directive 3.3.5 (Doc. 371-4,) which was ordered and sanctioned by Ernest Finley, as the City's ultimate policymaker[55] on MPD policies and procedures.

---

[54] This twelve minute delay is undisputedly established by the time stamps programmed by the MPD to be imprinted on Barber's body cam video (Doc. 370- and Doc. 368) as his body cam made that recording.

Those time stamps on that video show that Barber after struggling with his dog for almost two minutes, finally choked his dog off of its attack on Mr. Pettaway and disengaged the dog's jaws from Mr. Pettaway's upper thigh at approximately 3:17:37 AM, and that medical care was first provided to Mr. Pettaway twelve minutes later at approximately 3:29.39 AM, when one of the Rescue Squad EMT members who had been summoned arrived to provide medical care and first reached down and touched Mr. Pettaway to begin providing medical care to him.

[55] Both the City's Rule 30(b)(6) designee, Lt. Raymond Carson, as well as Ernest Finley testified that MPD Chief Ernest Finley was the final and ultimate policymaker for the City Police Department in July, 2018 and had been since approximately January, 2015 when he became Montgomery' Police Chief.  The City's testimony on this point, given by its Rule 30(b)(6) designee, Lt. Carson, appears at pages 17 and 19 of the City's deposition (Doc. 371-21).  At page 17, Lt. Carson testified:

> Q.  Who was the final policy maker for the City of Montgomery Police Department in July, 2018?
> A. That would have been Chief Ernest Finley.

Again at page 19 of the City's 30(b)(6) deposition, Lt. Carson testified (Doc. 371-21):

> Q. How long had Chief Finley been the chief of police in Montgomery?
>
> A. Since 2015 --
>
> Q.  Okay.  I think he was sworn in in January of 2015, according to reports.  Does that sound --
>
> A. That sounds vague.  Again, I'm not exactly --
>
> Q. Right, testifying exactly.

196. Second, the evidence undisputed establishes that there was "*a policy of deficiencies in . . . procedures such that [Mr. Pettaway] was effectively denied access to adequate medical care*." Again, the policy deficiency is the City's Written Directive 3.3.5 (Doc. 371-4) which, by prohibiting MPD police from providing rudimentary first aid to stem or retard bleeding, effectively denied Mr. Pettaway the prompt and proper medical aid the City was required to provide him by the Due Process Clause.

197.   In *Kruse v. Williams*, 592 F. App'x 848 (11th Cir. 2014), the Eleventh Circuit addressed an objective element and three objective elements of proving deliberate indifference to a need for prompt and proper medical care to pretrial detainees, 592 F. App'x 848, 856:

> To prove deliberate indifference, a plaintiff must first satisfy the objective component by showing that he had *a serious medical need*. Id. at 1326. Second, the plaintiff must satisfy the subjective component by showing that the prison official acted with deliberate indifference to his serious medical need. Id. The subjective component of the deliberate-indifference test requires the plaintiff to prove three things: "(1) *subjective knowledge of a risk of serious harm*; (2) *disregard of that risk*; (3) by *conduct that is more*

> A. -- sure when, but it was sometime in 2015.

> Q. Assuming that those news reports and what I've seen about when he began is accurate, January 2015 -- between January of 2015 and June 8th (2021) last week, would Chief Finley be the final policy maker for the City of Montgomery Police Department?

> A. Yes, sir, he would.

Further, Ernest Finley confirmed Lt. Carson's testimony that he, Ernest Finley, was the ultimate policymaker for the policies and procedures of the Montgomery Police Department, page 9, Finley deposition (Doc. 371-6):

> Q.  Plaintiff's Exhibit 1-B is the testimony of Lieutenant Carson with regard to that.  He said that he took -- was promoted in July of 2018 and began at that point.
>
>      He also -- I'll put in Plaintiff's Exhibit 1-A, and these are some -- his testimony with regard to the fact that during the course of your being the Police Chief at the City of Montgomery, you were the ultimate policymaker for what goes in and what is out as far as policies and procedures for Montgomery Police Department police officers, correct?

> A.  Correct.

*than gross negligence*." Id. at 1326-27 (quotation and alteration omitted). Whether an official has subjective knowledge of a risk of serious harm and whether she disregarded that risk are questions of fact that can be demonstrated in the usual ways, including inference from circumstantial evidence. Id. at 1327. Third, the plaintiff must show that the official's wrongful conduct caused the constitutional harm. Id. (emphasis supplied)

### (1) the objective component: "a serious medical need"

198.   There is no dispute about the need in this case for medical care or aid for Mr. Pettaway.  A MPD police dog cut or tore a major artery causing readily apparent, obvious and profuse bleeding.  See the attached photos[56] of Mr. Pettaway lying unconscious in his glistening, blood drenched shirt and pants, and a pool of his blood formed around his body, unaided or attended by the half a dozen laughing and joking policemen standing directly over him.

199.   Profuse bleeding is an injury or condition that the Eleventh Circuit has specifically held to be so obvious that even a lay person would easily recognize the necessity for a doctor's attention" to treat it and such a "freely bleeding cut" obviously "creates a "substantial risk of serious harm."  *Hinson v. Bias*, 927 F.3d 1103, 1121-22 (11ᵗʰ Cir. 2019) (citing its language from *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11ᵗʰ Cir. 1985)):

> We have explained that a "serious medical need" is an injury or condition that . . . "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (cleaned up). To qualify as a "serious medical need," an injury or condition, if not treated, must create a "substantial risk of serious harm." Id. (cleaned up). For example, we have concluded that *a freely bleeding cut that created a pool of blood on the ground and required stitches presented a serious medical need*. See Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11ᵗʰ Cir. 1985) (per curiam) (emphasis supplied)

---

[56]  These photographs (Doc. 370-28) are still shots or individual frames taken from video recordings made by Barber or Watt's body camera, Doc. 370-26 and Doc. 370-27.

66

**(2) "subjective knowledge of a risk of serious harm"**

200. Ernest Finley has admitted his subjective knowledge that MPD policemen will inevitably cause injuries that create "serious medical needs" and the "substantial risk of serious harm" in his following deposition testimony:

a. Doc. 371-6, Finley depo, p. 55:

> Q. Okay. Would you agree that in arresting and apprehending suspects or persons, citizens, police can cause a broad range of different types of injury?
>
> MR. EAST: Object to form.
>
> A. You said police can cause?
>
> Q. Uh-huh.
>
> A. It can happen, yes.

b. Doc. 371-6, Finley depo, p. 55-56:

> Q. They have to shoot people sometimes and do shoot people at times, correct?
>
> A. That's correct.
>
> Q. All of the kinds of injuries from spraining a wrist or all the ways -- the whole gamut of different types of personal injuries can be caused by Montgomery police officers in the course of making arrests or apprehending persons, correct?
>
> MR. EAST: Object to form.
>
> A. Yes.
>
> Q. Some are relatively minor and some are more serious, correct?
>
> A. Correct.
>
> Q. And some are life-threatening, correct?
>
> A. Correct.
>
> Q. There are certain types of injuries for which first aid or medical care must be given almost immediately in order to prevent death or very serious injury, correct?
>
> A. Correct.

c. Doc. 371-6, Finley depo, p. 60-61:

Q.  Okay.  Do you know that if a major blood vessel in a person's body is cut or severed or torn and they are bleeding heavily, that person's blood is escaping from their body, that that must be treated immediately?

MR. EAST:  Object to form.

A.  Yes.

d. Doc. 371-6, Finley depo, p. 61:

Q.  Okay.  Let's look at 3.3.5.  There is a sentence on here that states -- I'm looking at [section] C right here. You've referred to it several times.  Would you read —

A.  "Medical aid is to be rendered by only those trained or certified to render such aid."

Q.  Aren't all police officers in the State of Alabama required to get first aid training before they become police officers?

A.  The basic CPR[57], yes.

Q.  And they aren't trained in first aid other than that?

A.  No, sir.

Q.  And how do you know that?

---

[57] CPR is an acronym for cardiopulmonary resuscitation, which addresses only cessation of breathing or heartbeat. The Mayo Clinic website states as follows concerning cardiopulmonary resuscitation or CPR, https://www.mayoclinic.org/first-aid/first-aid-cpr/basics/art-20056600:

Cardiopulmonary resuscitation (CPR) is a lifesaving technique that's useful in many emergencies, such as a heart attack or near drowning, in which someone's breathing or heartbeat has stopped. The American Heart Association recommends starting CPR with hard and fast chest compressions. This hands-only CPR recommendation applies to both untrained bystanders and first responders.

If you're afraid to do CPR or unsure how to perform CPR correctly, know that it's always better to try than to do nothing at all. The difference between doing something and doing nothing could be someone's life.

68

A.  You know, through my training as well as overseeing the academy.  I haven't seen anything more advanced than the basic CPR.

e. Doc. 371-6, Finley depo, p. 62:

Q.  All right.  Is it your testimony that you know that police officers in the State of Alabama are not trained by APOST to give first aid in a variety of situations other than CPR?

A.  They are trained, but the officers at MPD are not -- have not received that APOST additional advanced medical training.

Q.  I'm not talking about advanced medical training.  I'm talking about rudimentary.

A.  Basic, no.

f. Doc. 371-6, Finley depo, p. 79:

Q.  All right.  Would you agree that there are unavoidable and inevitable delays between when someone suffers an injury at the hands of the police somewhere in the City of Montgomery and when these two calls, at least two calls have to be made and then the EMT unit has to go out to the location?  There's an inevitable delay in getting there, correct?

MR. EAST:  Object to form.

A.  Yes.

### (3) "disregard of that risk"

201.  Ernest Finley testified in the clearest, most unambiguous manner possible that he completely disregarded the risk to persons upon whom his police had inflicted a life-threatening injuries, including that specifically of arterial bleeding, when he testified that his police had no obligation to themselves attempt to stop or reduce the loss of blood by such injured persons even when necessary to avoid their loss of life, p. 39 (Doc. 371-26):

Q.  Okay.  Your testimony is that MPD policy 3.3.5 did not require MPD policemen who cause say a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life, correct?

MR. EAST:  Object to form.

A.  Correct.

202. Moreover, MPD policy 3.3.5, the City's policy for rendering aid to persons injured by Montgomery police, plainly provides that not only were *MPD police **not required** to provide any hands-on first aid* to save such person's lives, but since it was known that there were no MPD police trained or certified in first aid, *MPD police **were prohibited** from providing any such first aid*.  That is how each of the five on-site police defendants who have been deposed in this case, See the testimony of Keiundra Watts, Ryan Powell, Smith, Bianka Ruiz and Neal Flournoy cited earlier in which each testified that they understood MPD Written Directive 3.3.5 (Doc. 371-4,)—o prohibit them from providing any first aid or medical aid.

### (4) "conduct that is more than gross negligence"

203.  Again, we cite testimony of Ernest Finley at page 39 (Doc. 371-6) of his deposition:

> Q.  Okay.  Your testimony is that MPD policy 3.3.5 did not require MPD policemen who cause say a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life, correct?
>
> MR. EAST:  Object to form.
>
> A.  Correct.

204.  We submit that the cruel and callous disregard for human life evidenced by this answer far exceeds "gross negligence."  Finley's testimony is the epitome of "deliberate indifference.  How much plainer can one say, "*I don't care if people die*"?

205.  This testimony clearly establishes the deliberate indifference of the City and its policymaker Ernest Finley for the lives, safety and well-being of Mr. Pettaway and for persons who like him, will be injured in the future by MPD police in such a way that immediate first aid or medical attention is required within a period of time that exceeds the inevitable delay that Chief Finley testified he knew will occur between the infliction of the injury and the arrival of EMTs summoned by MPD police, in order to save their lives.

70

**b. MPD Written Directive 3.3.5 (Doc. 371-4)**

**and the MPD policemen's failure to provide "prompt and proper" medical care [58]**

206.   Five of the MPD patrolmen defendants have been deposed.   They consistently testified that the MPD did not provide them with any first aid or medical training, they had no training in treating a heavily or profusely bleeding wound, and that because they had no first aid training in treating heavy blood loss, MPD policy prohibited them from attempting to provide any kind of medical care to persons such as Mr. Pettaway that night.

*Bianka Ruiz*

Doc. 371-16, Bianka Ruiz, p. 39-40

Q  So - - All right.  Now, you saw and -- that Mr. Pettaway as he lay out there on the sidewalk was bleeding heavily; correct?

A  Yes.  I saw all the blood.  Yes, sir.

Q   And you knew that if -- there was a danger of him possibly dying if something wasn't done to stop or reduce or retard the flow of blood; correct?

A  It -- yes, sir.

Q  All right.  Is the reason that you didn't have a -- or take any action to reduce Mr. Pettaway's loss of blood was that you hadn't been trained in that and that Montgomery Police Department policies prohibited you from -- prohibited you from doing that?  Are those reasons why you didn't do that?

A That's correct.  Yes, sir.

Q  Are there any other reasons you can think of that you didn't provide -- make any attempt to provide first aid to Mr. Pettaway?  Any other reasons you can think of?

A  I just don't have medical knowledge. I don't have knowledge of assisting in that -- in that manner.

Doc. 371-16, Bianka Ruiz, p. 40-41

Q  All right.  The Montgomery Police Department doesn't require you to be trained and doesn't train you in first aid to stop bleeding, does it; or did it?

A  At -- at that time; no, sir.  We were only trained to do CPR.

---

[58] *Kruse v. Williams*, 592 F. App'x 848 at 856

71

Q  And -- well, Montgomery Police Department didn't train you to do that. You got that in the police academy; correct?

MR. EAST:  Object to the form.

A  That's correct.

Q  Okay.  Did the -- after you left the police academy, did the Montgomery Police Department train you in any aspect of first aid or providing medical care in any area?

A  No, sir.

### *Joshua Smith*

Doc. 371-18, Joshua Smith depo, p. 47-48:

Q  Okay.  All right.  In fact, let me ask you to take a look back at Plaintiffs' Exhibit 3 to Mr. Finley's deposition.  Do you see the last sentence there, paragraph C?  Would you read that out loud.

A  Yes, sir.  "Medical aid is to be rendered by only those trained and/or certified to render such aid."

Q  Okay.  So not only you were not required to.  If you weren't trained or certified in the medical care or first aid, then you were prohibited from providing any first aid; correct?

A  Yes, sir.

Doc. 371-18, Joshua Smith depo, p. 42-43

Q  All right.  And this – the Montgomery Police Department provided you no training with regard to first aid or medical care at all; correct?

A  Yes, sir.

Q  What I said is correct?

A  Correct.

Q  Okay.  And they didn't require you to be trained in any kind of medical care or first aid; correct?

A  Correct.

Q  And to the best of your knowledge, they didn't require any police officer to be trained in medical care or first aid to your knowledge; correct?

A  Correct.

Q  You don't know of any Montgomery police officer who's ever received any training from the Montgomery Police Department in medical care or first aid; correct?

A  I do not personally know, sir.

Doc. 371-18, Joshua Smith depo, p. 45-46

Q  Okay.  But as far as any kind of bleeding, especially a major artery being severed or cut, you had received no training about that at all; correct?

A  No, sir.

Q  And don't know that any other police officer had ever received any training from the Montgomery Police Department about that, correct, to your knowledge?

A  That is correct, sir.

Doc. 371-18, Joshua Smith depo, p. 51:

Q  Did anyone at the Montgomery Police Department ever tell, instruct, direct you that where you came upon in the course of arresting somebody a potentially life-threatening injury that you had the obligation to provide any medical care or first aid care of any type to that person to prevent their death?

A  No, sir.

## Ryan Powell

DocC. 371-17, Ryan Powell depo, p. 38:

Q  And after you became a police officer -- sworn as a police officer, did the Montgomery Police Department ever provide you with any training in any kind of first aid or medical care?

A  No.

Q  Okay.  Do you know if it provided it to any other police officer?

A  Not that I'm aware of.

Doc. 371-17 Ryan Powell depo, p. 39-40:

Q  Look at the last line of directive 3.3.5 in front of you.  Do you see the paragraph C there?

A  Yes, sir.

73

Q  Would you read that?

A  "Medical aid is to be rendered by trained and/or certified to render such aid."

Q  And you had no such training?

A  Correct.

Q  And you know -- you don't know of any other police officers that had that training; correct?

A  Correct.

Q  Well, so did you understand this to be a directive to you to not -- for you not to provide any medical care or attempt to try to provide medical care?

A  Correct.

Doc. 371-17, Ryan Powell depo, p. 43-44

Q  The policy of Montgomery Police Department was not to provide any kind of medical training or first aid to any of its police officers; correct?

A  Correct.

Q  All right.  And coupled with that, it also provided that if you weren't trained or certified in providing first aid or medical care, then you were prohibited from providing medical aid or first aid; correct?

A  Correct.

Ryan Powell was cited at page 41 of his deposition, Doc. 371-17, to a portion of Lt. Carlisle's deposition marked as Exhibit B to Powell's deposition in which Lt. Carlisle testified that there were "no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person; and then Powell was asked at page 42:

Q  Is that consistent with your understanding of what Montgomery Police Department policy was in July of 2018?

A  Yes, sir.

Q  There were no circumstances.  It didn't matter what the injury was, how severe it was, how likely it was that, if not treated, death would ensue. Under no circumstances were you required to provide medical care; correct?

A  Correct.

Q  All right.  And, in fact, if you weren't trained for it, you were prohibited from doing it; correct?

A  Correct.

Q.  Is that correct?

A  Yes, sir.

### *Keiundra Watts*

Keiundra Watts, was also provided with a copy of Exhibit B to Lt. Carlisle's deposition in which Lt. Carlisle testified that there were "no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person and Ms. Watts was asked this same question (Doc. 371-15, Keiundra Watts, p. 45-46):

Q  Is that also consistent with what you know and were trained and were taught by the

Montgomery Police Department?

A  Yes, sir.

Doc. 371-15, Keiundra Watts, p. 45:

Q  Okay.  Had anybody at the police department ever in your time you there -- that you were a police officer prior to July 8th, of 2018; anybody ever tell you or direct you that you are to provide first aid if you see somebody who has suffered an injury that looks to you to be life threatening?

A  No.

Doc. 371-15, Keiundra Watts, p. 46-47

Q  Okay.  Are you trained in or are you certified in any kind of medical care or first aid?

A  Now.  Yes, sir.

Q  I'm sorry?

A  Yes, sir; I am now.

Q  When was that?

A  The beginning of this year, 2021.

Q 2021?

A Yes, sir.

Q Okay. Prior to that time, were you?

A No, sir.

Q Okay. Did the Montgomery Police Department ever provide you with any kind of medical training or first aid training prior to 2021?

A Yes, sir.

Q What was that?

A CPR.

Q You were taught that back at the Police academy?

A Right.

Q Police academy?

A Yes.

Doc. 371-15, Keiundra Watts, p. 57-58:

Q Okay. Do you understand from the sentence at the bottom of page -- or the first page of Plaintiff's Exhibit 3 (Doc. 371-4, Written Directive 3.3.5) where medical aid is to be rendered only by those trained or certified to render such aid; do you understand that to be that you are prohibited from providing medical care unless you are trained?

A Yes, sir.

Q Okay. So not only the police department didn't – didn't require you to provide first aid, they prohibited you from doing that; correct?

A Yes.

Q Because they didn't provide you any training --

A Yes, sir.

Q -- in medical care?

A Right.

Q And they didn't require you to be trained in medical area?

A No, sir.

76

Q  What I said is correct?

A  Correct.

### *Neal Flournoy*

Doc. 371-19, Neal Flournoy depo, p. 27-28:

> Q.  All right.  Let me ask you about whether -- At any time while you were a Montgomery Police Department officer, were you ever instructed under any circumstances that Montgomery police officers were to render first aid or to try to provide any kind of medical assistance or care to a person that was injured by them?

> A.  We were never directed to provide medical care for anybody.  We were always told to hold off and wait for medics, call medics.  The moment that you recognize that there's an injury, call medics.  And obviously, you know, if it's a paper cut, you don't call medics for a paper cut unless the person requests it.  But in situations such as this, there's obviously something wrong, call medics.

> Q.  Okay.  So was the policy that you weren't required to or was the policy that you were told not to?

> A.  It was -- The policy as written if I remember was you basically have to be certified and trained to perform medical things.  If you're not certified, if you're not trained, then don't do it, call for medics, let them do it.  They're the medical professionals, let the medical professionals do medical stuff.

> Q.  So for all Montgomery police officers who weren't trained or certified with regard to first aid, they were all instructed not to provide any medical care or first aid.

> A.  Pretty much.

> Q.  Correct?

> A.  Yes, sir.

> Q.  Well, not pretty much.

> A.  I'm sorry.  Yes, sir.

207.  Thus, the individual patrol policemen defendants herein have testified that, that they were trained and instructed that because MPD policemen were not trained or certified in first aid for arterial bleeding, MPD Written Directive 3.3.5 (Doc. 371-4,) completely prohibited MPD

police from providing prompt and proper first aid or medical aid to Joseph Lee Pettaway on July 8, 2018.

208. More specifically, Written Directive 3.3.5 (Doc. 371-4,) plainly states and each of the five police defendants who were present at 3809 Cresta Circle on July 8, 2018, have testified that they understood that directive to prohibit them from providing any first aid to Mr. Pettaway that night since (a) the City had not trained or required them to be trained or certified in the required medical aid necessary to save Mr. Pettaway's life, i.e., to stop or retard his arterial bleeding.  Here is what they testified in their depositions:

a.  Keiundra Watts, Doc. 371-15, p. 57-58:

> Q  Okay.  Do you understand from the sentence at the bottom of page -- or the first page of Plaintiff's Exhibit 3 (Written Directive 3.3.5) where medical aid is to be rendered only by those trained or certified to render such aid; do you understand that to be that you are prohibited from providing medical care unless you are trained?
>
> A  Yes, sir.
>
> Q  Okay.  So not only the police department didn't -- didn't require you to provide first aid, they prohibited you from doing that; correct?
>
> A  Yes.
>
> Q  Because they didn't provide you any training --
>
> A  Yes, sir.
>
> Q  -- in medical care?
>
> A  Right.
>
> Q  And they didn't require you to be trained in medical area?
>
> A  No, sir.
>
> Q  What I said is correct?
>
> A  Correct.

b.  Joshua Smith, p. 49 (Doc. 371-18):

> Q  There weren't any circumstances under which any Montgomery police officer was required to provide medical care to someone injured, even when they had a life-threatening injury; correct?

A  Yes, sir.

and Joshua Smith, p. 47-48 (Doc. 371-18):

Q  Okay.  All right.  In fact, let me ask you to take a look back at Plaintiffs' Exhibit 3 (Doc. 371-4,) to Mr. Finley's deposition.  Do you see the last sentence there, paragraph C?  Would you read that out loud.

A  Yes, sir.  "Medical aid is to be rendered by only those trained and/or certified to render such aid."

Q  Okay.  So not only you were not required to.  If you weren't trained or certified in the medical care or first aid, then you were prohibited from providing any first aid; correct?

A  Yes, sir.

c.  Bianka Ruiz, p. 39-40 (Doc. 371-16):

Q  All right.  Now, you saw and – that Mr. Pettaway as he lay out there on the sidewalk was bleeding heavily; correct?

A  Yes.  I saw all the blood.  Yes, sir.

Q  And you knew that if -- there was a danger of him possibly dying if something wasn't done to stop or reduce or retard the flow of blood; correct?

A  It -- yes, sir.

Q  All right.  Is the reason that you didn't have a -- or take any action to reduce Mr. Pettaway's loss of blood was that you hadn't been trained in that and that Montgomery Police Department policies prohibited you from -- prohibited you from doing that?  Are those reasons why you didn't do that?

A  That's correct.  Yes, sir.

d.  Ryan Powell, p. 42-43 (Doc. 371-17)

Q  There were no circumstances.  It didn't matter what the injury was, how severe it was, how likely it was that, if not treated, death would ensue.  Under no circumstances were you required to provide medical care; correct?

A  Correct.

Q  All right.  And, in fact, if you weren't trained for it, you were prohibited from doing it; correct?

A  Correct.

Q  Is that correct?

A  Yes, sir.

e.  Neal Flournoy, p. 27 (Doc. 371-19)

Q.  All right.  Let me ask you about whether -- At any time while you were a Montgomery Police Department officer, were you ever instructed under any circumstances that Montgomery police officers were to render first aid or to try to provide any kind of medical assistance or care to a person that was injured by them?

A.  We were never directed to provide medical care for anybody.  We were always told to hold off and wait for medics, call medics.

and Neal Flournoy, p. 27-28 (Doc. 371-19):

Q.  Okay.  So was the policy that you weren't required to or was the policy that you were told not to?

A.  It was -- The policy as written if I remember was you basically have to be certified and trained to perform medical things.  If you're not certified, if you're not trained, then don't do it, call for medics, let them do it.  They're the medical professionals, let the medical professionals do medical stuff.

Q.  So for all Montgomery police officers who weren't trained or certified with regard to first aid, they were all instructed not to provide any medical care or first aid.

A.  Pretty much.

Q.  Correct?

A.  Yes, sir.

Q.  Well, not pretty much.

A.  I'm sorry.  Yes, sir.

### (c) Survivability of Dog Bite Wound

209.    Dr. Boudreau, the Department of Forensic Sciences' Medical Examiner who conducted Mr. Pettaway's autopsy, stated in his autopsy report (Doc. 371-12) that the cause of Mr. Pettaway's death was a "dog bite" to which he further stated he was certain of the dog bite causing Mr. Pettaway's death to "a reasonable degree of medical certainty,' see page 20 of his deposition (Doc. 371-11):

Q. Are you certain to a reasonable degree of medical certainty that it was loss of blood from this dog bite wound that caused Mr. Pettaway's death?

A. Yes.

210. Dr. Boudreau also testified that these basic measures to stop or retard bleeding – application of steady pressure to the wound that Mr. Pettaway suffered – had been applied to Mr. Pettaway's wound, Dr. Boudreau knew of no reason why they would not have worked to stop or significantly retard Mr. Pettaway's loss of blood, Doc. 371-11, p. 26-27:

Q. Pardon me. Do you know of any reason if one of these measures they're talking about, direct pressure or packing the wound, do you know of any reason that if they had been applied or taken within a few minutes after the dog bites were inflicted, that they would not have stopped the bleeding or significantly reduced it?

A. They may have reduced it. I wasn't there. I can't tell you how badly it was bleeding or, you know, how much pressure was applied or -- do you know of any reason that would not have significantly retarded the flow of blood?

Q. I know. Well, the testimony is going to be there wasn't any. But I'm saying if that was applied,

211. Dr. Pettaway acknowledged that he did not know and "can't exactly say" how long unrestricted loss of blood from Mr. Pettaway's would have taken to cause his death, but that it was more than six minutes, when asked to "quantify" the number of minutes it would have taken for unrestricted or uncontrolled bleeding from this dog bite would have taken to result in death, he did not know and "can't exactly say" but that it would have been more than six minutes, Boudreau deposition testimony, Doc. 371-11, p. 21-22:

Q. Okay. Can you quantify "minutes" at all? Three, five, six --

A. Well, no. It wouldn't have been an instant death. I mean, he would have to bleed for a while. How many minutes, I can't exactly say. I don't know.

212. The only competent, qualified, admissible expert witness opinion testimony regarding the survivability of this dog bite wound will be provided by plaintiff's expert witness, Dr. Benjamin Omalu, whose testimony on this point is summarized in his declaration filed as Doc. 371-10, hereto:

81

4. The focal vascular injury to Mr. Pettaway's left femoral artery and vein, was a highly survivable injury. The confidence interval for this opinion is 90 – 99%. Direct pressure, if applied to the injury, would have stopped or sufficiently slowed the bleeding, giving emergency physicians time to repair the damage and save Mr. Pettaway's life.

5. To a 90 – 99% confidence interval and well beyond a reasonable degree of medical certainty Mr. Pettaway would have survived this wound if the basic, simple first aid measure of applying steady pressure to the wound and/or packing the wound with any available absorbent material, such as a T-shirt or any other available item of clothing had been made until the emergency medical personnel arrived."

**(d)**

**Conclusion regarding the Fourth Claim for Relief**

213. Plaintiff's proof of the facts supporting the *Monell* claim against the City for its written policy 3.3.5 (Doc. 371-4,) which prohibited MPD police from providing first aid to Mr. Pettaway are without dispute and in fact were provided by the defendants themselves: Mr. Pettaway had an objective "serious medical need," the City and its policymaker Finley had "subjective knowledge of a risk of serious harm" if MPD policemen are not trained and required to provide life-saving first aid in circumstances where it is essential to save lives, and that the City and Finley in setting policy that effectively prevented MPD police from providing such first aid "disregarded that risk," through "conduct that was more than gross negligence."

214. There are no genuine issues of material fact on any of these facts; and the plaintiff is entitled to summary judgment as a matter of law on the Fourth Claim for Relief against defendants City of Montgomery and its policymaker Ernest Finley in his official capacity.

215. On the strength of the foregoing evidence, legal authority and arguments made herein, plaintiff submits that there is no genuine issue of material fact regarding the liability of Ernest Finley in his official capacity and the City of Montgomery on the Fourth Claim for Relief and requests that the Court enter an Order granting plaintiff a partial summary judgment against Ernest Finley and the City of Montgomery on their liability to plaintiff on the Fourth Claim for Relief, and that holding that both are liable to plaintiff for damages, but reserve the determination of the amount of that award of damages for a jury to make at trial.

/s/ Griffin Sikes, Jr.

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, Alabama 36111
334.233.4070
sikeslawyer@gmail.com

/s/ H. E. Nix, Jr.

H. E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
334.279.7770
cnix@nixattorney.com

Certificate of Service

I certify that a true and correct copy of the foregoing has been electronically filed on this 5th day of October, 2022, in Pacer, the Court's electronic filing website, for electronic service on all counsel of record herein:

C. Winston Sheehan, Esq., at wsheehan@ball-ball.com

Allison Alford Ingram, Esq. ALA@ball-ball.com

Stacy Bellinger, Esq., at sbellinger@montgomeryal.gov

John David Norris, Esq., at norrisj@bellsouth.net

William P. Gray, Esq., at wpg@grayattorneys.com

Rebecca L. Chambliss, Esq., at rebecca@chambliss.law

/s/ Griffin Sikes, Jr.

Of Counsel

# DOCKET 378

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WALTER PETTAWAY, *as*          )
*Administrator the Estate of*     )
*Joseph Lee Pettaway*, *deceased*,  )
                                   )
    Plaintiff,              )
                                   )
vs.                                )    Case No. 2:19-CV-00008
                                   )
NICHOLAS D. BARBER, *et al.*,      )
                                   )
    Defendants.             )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants in the above-styled cause, City of Montgomery, Ernest Finley, Michael D. Green, Joshua T. Smith, Keiundra Watts, Ryan Powell, Nicholas D. Barber, Justin Thrasher, Neal Flournoy, and Bianka Ruiz, (collectively, "the Defendants"), and pursuant to Rule 56 of the *Federal Rules of Civil Procedure* move this Honorable Court to grant summary judgment in their favor on the grounds that there are no genuine issues of material fact to be submitted to a jury and the Plaintiff's claims should be dismissed as a matter of law with respect to all claims asserted in the Third Amended Complaint [Doc. 205]. In support of this Motion, the Defendants adopt, incorporate by reference, and rely upon the following:

1. All pleadings of record filed in the case;

2. Evidentiary materials submitted in support of the Defendants' Motion for Summary Judgment and filed contemporaneously herewith;

3. Defendants' Joint Brief in Support of Motion for Summary Judgment, including the Narrative Statement of Undisputed Facts, all arguments, legal precedent; and

4. The Brief contemporaneously filed in support of Summary Judgment by Ryan Powell.

WHEREFORE, the Defendants City of Montgomery, Ernest Finley, Michael D. Green, Joshua T. Smith, Keiundra Watts, Ryan Powell, Nicholas D. Barber, Justin Thrasher, Neal Flournoy, and Bianka Ruiz respectfully move this Honorable Court to enter summary judgment in the Defendants' favor as to all of the Plaintiff's claims.

Respectfully submitted this the 5th day of October, 2022.

/s/ Allison A. Ingram
ALLISON A. INGRAM (ASB-6024-F68A)
C. WINSTON SHEEHAN, JR. (SHE013)
*Attorney for Defendants, City of Montgomery, Ernest Finley, Michael D. Green, Joshua T. Smith, Keiundra Watts, Ryan Powell, Nicholas D. Barber and Bianka Ruiz*

**OF COUNSEL:**

BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
(334) 387-3222 – facsimile
ALA@ball-ball.com
wsheehan@ball-ball.com

2

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, the foregoing has been served upon the following by electronic filing and notification through CM/ECF with United States District Court Middle District of Alabama:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

William Patton Gray , Jr
Gray & Associates LLC
3500 Blue Lake Drive; Suite 455
Birmingham, AL 35243
wpg@grayattorneys.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

*/s/ Allison A. Ingram*
OF COUNSEL

# DOCKET 379

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WALTER PETTAWAY, *as Administrator* | ) | |
| *the Estate of Joseph Lee Pettaway*, *deceased*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19-CV-00008 |
| | ) | |
| NICHOLAS D. BARBER, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

---

**JOINT NOTICE OF FILING EVIDENTIARY MATERIALS IN SUPPORT
OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

---

COME NOW the Defendants City of Montgomery, Ernest Finley, Michael D. Green, Joshua T. Smith, Keiundra Watts, Ryan Powell, Nicholas D. Barber, Justin Thrasher, Neal Flournoy and Bianka Ruiz, (collectively, "the Defendants"), and hereby jointly submit the following evidentiary materials in support of their Motion for Summary Judgment:

**Exhibit 1 –** Excerpts from the Deposition of James Jones

**Exhibit 2 -** Excerpts from the Deposition of Nicholas Barber

**Exhibit 3 -** Nicholas Barber Bodycam Footage (UNDER SEAL)

**Exhibit 4 -** Call for Service Detail Report (UNDER SEAL)

**Exhibit 5 –** Excerpts from the Deposition of Michael Green

**Exhibit 6 -** Excerpts from the Deposition of Jimmy Ezell

**Exhibit 7 –** Affidavit of Jimmy Ezell

**Exhibit 8 -** Excerpts from the Deposition of Nicholas Schnupp

**Exhibit 9 –** Joseph  Pettaway Certified Convictions

**Exhibit 10 –** Joseph Pettaway Criminal Record in Montgomery County case CC-2017-000380

1

**Exhibit 11 -** Excerpts from the Deposition of Bennett Omalu

**Exhibit 12** - Bodycam Footage of Keiundra Watts

**Exhibit 13** – Excerpts from the Deposition of Dr. Stephen Boudreau (2021)

**Exhibit 14 –** Excerpts from the Deposition of Ernest Finley

**Exhibit 15** - MPD Policy Directive 3.3.5

**Exhibit 16** - Excerpts from the Deposition of Ryan Powell

**Exhibit 17 -** Excerpts from the Deposition of Joshua Smith

**Exhibit 18 -** Excerpts from the Deposition of Keiundra Watts

**Exhibit 19 -** Excerpts from the Deposition of Bianka Ruiz

**Exhibit 20 -** Excerpts from the Deposition of Raymond Carson

**Exhibit 21 -** Declaration of Ernest Finley

**Exhibit 22 -** Excerpts from the Deposition of William Gault

**Exhibit 23** - Baptist Medical Center South records on Joseph Pettaway

**Exhibit 24 -** Excerpts from the Deposition of Neal Flournoy

**Exhibit 25 -** Declaration of Stephen Boudreau

**Exhibit 26 -** Excerpts from the Deposition of Stephen Boudreau (2022)

**Exhibit 27 -** Bodycam of Officer Justin Thrasher (UNDER SEAL)

**Exhibit 28 -** Declaration of Andre Carlisle


Respectfully submitted this the 5th day of October, 2022.


/s/ Allison A. Ingram
ALLISON A. INGRAM (ASB-6024-F68A)
C. WINSTON SHEEHAN, JR. (SHE013)
*Attorney for Defendants, City of Montgomery, Ernest Finley, Michael D. Green, Joshua T. Smith, Keiundra Watts, Ryan Powell, Nicholas D. Barber, Bianka Ruiz, Neal Flournoy and Justin Thrasher*

2

**OF COUNSEL:**
BALL, BALL, MATTHEWS & NOVAK, P.A.
445 Dexter Avenue, Suite 9045
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
(334) 387-3222 – facsimile
ALA@ball-ball.com
wsheehan@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, the foregoing has been served upon the following by electronic filing and notification through CM/ECF with United States District Court Middle District of Alabama:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

William Patton Gray , Jr
Gray & Associates LLC
3500 Blue Lake Drive; Suite 455
Birmingham, AL 35243
wpg@grayattorneys.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

/s/ Allison A. Ingram
OF COUNSEL

3

# DOCKET 379-1

# EXHIBIT 1

**In The Matter Of:**

**Walter Pettaway vs Nicholas D. Barber, et al.**

_____

James Jones

*September 24, 2021*

_____

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Walter Pettaway vs Nicholas D. Barber, et al.                                James Jones
                                                                              9/24/2021

A.              I've been there now two months.

Q.              Okay.  I think that I asked you your age, but give us your date of birth also if you don't mind.

A.              November the 25th 1965.

Q.              All right, sir.  Mr. Jones, do you know -- did you know Joseph Lee Pettaway?

A.              Yes, sir.

Q.              Okay.  How long had you known Joseph Lee Pettaway?

A.              Since 1972.

Q.              And how old were you in 1972?

A.              Seven.

Q.              All right.  And how old was Mr. Pettaway?

A.              I think that I'm -- I'm thinking that I'm two or three years older than him, so he was like about five.

Q.              Okay.  Did Joseph Lee Pettaway have a nickname?

A.              Yes.

Q.              What did y'all call him?

A.              Poppet.

Q.              P-O-P --

A.              P-O-P-P-E-T.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8

**Walter Pettaway vs Nicholas D. Barber, et al.**                    James Jones
                                                                      9/24/2021

Q.        Okay.  Back in the first of the year, January, February, March, April, May, through there, the first half of 2018, were you repairing a house over on Cresta Circle?

A.        Yes.

Q.        Okay.  I'm going to show you a photograph.  We'll make this Exhibit 1 to your deposition.

          (Plaintiff's Exhibit 1 was
           marked for identification)

Q.        Is that a photograph of the house that you were repairing?

A.        Yes.

Q.        And was Mr. Pettaway helping you repair that house?

A.        Yes, sir, he was.

Q.        Okay.  Did you have anybody else helping you repair the house also?

A.        Yes.  My cousin came down, Gary Dickson.  He was helping me, too.

Q.        Okay.  And how long had you been -- in July of 2018, how long had you been working on that house?

A.        Well, I started by myself.  And I don't quite remember when -- I think that Joe

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9

started helping me a little after he got out

because when I first started, I don't think that he

was -- I think that he was still incarcerated.

Q.          All right.  And again, let me come

back.  How long had you been working on the house

as of July?

A.          Four or five months.

Q.          Okay.

A.          Four or five months.

Q.          Did you own the house?

A.          No.

Q.          Okay.  Do you recall the address of

the house?

A.          Yes, 3809 Cresta Circle.

Q.          Speak a little slower if you don't

mind, please, sir.

A.          Okay.

Q.          When we get older, we get hard of

hearing.

A.          I'm a little old.  That's what I'm

saying.

Q.          I'm going to also show you a diagram

of the house that I'll mark.

            (Plaintiff's Exhibit 2 was

             marked for identification)

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

Q.          I'll represent to you that this was
made by the Alabama Law Enforcement Agency of the
house.

A.          Uh-huh.

Q.          And it diagrams the arrangement of the
rooms in the house.

A.          Right.

Q.          Do you recognize that as -- Is that an
accurate representation of the arrangement of the
rooms in the house?

A.          Yes.

Q.          All right.  Did you own the house?

A.          No.

Q.          Who owned the house?

A.          Mr. Norris Harris.

Q.          All right.  And who is Mr. Harris?

A.          He's a minister.

Q.          Okay.  Where does he live?

A.          910 Hugh Street, Western Hill.

Q.          Huge Street?

A.          Hugh, H-U-G-H.

Q.          Okay.  All right.  Were you paying
people to repair the house or was Mr. Harris paying
people to repair the house?

A.          I was.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

Walter Pettaway vs Nicholas D. Barber, et al.                    James Jones
                                                                 9/24/2021

Q.          And what was the arrangement that you
had with Mr. Harris with regard to you paying
people to repair his house?

A.          Reduction, reduction on the rent.

Q.          Okay.  And had you been living in the
house?

A.          We lived in the house before.  My mom
rented the house before.

Q.          I know.  Twenty years before.

A.          Right.  Exactly.

Q.          I'm not talking about that.  I'm
talking about in -- At the first when you started
working on it in 2018, had you been living in the
house at that time?

A.          Yeah.  I lived there.

Q.          All right.  When did you live in the
house?

A.          Right after I made the repairs.

Q.          No, no.  I'm talking about before you
started making the repairs.

A.          Oh, no.  You couldn't live in the
house.

Q.          Okay.  And why couldn't you live in
the house?

A.          It was tore up.

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

A.            It was vacant, yeah.

Q.            Okay.  And it was in terrible shape as you call it.

A.            Yeah.  Had to get the plumbing --

Q.            Is that accurate?

A.            That's accurate.  Had to get the plumbing did and everything.

Q.            Okay.  Now, in July of 2018, had you done a number of these repairs?

A.            Yes.

Q.            And had Poppet or Mr. Pettaway helped you in doing that?

A.            Yes.

Q.            And you paid him for helping you repair the house?

A.            Yes.

Q.            All right.  And you paid Gary Dickson also --

A.            Right.

Q.            -- to help you repair the house?

A.            Uh-huh.

Q.            All right.  Was there anybody living in the house during the time that you were repairing it?

A.            No.  We were staying in there.  We

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

Walter Pettaway vs Nicholas D. Barber, et al.                                    James Jones
                                                                                 9/24/2021

A.              Yes, sir.

Q.              All right.  Had you started putting that Sheetrock up?

A.              Yeah.  I had already done that.

Q.              Okay.  How about the flooring?  What was the condition of the flooring when you started working on it?

A.              It was just concrete.

Q.              Okay.  How about kitchen appliances and cabinetry?

A.              There was cabinetry, but the cabinets was -- it was all torn to pieces and hanging on the floor.  The stove was -- you know, just wasn't --

Q.              Did you repair that cabinetry or did you replace it with other cabinetry?

A.              I replaced it.

Q.              Okay.  So you took the old -- the existing cabinetry that was -- This is in the kitchen that we're talking about, right?

A.              Right, the cabinetry in the kitchen.

Q.              Okay.  That was in disrepair.  You pulled it out of there, tore it out.

A.              Right.

Q.              Okay.  And you put in some new cabinetry.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

A.          Yeah.

Q.          All right.  And how about kitchen appliances?

A.          Refrigerator.  I ended up putting a refrigerator in there.

Q.          I'm sorry.  You did what?

A.          Refrigerator.

Q.          You put a new one in?

A.          Yeah.  New refrigerator, yeah.

Q.          Okay.  You took the old one out and threw it away.

A.          There wasn't none in there.

Q.          There wasn't any.  Okay.  How about the stove?

A.          I took the stove and throwed it out.

Q.          And put a new one in.

A.          Put a new one in.

Q.          Okay.  How about in -- The night that we're talking about is -- I think that it is a Saturday night going over into Sunday morning.

A.          Uh-huh.

Q.          And the date, I think, is July the 7th of 2018 and July 8 of 2018.

A.          Right.

Q.          I'm looking at what the condition of

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

the house -- I'm trying to ask what the condition of the house was the night of July 7 and July 8 of 2018.  What was the condition of the house?  Was it habitable then?

A.          Yes.  It was habitable.

Q.          By "habitable," you mean had running water, electricity?

A.          Without -- No, not without -- Without the electricity and the water, no.

Q.          Okay.  Well, had you finished all of the repairs in the house?  Was it completely finished?

A.          Everything but the floors.

Q.          Okay.  The flooring.

A.          The flooring and finish painting.

Q.          All right.  And had you spent some nights over there during the cooler months in the spring?

A.          Yes.

Q.          All right.  Did you cease spending the night over there when it got warmer?

A.          Yeah.  It was hot.  You know what I'm saying?  It was hot.  It was still hot.

Q.          All right.  Now, in July of 2018, the house would have been habitable for a resident all

Walter Pettaway vs Nicholas D. Barber, et al.                              James Jones
                                                                          9/24/2021

except for the floor and the fact that there was
not running water.

A.          Or lights.

Q.          Or electricity running in the house,
right?

A.          Yes, sir.

Q.          Okay.  In the months leading up to
July of 2018, had Joseph Lee Pettaway and Gary
Dickson worked on the house together?

A.          Yeah.  All of us did, all three of us.

Q.          Right.  Did they know each other?

A.          Yeah.

Q.          Okay.

A.          I introduced them.

Q.          Okay.  Did they get along with each
other during the time that they were working on the
house?

A.          Yeah.

Q.          Huh?

A.          Yeah, they did.

Q.          Okay.  All right.  Did you ever see
them have any kind of dispute or problem between
the two of them?

A.          No.

Q.          Okay.  Did there come a time when

Walter Pettaway vs Nicholas D. Barber, et al.                    James Jones
                                                                  9/24/2021

Mr. Dickson began to spend the nights, some of the nights in the house?

A.          Yes.

Q.          Over in maybe the end of June or the first of July?

A.          Yes.

Q.          Okay.  Was Mr. Dickson paying you anything to live in the house?

A.          No.

Q.          Okay.  Did you know that Joseph Lee Pettaway on occasion stayed in the house or not?

A.          No.

Q.          You don't know about that.

A.          No.

Q.          Okay.  Tell me about -- Was July 7 the --

A.          Saturday?

Q.          That was a Saturday?

A.          I think so.

Q.          Okay.  What had y'all done at the house that day?  When I say "y'all," I mean you and Joseph Lee Pettaway and Mr. Dickson.

A.          We did windows, put the back window in.  We put the back window in and then we just -- After that, he helped clean up around the yard.  We

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

barbecued and drunk a few beers.  That's it.

Q.          All right.  Who all was back there at the barbecue that you can recollect?

A.          Man, there was a bunch of people back there, Mr. Sikes.

Q.          All right.  Well, tell me the ones that you know were back there.

A.          I knew all of them, but I don't know all of them's names.

Q.          Tell me the names of the people that you do know were there.

A.          Shaunta, me, Gary, Poppet.

Q.          And by Poppet, you mean James Pettaway.

A.          Yeah, Joseph.

Q.          Joseph Pettaway, excuse me.  Joseph Lee Pettaway.

A.          Yes.

Q.          Okay.

A.          There was a girl.  Her name was Bea. A bunch of the neighbors.  It was just -- I can't name them all.

Q.          Okay.  And in the summertime -- This would have been sometime maybe -- it got dark maybe 8:00 or something like that?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

you've told us about?  And that's at least six police standing around outside the house and the conversation that you had with one of the policemen there --

A.          Uh-huh.

Q.          -- about him asking you if they could let the dog into the house.  Do you recall any other conversations out there?

A.          Huh-uh.

Q.          You need to answer "yes" or "no."

A.          No.

Q.          "Huh-uh" doesn't come out.

A.          I'm sorry.  No.

Q.          All right.  Was there anything in the house to be stolen?

A.          A TV and tools.  That's it.

Q.          How old was the TV?

A.          It was new.

Q.          Okay.  There was a TV in there and there were some tools.

A.          Yeah.

Q.          Okay.  Anything else of value in the house?

A.          No.

Q.          Okay.  What's the next thing that you

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

Q.            Okay.  But does that accurately --
Other the bloody trail in the photograph, other
than that, does that fairly and accurately depict
what the house -- that hallway, that portion of the
house, the hallway, looked like?

A.            Yes.

Q.            Okay.  And what is that in boxes there
along the wall?

A.            That's my flooring.

Q.            That's what?

A.            Flooring.

Q.            The flooring that you were going to
put in?

A.            Yeah, the hardwood floor.  Yes.

Q.            All right.  Is that a concrete floor
there?

A.            Yes.

Q.            Okay.  And that was the condition that
it was in on July 7 and July 8.

A.            Yes, sir.

Q.            The concrete floor I'm talking about.

A.            Yes.

Q.            Okay.  Now, were you subpoenaed to
come here today, sir?

A.            Yes, sir.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

Walter Pettaway vs Nicholas D. Barber, et al.                                    James Jones
                                                                                 9/24/2021

A.          Yes.

Q.          Okay.  Gary Dickson is your cousin?
Is that right?

A.          Yes.

Q.          Okay.  And he was staying at the
house.

A.          Yeah.  He was staying at the house
that night.

Q.          That night.  And had he been staying
there for a while?

A.          Yes.  He'd been staying there for a
while.

Q.          Okay.  And you had stayed there off
and on for a while --

A.          Yes.

Q.          -- leading up to that, too.

A.          Yes, sir.

Q.          Okay.  Y'all had a barbecue that day.

A.          Yes.

Q.          You left about 10:30 or 11?

A.          Yeah, around 10:30 or 11.

Q.          And everybody else was leaving, too.

A.          Yes, sir.

Q.          Did you know that Gary Dickson was
still going to be staying there that night?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54

Walter Pettaway vs Nicholas D. Barber, et al.

James Jones
9/24/2021

A.          Yes, I did.

Q.          Did you think that anybody else was going to be staying there that night?

A.          No, sir.

Q.          And I think that you said -- and tell me if this is right -- that y'all had put the back window in --

A.          Yeah.

Q.          -- that day?

A.          Uh-huh.

Q.          Which back window is that?

A.          The very back -- The biggest bedroom, the near back.

Q.          Was that window still in the next morning?

A.          No.

Q.          So that window -- Do you know what happened to that?

A.          Yes.  That's the one that was taken out.

Q.          It was taken out.  Do you know who took it out?

A.          No, I do not.

Q.          Okay.  Do you know how Mr. Pettaway got in the house?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55

Walter Pettaway vs Nicholas D. Barber, et al.                    James Jones
                                                                9/24/2021

A.             Well, I wasn't there.  No, I do not.

Q.             That's fair.  But the window was in
when y'all left.

A.             Yes, sir.

Q.             And the window was out the next day.

A.             Yes, sir.

Q.             Okay.  Gary Dickson called you that
night and said that somebody broke in, that he
thought that they were still there.  And tell me
again.  Where did you say that he told you that he
saw a hand?

A.             In the closet.

Q.             Which closet?

A.             In the same room where the window was
missing.  He said that he seen a hand.

Q.             Okay.  And so you showed up at the
scene.

A.             Yes, sir.

Q.             And you told -- Tell me what you told
the police.

A.             Well, when I showed up, they asked me
like do you own the house?  I was like no, I don't
own the house.  I said I'm renting the house.  They
had called the canine officer and he asked me, said
can we send the dog in?  And I said yes.

# DOCKET 379-2

# EXHIBIT 2

# In The Matter Of:

# Walter Pettaway vs Nicholas D. Barber, et al.

---

Nicholas D. Barber

*September 3, 2021*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

having seen the video recently, correct?

A.      Correct.

Q.      Okay.  Tell me what all -- and I don't care whether you remember it independent of the video or whether the video refreshed your recollection.  Tell me all of what you can recall the information was that Gary Dickson gave you.

A.      I remember him saying he was in the bedroom asleep.  That's when he heard the noise.  Went to go and investigate it.  And he went into the -- across the hallway to a different room and he saw the -- a hand in the closet.  And then I asked him if he had any, like, clothing description of any kind and he said no, all he could see was a hand.  And I remember him specifically saying I know a man's hand when I see one.

Q.      Did he say a man's hand or did he say a human hand?

A.      Man's hand.  And he -- then I asked him where -- where the homeowner was coming from.  He had mentioned an apartment by Eastdale Mall area, that he was en route to that.  Let me back up.  I apologize. Before we got to that part, he said he walked outside to act like he's going to smoke a cigarette, but really just grabbed the phone and smoked a cigarette

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 73

also.  And then called the police to report the burglar.

Q.      Anything else he told you?

A.      Not that I recall.  Let me take that back. After the bite, then I got his information.

Q.      No, no, I'm not talking about -- I'm talking about -- we're talking about the information you had at the time you released the dog.

A.      Okay, yes.  Then that's all I really remember, just that he was woken -- the key points would be that he was woken up.  He could see a hand in the closet.  Then he came outside and called 911.  Or called the police department.

Q.      Did you -- this noise, was he more specific about the noise that he heard that woke him up?

A.      Not that I can remember, no.

Q.      Do you recall him telling you that there was somebody knocking on the door?

A.      I don't recall that.

Q.      You didn't see that in the video?

A.      Not that I remember, no.

Q.      Well, that would be significant, wouldn't it?

A.      It would be.  I don't recall him.

Q.      Most burglars don't knock on the door, do

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 74

Walter Pettaway vs Nicholas D. Barber, et al.                    Nicholas D. Barber
                                                                        9/3/2021

Q.        With those exceptions, does it look like --
does that look like a fair and accurate depiction of
the house?

A.        Yes, minus the fire damage and the boards.

Q.        Right.  Okay.  Do you have any idea how
small a house that was, square footage?

A.        No.

Q.        Can you approximate it from that or not?

A.        Maybe 1000, 1100 maybe.

Q.        I think I've seen some reference to 900
square feet earlier, 900 and some change maybe.  Would
that be within the range of what you think that might
be accurate?

A.        Yes, close enough.  Mine is a guess, so.

Q.        I'm going to show you also what's been
marked as Plaintiff's Exhibit 3.

            (Plaintiff's Exhibit 3 was

             marked for identification.)

Q.        You went inside the house, correct?

A.        Correct.

Q.        And I know you were only in there one -- no,
you were in there twice, I suppose, right?

A.        Correct.

Q.        Came in and went and came out and came in
and went in again, correct, that night?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 81

Walter Pettaway vs Nicholas D. Barber, et al.                              Nicholas D. Barber
                                                                                   9/3/2021

A.          Yes.  And that was when I went to lift the
bed up as best I could.

Q.          Do you remember him telling you he's
bleeding?

A.          I don't remember that.

Q.          You didn't remember him telling you that
he's bleeding?

A.          No.

Q.          Do you remember him saying that more than
once?

A.          No, I don't.

Q.          Do you remember effusively praising your
dog?

A.          That was a normal praise.

Q.          I didn't ask you what's normal or what isn't
normal.  Do you remember repeatedly praising your dog?

A.          Yes.

Q.          Good boy, good boy, good boy, good boy.  You
said that 15 or 20 times, didn't you?

A.          I don't remember how many times.

Q.          You don't think that it was that many?

A.          I'm saying I can't --

Q.          I know you didn't count them.  Do you recall
that that's in the ballpark -- that's an
approximation?  You said it that many times?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 113

Walter Pettaway vs Nicholas D. Barber, et al.                          Nicholas D. Barber
                                                                              9/3/2021

When you release a dog off the leash, you lose a degree of control, don't you?

MR. EAST:  Object to the form.

A.      Yes, a degree.

Q.      The only practical way that you can control the dog after he's off leash is by your verbal commands, and then you actually having to physically wrestle the dog off or choke him off, correct?

A.      Correct.

Q.      Okay.  This dog didn't respond to verbal commands, did it?

MR. EAST:  Object to the form.

A.      No, he does.

Q.      Why did you choke him off rather than simply tell him to -- is the signal to release "af liggen"?

A.      "Af liggen" is dual purpose,

Q.      I'm sorry?

A.      Yes, it is, but it also means down.

Q.      Okay.

A.      So, the -- choking off is a much quicker, more efficient way as opposed to --

Q.      Well, I would differ with you.  I think that was the only way to get this dog off of him.  He wasn't going to release him if you just stood there and yelled af liggen at him for a week, would he?

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

A.        No, sir.

Q.        So, I think that -- do you read Chief Finley as saying that neither you, nor the other police officers out there, were required to provide first aid to Mr. Pettaway?

A.        Correct.

Q.        Do you read that that way also?

A.        Yes, sir.

Q.        And do you agree with Chief Finely about that, that you had no obligation to do that under the policies and procedures of the Montgomery Police Department at the time?

A.        It's really -- I mean, I don't make policy. However, I'm also not trained in --

Q.        To give medical care?

A.        To give medical care.  And then if I were to do that, then I run the risk of doing -- making something worse.

Q.        I'm going to ask we strike that answer as nonresponsive.

I'm simply asking you, Chief Finley says that neither you, nor any other policeman under there, under City of Montgomery Police Department policy and procedure at the time, that y'all didn't have any obligation to provide medical care or first aid to

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 146

Walter Pettaway vs Nicholas D. Barber, et al.                    Nicholas D. Barber
9/3/2021

A.        Yes.

Q.        -- of Mr. Pettaway?

          This is when he's lying -- he was
unconscious in the room where the attack had occurred,
correct?

          MR. EAST:  Object to the form.

A.        I don't know if he was unconscious or not,
but he was in the same room, yes.

Q.        Did you speak with him?

A.        No, I don't believe.

Q.        Did you see him move while he was in there
-- while you were in there?

A.        I don't recall seeing him move.

Q.        Was he lying on his side?

A.        Yes, I believe so.

Q.        Are these some of the -- you see there?  Are
those some of the supplies that were -- over on the
left side of the screen, some of the building supplies
that were in the house?

A.        I see it, yes.

                    (Video playing.)

Q.        This is just prior to you taking the
photograph?

A.        Yes, I believe so.

Q.        Does he appear unconscious to you?

Walter Pettaway vs Nicholas D. Barber, et al.                    Nicholas D. Barber
                                                                        9/3/2021

A.        I don't really have a way of knowing.

Q.        Okay.  I want to ask you about this.  You take the photograph here.  I'll show you the photograph.

                    (Video playing.)

Q.        Did you hear what you said?

A.        "Awesome."

Q.        Yes, sir.  What did you mean?

A.        Just something I say, like good deal or awesome or okay.  If someone asks me -- I'll give you a random example.  Someone tells me, I came back from lunch, I'll say "Awesome."

Q.        Let me show you another clip.

                    (Video playing.)

Q.        Do you recognize your voice in there?

A.        I do.

Q.        Okay.  Somebody asks, "Did you get a bite?" And you sort of sounded like you were sort of strutting, "Sure did, haha."

          MR. EAST:  Object to the form.

Q.        Is that accurate?

A.        That's what I said, yes.

Q.        I'll show you another clip here.

          What I'd like for you to do -- on this clip, if you can, there's some police officers that speak.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 158

PROPERTY OF
ALABAMA LAW ENFORCEMENT AGENCY

USCA11 Case: 25-10676   Document: 31-1   Date Filed: 06/20/2025   Page: 184 of 216



| Case Number: 1803000004SI | Date: 7/8/2018 |

Location: 3809 Cresta Circle, Montgomery, Alabama 36108

Kitchen

Master Bed Room

Living room

Storage Room

N

3800 Blk of Cresta Circle

PLAINTIFF'S
EXHIBIT
3
BARBER

Created using ScenePD.  Licensed customer ALABAMA PUBLIC SAFETY DATA/INFORMATION SYSTEMS          Page 2 of 2

076 Pettaway v. Barber and Green

# DOCKET 379-3

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WALTER PETTAWAY, *as Administrator* *the Estate of Joseph Lee Pettaway, deceased,* | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 2:19-CV-00008 |
| NICHOLAS D. BARBER, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## NOTICE OF CONVENTIONAL FILING UNDER SEAL

COME NOW the Defendants and give notice of the filing as Exhibit 3 to Defendants City of

Montgomery, Ernest Finley, Nicholas Barber, Michael Green, Ryan Powell, Bianka Ruiz, Justin

Thrasher, Joshua Smith, Keiundra Watts, and Neal Flournoy's Evidentiary Submissions in Support of

Motion for Summary Judgment, which exhibit is a full, complete, unedited copy of the video recording

made by the body camera of Nicholas Barber, as a conventionally filed exhibit under seal in accordance

with the Court's prior Protective Orders regarding this video recording.

Respectfully submitted this the 5th day of October, 2022.

/s/ Allison A. Ingram
ALLISON A. INGRAM (ASB-6024-F68A)
C. WINSTON SHEEHAN, JR. (SHE013)
*Attorney for Defendants, City of Montgomery,*
*Ernest Finley, Michael D. Green, Joshua T. Smith,*
*Keiundra Watts, Ryan Powell, Nicholas D. Barber*
*and Bianka Ruiz*

**OF COUNSEL:**

BALL, BALL, MATTHEWS & NOVAK, P.A.
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
ALA@ball-ball.com
wsheehan@ball-ball.com

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on October 5, 2022, the foregoing has been served upon the following by electronic filing and notification through CM/ECF with United States District Court Middle District of Alabama:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

William Patton Gray , Jr
Gray & Associates LLC
3500 Blue Lake Drive; Suite 455
Birmingham, AL 35243
wpg@grayattorneys.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

               */s/ Allison A. Ingram*
               OF COUNSEL

# DOCKET 379-4

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WALTER PETTAWAY, *as Administrator*        )
*the Estate of Joseph Lee Pettaway*, *deceased*,        )
                                        )
    Plaintiff,                       )
                                        )
vs.                                     )        Case No. 2:19-CV-00008
                                        )
NICHOLAS D. BARBER, *et al.*,           )
                                        )
    Defendants.                     )

## NOTICE OF CONVENTIONAL FILING UNDER SEAL

COME NOW the Defendants and give notice of the filing as Exhibit 4 to Defendants City of Montgomery, Ernest Finley, Nicholas Barber, Michael Green, Ryan Powell, Bianka Ruiz, Justin Thrasher, Joshua Smith, Keiundra Watts, and Neal Flournoy's Evidentiary Submissions in Support of Motion for Summary Judgment, which exhibit is a full, complete, unedited copy of the MPD Dispatch Log, as a conventionally filed exhibit under seal in accordance with the Court's prior Protective Orders regarding this video recording.

Respectfully submitted this the 5th day of October, 2022.

/s/ Allison A. Ingram
ALLISON A. INGRAM (ASB-6024-F68A)
C. WINSTON SHEEHAN, JR. (SHE013)
*Attorney for Defendants, City of Montgomery,*
*Ernest Finley, Michael D. Green, Joshua T. Smith,*
*Keiundra Watts, Ryan Powell, Nicholas D. Barber*
*and Bianka Ruiz*

**OF COUNSEL:**

BALL, BALL, MATTHEWS & NOVAK, P.A.
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680 - telephone
ALA@ball-ball.com
wsheehan@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2022, the foregoing has been served upon the following by electronic filing and notification through CM/ECF with United States District Court Middle District of Alabama:

Griffin Sikes, Jr.
Post Office Box 11234
Montgomery, AL 36111
sikeslawyer@gmail.com

H.E. Nix, Jr.
7515 Halcyon Pointe Drive
Montgomery, AL 36117
cnix@nixattorney.com

William Patton Gray , Jr
Gray & Associates LLC
3500 Blue Lake Drive; Suite 455
Birmingham, AL 35243
wpg@grayattorneys.com

John David Norris
Norris & Rankin LLC
2410 Cobbs Ford Road
Millbrook, AL 36054
norrisj@bellsouth.net

Rebecca L. Chambliss
Chambliss Law
P.O. Box 241726
Montgomery, AL 36124
rebecca@chambliss.law

Stacy L. Bellinger
City of Montgomery Legal Dept.
Post Office Box 1111
Montgomery, Alabama 36101-1111
sbellinger@montgomeryal.gov

/s/ Allison A. Ingram
OF COUNSEL

2

# DOCKET 379-5

# EXHIBIT 5

# In The Matter Of:

# Walter Pettaway vs Nicholas D. Barber, et al.

---

Sgt. Michael D. Green

*August 11, 2021*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
8/11/2021

A.      Correct.

Q.      What were the numbers of police officers going to do, in your view?

A.      In my view on my way there is to set the perimeter.

Q.      And that's it?

A.      Correct.

Q.      How did you -- you had not arrived on scene, right?

A.      At --

Q.      At this point 2:46:35.

A.      Yes, sir.

Q.      And you didn't know what the layout of the property was, correct?

A.      Correct.

Q.      You didn't know what the house looked like, correct?

A.      Correct.

Q.      You didn't know what the configuration of the inside of the house was, right?

A.      Correct.

Q.      Didn't know how many rooms it had, right?

A.      Right.

Q.      You didn't know really whether anyone was permanently living in the house, did you?

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
8/11/2021

Q.        So, would those be called assistant chiefs
or deputy chiefs?

A.        They would, but they are titled as chief.

Q.        Okay, okay.  So, Ernest Finley was the chief
of police --

A.        Correct.

Q.        -- at this time, July 8, 2018, correct?

A.        Yes, sir.

Q.        Do you recall who the chief of operations
was?

A.        I don't know.

Q.        Who is it now?

A.        It's either Chief Reeves.  If not, Chief
Dean.

Q.        Before you give an order, for example, that
the K-9 go into the house and apprehend the person
inside, do you have to clear that with anybody?

A.        No, sir.

Q.        Did you determine that the K-9 should go
into the house?

A.        Did I make the decision for him to go inside
the house?

Q.        Yes.

A.        I could ask him to go inside the house.

Q.        Did you ask him to go inside the house?

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
8/11/2021

A.      Yes.

Q.      And that was Barber, correct?

A.      Correct.

Q.      All right.  Did you ask him to go inside the house when you spoke with Barber on the phone before he arrived?

        Did you speak with Barber on the phone before he arrived?

A.      No, sir.

Q.      So, when did you first ask Barber to go into the house?

A.      After I got permission from Mr. Jones.

Q.      If you and Barber disagreed about whether the dog should go in the house, who had the right to control that decision?

A.      That's his dog.  He makes that call if he's going to send his dog in or not.

Q.      Okay.  Was there any other dog handler on scene that night?

A.      Not that -- not that I recall.

Q.      Was there any other police dog on scene that night?

A.      No, sir.

Q.      If there had been another handler, dog handler, on scene that night and with a police dog,

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
                                                                      8/11/2021

inside.

Q.        And so, why did you make that decision?
What was the basis of that decision?

A.        Once again, there's no power inside the
home.

Q.        I don't understand why that would matter.

A.        It matters.  Once you go inside the home,
and there's no power and you have someone in the
middle of the road telling you it's a possibility
someone is inside the house, we're going in with our
guns drawn to make sure whoever's inside don't hurt
us.  I'd rather for a dog to go in versus three to
four officers going in inside a house with no power
and one of us get hurt, if not killed.

Q.        So, you did not ask Barber to apprehend
anybody?  You just said, Please take your dog in; is
that right?

A.        Incorrect.  After I got permission from the
homeowner, I asked Barber could he take his dog in.

Q.        Right.  I wasn't talking about the order of
events.  I was talking about what the event was and
what you said.

          You didn't ask Barber to apprehend a
suspect.  You asked Barber to take the dog inside?

A.        Correct.

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
8/11/2021

Q.      But the -- so, look at the bottom line --

A.      Uh-huh.

Q.      -- of Plaintiff's Exhibit 3 Finley and read it to me.

A.      Part C here (indicating)?

Q.      Yes.

A.      "Medical aid is to be rendered only by those trained and that are certified in the render of aid."

Q.      And you just said you that none of you in the Montgomery Police Department are trained?

A.      No, sir.  I said we are trained in basic CPR through the academy class.

Q.      What is CPR?

A.      CPR is basically a first aid.

Q.      CPR relates to the heart, right?

A.      Yes, sir.

Q.      Okay.  It relates to pushing down on the chest and breathing in somebody's mouth to try to keep them breathing, correct?

A.      Yes, sir.

Q.      It doesn't involve stopping the flow of blood from an artery, does it?

A.      No, sir.

Q.      Isn't it correct that the Written Directive and policy, as testified to by Chief Ernest Finley,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 137

Walter Pettaway vs Nicholas D. Barber, et al.                     Sgt. Michael D. Green
8/11/2021

was that only a trained and/or certified police

officer or other could render aid?

A.       Yes.

Q.       That's right.  And, Sergeant Green, tell me

who out there at the scene rendered medical aid or

first aid to Joseph Lee Pettaway.

A.       Once the medics got there, they attempted to

render him first aid.

Q.       Tell me who -- tell me which police officers

on the scene on July 8, 2018 at 3809 Cresta Circle

attempted to stop Mr. Pettaway's bleeding.

A.       No one stopped -- tried to stop it.  Like I

said earlier, no one knew where he was bleeding from.

Q.       Tell me -- and no one checked to try to

determine where he was bleeding from, right?

A.       Correct.

Q.       So, tell me what officer, police officer of

the City of Montgomery on scene at 3809 Cresta Circle

on July 8, 2018, made any attempt to medically assist

Mr. Pettaway.

         MR. EAST:  Object to the form.

A.       No one tried to give him any medical

attention.

Q.       So, let me ask you this.  Has the policy

changed?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 138

Walter Pettaway vs Nicholas D. Barber, et al.                    Sgt. Michael D. Green
8/11/2021

assumptions as to what charges might be preferred, if any, right?

A.      Can't say what they were thinking.  I don't know.

Q.      I'm sorry?

A.      I can't say if they were saying that amongst themselves or thinking that.  I don't know.

Q.      Well, they were your crew, right?

A.      Correct.

Q.      But you don't know -- I mean, nobody out there had any particular or specific charge in mind when -- or before the dog went into the house, correct?

        MR. EAST:  Object to the form.

Q.      That's what you've been saying.  I mean, I'm just trying to capsulize it.

A.      Well, we got there on the scene, we're not thinking about what particular charge is going to be. I mean, don't get me wrong.  We have a little common sense.  We're already saying, Okay, if anybody in there, we know it's going to be a burglary charge.  We do know that.  But we're not sitting around saying it's going to be A, B or C.  We're not saying that.

Q.      Well, do you really know that even?  Because isn't it possible that the person inside the house did

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 187

# DOCKET 379-6

# EXHIBIT 6

Case 2:19-cv-00008-ECM-JTA Document 379-6 Filed 10/05/22 Page 2 of 9

USCA11 Case: 25-10676 Document: 31-1 Date Filed: 06/20/2025 Page: 205 of 216

**In The Matter Of:**

**Walter Pettaway vs Nicholas D. Barber, et al.**

_____

Lieutenant James Ezell, Jr. - Vol. I

*July 30, 2021*

_____

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Case 2:19-cv-00008-ECM-JTA Document 379-6 Filed 10/05/22 Page 2 of 9

USCA11 Case: 25-10676 Document: 31-1 Date Filed: 06/20/2025 Page: 205 of 216

Walter Pettaway vs Nicholas D. Barber, et al.                    Lieutenant James Ezell, Jr. - Vol. I
7/30/2021

A.        Because -- I know you've never seen a police
dog bite a person.  I've seen many --

Q.        I haven't.

A.        -- many, of them.  And when people are bit
by a dog, they don't just sit still and quiet, okay?

Q.        Uh-huh.

A.        In training, when we call a dog off, we say,
stand still, don't move, auf liggen.  That means stand
still and don't move.  Auf liggen means down.  Auf
liggen is the command for the dog -- the dog can't
down if he's still biting, right?  So, auf liggen
means release the bite and down, okay.  We do that in
training.  In a real bite scenario where a person is
being bitten, they don't stand still.

Q.        They can't, can they?

A.        They are in pain.  And we don't call a dog
off because that person -- if you call the dog off and
then -- the person's first inclination is usually to
try to run, kick at the dog, get away, escape, which
will result in a re-bite, more injuries.

Q.        Is that the full explanation --

A.        Unless you have more questions.

Q.        -- why it's safer for the dog to be choked
off than to be called off?

A.        That's my explanation of why.

Walter Pettaway vs Nicholas D. Barber, et al.                    Lieutenant James Ezell, Jr. - Vol. I
7/30/2021

criminals.  That's not the case, is it?

MR. EAST:  Object to the form.

A.       They are not convicted criminals.

Q.       I mean, the officer in this situation didn't know one way or the other whether somebody was in the house; if so, who it may have been; if so, what age they were; if so, what activities they were conducting inside the building, and certainly didn't know whether the person had committed a crime; isn't that right?

MR. EAST:  Object to the form.

A.       That's not right.

Q.       Why is it not right?

A.       The officer, just like any other crime that is reported that the officer does not witness, has relied on witnesses who are reporting the said crime. At approximately 2:40 in the morning, someone comes into your window while you're in the house asleep, you've got to assume they are probably not coming in to make Sunday lunch.

Q.       So, you assume the worst?

A.       You -- probably have nefarious intentions.

Q.       But isn't it correct that there are circumstances that are not nefarious where things like that happen?  Somebody comes into the house while somebody else is asleep, like a situation where a

# In The Matter Of:

# Walter Pettaway vs Nicholas D. Barber, et al.

---

Lieutenant James Ezell, Jr. - Vol II

*August 30, 2021*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Walter Pettaway vs Nicholas D. Barber, et al.          Lieutenant James Ezell, Jr. - Vol II
                                                                              8/30/2021

or whatever it may be.  He can't be looking for a bite suit or an exposed sleeve, which we don't use.  And that's the reason why.  Because nobody -- no criminal I've seen on the street is wearing a bite suit or an exposed sleeve.

Q.      Right.

A.      So, we're teaching the dog to fight the man, not the equipment.

Q.      How do you do that?  I mean, what -- from a practical standpoint, how do you do that?

A.      There's lots of different ways to do it. One -- one of my favorites is to put the dog in a muzzle, have a decoy where a bite suit top -- just place it over their shoulders, don't put their arms in it, hold the bite suit top.  The handler gives his warnings.  The decoy doesn't listen and takes off running.  The dog sees that.  The handler then gives the command and sends the dog for a bite.

Q.      What command are you talking about?

A.      "Voran."

Q.      "Voran," what does that mean?

A.      That just means apprehend.

Q.      Apprehend?

A.      Yes.

Q.      Is it with a "B" or a "V" as in victory?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 242

when the handler knows that the dog has apprehended a subject in the residence, what must he do?

A.        At the point that the handler hears or sees an apprehension, it's time to make their way to that area.  And that doesn't mean throw out all officer safety en route to that.

If the handler is -- saw the dog -- maybe the dog ran to the back of the residence and apprehended a subject, and the handler saw that the dog did not search each room on the way there.  The handler can't assume that that's the only person in the house.  So, he must tactically make his way to the site of the apprehension.

Q.        Okay.  And once the officer is at the site of the apprehension -- in this case, I think he was there at the time that the bite first occurred.  That your recollection?

A.        I don't remember --

Q.        Okay.

A.        -- if he was in the room with him or not when --

Q.        Okay.

A.        -- he got the apprehension.

Q.        All right.  So, tell me what a handler must do -- we're talking about a handler without backup

now -- what a handler must do after the bite has been applied to the subject.

A.        The handler should ensure that the person who's apprehended has no weapons.  So, it's going to necessitate that that handler be able to see both of the suspect's hands before any further steps.

Q.        Let's see.  Both of the subject's hands. Before anything else can be done?  Is that basically what you're saying?

A.        Yes.

Q.        Okay.  So, do you recall whether and, if so, when, Barber was able to see the subject's hands?

A.        I don't know exactly when Barber saw the subject's hands.  I know when -- around when I saw them in the video.

Q.        When did you see them?

A.        When he was completely out from under the bed.

Q.        And at that point, what must the handler do? He sees the subject's hands.  What must he do?

A.        I recommend that he handcuff the suspect before removing the dog so that if the person has weapons, they can't retrieve them while he is calling the dog off or choking the dog off and kill my handler.

weapons.  If the handler can determine that, then they wouldn't necessarily need to handcuff first.  So, the only situation I can foresee that would be if the suspect were naked.

Q.        All right.  How long in time should there be between the handler seeing the hands and the release of the bite?

A.        However long it takes the handler or the handler's partner to handcuff that subject and determine that they can't reach a weapon.

Q.        Would that amount of time be reduced if the handler has a backup?

A.        Not necessarily.

Q.        Explain that to me.

A.        I just can't say that it would reduce time to have the second person.  If the handler was efficient, he could just as quickly handcuff the suspect himself.

Q.        I mean, two people, both of whom are trained in canine use, both of whom know the procedures for the arrest of a subject or seizure of a subject or the biting of a subject by a canine, both of whom are in the room watching, would reduce the amount of time to handcuff the person or the subject, wouldn't they?

A.        I just answered not necessarily if the

# DOCKET 379-7

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| WALTER PETTAWAY, as Administrator of the Estate of Joseph Lee Pettaway, deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CASE NO. 2:19-CV-00008-ECM-JTA |
| NICHOLAS D. BARBER, et al. | ) ) | |
| Defendants. | ) ) | |

**AFFIDAVIT OF JIMMY D. EZELL, JR.**

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **COUNTY OF MONTGOMERY** | ) |

My name is Jimmy D. Ezell, Jr., and I am over nineteen (19) years of age. I make this Affidavit based upon my personal knowledge. I have been employed with the Montgomery Police Department since March 23, 2001. I am Police Lieutenant Commander of the Canine Bureau for the Montgomery Police Department ("MPD"), and it is in this capacity that I state the following:

1.  In a 2015 incident, I was present when police canine Niko was involved in an apprehension and arrest involving an individual suspected in a business burglary that had fled into a residence and was hiding behind a couch. Niko was sent into the residence where he located the suspect and held the bite onto the suspect's leg until the canine officer placed handcuffs on the suspect.

2.  At the time of his apprehension, the suspect had a gun and knife underneath his body, which he was attempting to grab.

3.      Had the officer handling Niko in the 2015 apprehension and arrest not handcuffed the suspect prior to Niko releasing his bite, the suspect could have reached for his weapons and injured or killed the Canine Officer or other officers nearby.

4.      I was aware of this prior 2015 incident and used it when training others at the Montgomery Police Department ("MPD") to emphasize the importance of handcuffing a suspect prior to ordering the dog to release its bite.

5.      Niko had not been trained to target any particular body part when making an apprehension; rather, he was trained to bite whatever body part that he first encountered.

6.      MPD has been using canine dogs since the 1960s, and to the best of my knowledge, no MPD canine dog had ever caused a fatal injury.

FURTHER AFFIANT SAYETH NOT

_____
Jimmy D. Ezell, Jr.

**STATE OF ALABAMA**                    )
**COUNTY OF MONTGOMERY**        )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that JIMMY D. EZELL, JR., whose name is signed to the foregoing and who is personally known to me having been placed under oath, acknowledged before me on this day that, being informed of the contents of the Affidavit, he executed the same voluntarily.

Sworn to and subscribed before me this 5th day of October, 2022.

_____
NOTARY PUBLIC

My Commission Expires: 11/23/2024

2